CHRISTOPHER E. PRINCE (SBN 183553)
  cprince@lesnickprince.com
MATTHEW A. LESNICK (SBN 177594)
  matt@lesnickprince.com
DEBRA E. CARDARELLI (SBN 272087)
  dcardarelli@lesnickprince.com
LESNICK PRINCE & PAPPAS LLP
315 W. Ninth Street, Suite 705
Los Angeles, CA  90015
Telephone:  (213) 493-6496
Facsimile:   (213) 493-6596

Proposed Attorneys for Debtor in Possession
Figueroa Mountain Brewing, LLC

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

NORTHERN DIVISION

| | |
|---|---|
| In re:<br><br>FIGUEROA MOUNTAIN BREWING, LLC,<br><br><br>                    Debtor in Possession. | Case No. 9:20-bk-11208-MB<br><br>Chapter 11<br><br>**DECLARATION OF JAIME DIETENHOFER IN SUPPORT OF FIRST DAY MOTIONS**<br><br>―――――――――――――――<br><br>[Hearing to be set by Court] |

## DECLARATION OF JAIME DIETENHOFER

I, Jaime Dietenhofer, declare as follows:

1.      I am a Managing Member and the Chief Executive Officer of Figueroa Mountain Brewing, LLC, the Debtor in the above-captioned bankruptcy case (the "Debtor" or "Fig Mountain").  I have personal knowledge of the facts set forth below and, if called, could and would competently testify as to these facts.

2.      On October 4, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  [Docket No. 1.]  The Debtor continues to operate and manage its affairs as Debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or committee has been appointed in the case.

## BACKGROUND

3.      Fig Mountain is a "craft beer" company founded by my father, Jim Dietenhofer, and me in 2010.[1]  Opening Fig Mountain was a dream come true for my father and me both, and it was something that we had talked about for years, as far back as the 1990s.  Founded as a single brewery, it has grown to four brewery-taprooms. Two other brewery-taprooms are operated by separate (non-debtor) affiliates using the Fig Mountain brand.

4.      My first serious exposure to craft beer was in college.  I went to Whitman college in Walla Walla, Washington.  At the time, the craft beer industry was still in its infancy.  Although Southern California had very few craft breweries, the Pacific Northwest was home to many of the country's best and most innovative small breweries.

---

[1] The term "craft beer" is not a legal term but rather a commonly used industry term without a universally agreed upon meaning. Most industry players would likely accept the Brewers Association's definition:  a company that makes beer that is small (making less than 6 million barrels of beer annually) and independent (less than 25 percent owned by a non-craft brewer). https://www.brewersassociation.org/statistics-and-data/craft-brewer-definition.

5.    As I was nearing my graduation from Whitman, I asked my father to help me start a brewery near our home in the Central Coast.  He refused, and he told me that he wanted me to continue my education.  I agreed, and I enrolled in a Master's degree program in Economics at UC Santa Barbara.

6.    As I was nearing graduation at UC Santa Barbara, I asked my father again, and he turned me down again, saying that he wanted me to get more experience in business.  I agreed, and in the year 2002, I graduated from Santa Barbara and moved to Los Angeles to start a custom garage improvement company, Garage Envy, Inc.

7.    Garage Envy was successful, but I had not given up on my dream of starting a brewery with my father.  If anything, running my own business gave me even more confidence that I could make it happen.  My father seemed to share my growing enthusiasm.  Over the next several years, we visited more than 140 breweries, talking to brewers and brewery owners about their successes and failures.  I spent countless hours drafting and revising business plans and business models.  We also developed our brand concept, deciding to name the brewery Figueroa Mountain -- after the locally-famous mountain we could see from our yard while I was growing up.

8.    In 2008, we decided to go for it.  We bought a building in Buellton and started construction.  Our timing was not ideal because the financial crisis started at almost the same time as construction.  But we overcame the challenges and opened our doors in 2010.

**Brewery Opens**

9.    When we opened, Fig Mountain was just a production brewery, manufacturing beer for wholesale.  But word spread quickly among the fast-growing population of craft beer aficionados, and soon a steady stream of craft beer fans started showing up at the brewery asking to taste our beer.  To serve this growing base of fans, we opened our first taproom (i.e., a retail location located on-site at the brewery).

3

10.    Fig Mountain started with a modest but adequate fifteen barrel brewhouse system with four fermentation tanks. With four tanks, Fig Mountain's maximum annual capacity was roughly 1,500 barrels (bbls), or about 345,000 bottles per year.

11.    We had initially planned to grow into our capacity over two years.  Instead, we maxed out in the first eight months.  We think our success is largely because of the quality of our product:  Fig Mountain is one of the most award-winning craft breweries in America, with more than 140 domestic and international awards.  We have won 24 awards at the Great American Beer Festival, more than any other brewery in the United States.

**Growing Pains**

12.    Over the years, Fig Mountain continued to grow rapidly, expanding capacity at its main facility and opening additional small production facilities with associated taprooms. In 2015, Fig Mountain entered into a tri-county (Santa Barbara, Ventura, San Luis Obispo) distribution agreement with Pacific Beverage Company, one of the premier craft beer distributors in California.  With the anticipated growth in orders from Pacific Beverage, Fig Mountain started a large expansion project at its main production brewery.  Our goal was to increase maximum annual capacity from 20,000 bbls to 110,000 bbls (i.e., from 4.6 million bottles to 25.5 million bottles).

13.    The expansion project was expected to take two years and cost approximately $4 million.  Ultimately, it took twice as long and cost twice as much.

14.    To finance the expansion, Fig Mountain took out a series of loans from Montecito Bank & Trust ("MB&T").  MB&T gave Fig Mountain an approximately $2.5 million line of credit in or about May 2015.  In April 2016, the term of the line of credit with MB&T was extended and the amount expanded to approximately $3.2 million.  MB&T filed a UCC-1 Financing Statement on May 20, 2015 covering "[a]ll Inventory, Chattel Paper, Accounts, Equipment, General Intangibles, Contract Rights and Deposit accounts."

15.     Breweries have high fixed costs and low marginal costs.  Real estate, startup construction costs, ongoing maintenance, equipment, fixed overhead, and production-independent payroll are significant portions of a brewery's cost structure.  On a per-unit basis, however, beer ingredients are relatively cheap.  The raw ingredients for a single 16-oz. pint of beer (water, yeast, malt, hops) are roughly $2.  At retail in a taproom, that same beer sells for $6 or more.  At the same time, the fixed costs to make any beer at all can easily exceed a million dollars.

16.     Given this basic cost structure, a brewery's profitability is highly dependent on its ability to generate sales near to its production capacity.  Broadly speaking, a brewery operating at one-third of its capacity or below will lose lots of money, and a brewery operating at two-thirds of capacity or above will make lots of money.

17.     The delays in the expansion (and cost overruns) put Fig Mountain in the worst possible position.  It had a 110,000 bbl cost structure with a 20,000 bbl production capacity.  Almost by definition, Fig Mountain could not operate profitably during this time.

18.     As a result, Fig Mountain fell behind on its obligations to MB&T, and MB&T issued a Notice of Default dated January 1, 2017.  Fig Mountain and MB&T have entered into a series of formal forbearance agreements which have now expired.  Separate from the formal forbearance agreements, MB&T has agreed to defer certain payments due to COVID-19.

### From Bad To Worse

19.     With the business coming under increasing financial pressure, my father and I searched for a variety of options to obtain additional financing or an equity investment to complete the expansion.  We found some assistance from Taylor Judkins, a local contractor who had recently purchased land adjacent to Fig Mountain's headquarters.  Mr. Judkins (directly and through his company, DTJ Development, LLC) agreed to make an equity investment and to replace the project's general contractor.  As the cost overruns continued, DTJ Development loaned Fig Mountain approximately $2.5

million to finance completion of the project.  To this day, the project is not fully completed.  The brewhouse is fully operational, so the brewery has significantly expanded capacity.  But certain improvements remain unfinished, such as installation of six additional fermentation and finishing tanks as well as electrical upgrades that would allow us to access municipal power (saving $250,000 per year in on-site generation costs).

20.    Unfortunately, dramatically expanding capacity did not solve Fig Mountain's financial problems: the MB&T loan was still in default, and the years of losses left Fig Mountain without enough operating capital to expand production.  Although the cost of ingredients for a single beer is small, when capacity reaches 110,000 bbls, those ingredients must be purchased by the truckload.  Fig Mountain was blessed with significant demand, and it had finally built out the brewery capacity to meet that demand, but now it didn't have enough money to make the beer.

21.    My father and I continued to look for someone to loan or invest money for operating capital.  I reached out to Todd Enright of White Winston Select Asset Funds in Boston, whom I had been introduced to several years earlier as a potential investor.  Mr. Enright told me that he could put together a plan to refinance the MB&T loan and provide operating capital.  At the time, he seemed knowledgeable about the industry and optimistic about Fig Mountain's prospects.

22.    Fig Mountain's outside counsel and I spent many months working out a term sheet for a refinancing of the MB&T loan and a working capital line of credit.  Mr. Enright met with us multiple times and also met with MB&T to negotiate a loan purchase agreement.

23.    Around this same time, my father was diagnosed with Non-Hodgkin's Lymphoma.  It was aggressive and incurable.  I spent the last month's of my father's life shuttling between the Santa Barbara cancer center and Fig Mountain headquarters,

hoping and praying that I could save my father's life and the business we had built together.

24.     My father died on July 20, 2019.  I was devastated and desperate to make some deal that would preserve his legacy.  Mr. Enright, despite repeated assurances over many months, never came through on his promises to refinance the MB&T loan. Instead, he proposed that White Winston give Fig Mountain a $750,000 bridge loan.  At the time, Mr. Enright and I both knew that this was not a sufficient amount of operating capital.  I estimated the company would need about $2 million, and I conveyed that to Mr. Enright.   And, of course, the bridge loan did nothing to address the MB&T loan default.  Mr. Enright assured me, however, that the bridge loan was merely an interim step on the way to a larger transaction.

25.     Mr. Enright flew to California around July 24.  We signed the loan documents on July 26, one day before my father's funeral.  The loan was secured by liens on substantially all of Fig Mountain's assets, though junior to MB&T on everything except inventory.  My mother and I also personally guaranteed the loan and pledged our membership interests in Fig Mountain as collateral.  I discovered later that White Winston had filed a UCC-1 financing statement with respect to Fig Mountain many months earlier.  I do not recall consenting to that filing.

26.     In hindsight, I believe that Mr. Enright never intended to refinance the MB&T loan and never intended to supply sufficient operating capital to the company.  I think he was taking advantage of my grief and desperation to gain leverage over the company and force it into bankruptcy for his own purposes.  At the time, however, I believed Mr. Enright's assurances, and I agreed to the White Winston terms.

### Todd Enright and White Winston Take Control

27.     Mr. Enright insisted that Fig Mountain hire him as a consultant, at a rate of $695 per hour, to try to help fix the company's financial situation.  In the guise of acting as a consultant, Mr. Enright installed two advisors in an operational capacity at the

company, Alan Newman (marketing) and Steve Hood (interim Chief Operation Officer). White Winston negotiated their compensation and directed Fig Mountain to pay it.  Mr. Newman and Mr. Hood worked with me and others at Fig Mountain to develop a business plan and financial model to establish the amount of working capital necessary to get Fig Mountain to a break-even point.

28.    Although this amount was developed in consultation with White Winston's own hand-selected personnel, White Winston never agreed to fund adequate operating capital.  Instead, White Winston consistently funded less than the amount required.  I now realize that this was intentional: Mr. Enright intended that the company always operate at the edge of insolvency so that he could extract ever more concessions from me and the company.

29.    During this time, White Winston exercised utter control over the company and its operations.  As a condition of the loan, White Winston opened a "lockbox" account at a bank in Boston, Boston Private.  White Winston maintained sole control over the account.  Our written agreement required White Winston to give us viewing rights, but White Winston never gave them to us.

30.    As a condition of the loan, White Winston required all payments from wholesale customers to go into the lockbox account.  At the time, White Winston allowed Fig Mountain to maintain separate bank accounts for our taprooms, i.e., retail sales. Generally, operating expenses (other than raw material expenses) were being paid from the taproom accounts.

31.    For raw materials purchases, White Winston required Fig Mountain to submit "drawdown requests" on a weekly basis.  White Winston would frequently refuse to fully fund drawdown requests.  Almost immediately, this caused serious problems for operations.  Because it takes several weeks to brew beer, a lack of raw materials and the inability to plan hindered Fig Mountain's ability to fulfill orders.

32.     In addition to its control over Fig Mountain's primary revenue (via the lockbox) and its purchase of raw materials (via drawdown requests), White Winston's consultants, Mr. Newman and Mr. Hood, were physically present at Fig Mountain headquarters. They made and enforced various operational changes in near daily consultation with Mr. Enright.  This included hiring and firing of personnel, budgeting, marketing decisions, package design and even altering the décor at Fig Mountain's taprooms.  Ultimately, White Winston also selected, recruiting and negotiated the compensation package of Fig Mountain's president.  As a practical matter, nearly every operational decision at Fig Mountain was made with Mr. Enright's knowledge and either explicit or tacit approval.

33.     By exercising operational control and keeping Fig Mountain on the edge of financial collapse, Mr. Enright extracted ever more concessions while also working behind the scenes to strengthen White Winston's leverage over the company.  In a series of transactions, White Winston purported to acquire several million dollars of Fig Mountain's unsecured debt while rolling it up into Fig Mountain's purported loan balance with White Winston.  Each time White Winston purported to acquire these unsecured debts and increase Fig Mountain's loan balance, White Winston would charge Fig Mountain exorbitant loan fees.  White Winston would also often demand that Fig Mountain and I sign a forbearance agreement purporting to waive a variety of rights and release any claims against White Winston for its prior conduct.

34.     In January 2020, Mr. Enright travelled to Buellton to meet with me and White Winston's on-site consultants.  He told me that he wanted Fig Mountain to file for bankruptcy.  I later saw on White Winston's list of charges that he had placed a $5,000 retainer with the bankruptcy firm of Levene, Neale, Bender Yoo and Brill, LLP.  I have never spoken with any attorney at that firm, but I presume that Mr. Enright wanted to select Fig Mountain's bankruptcy counsel to better control the bankruptcy process.

35.    I told Mr. Enright that I did not want the company to file bankruptcy at that time.  Mr. Enright told me I had no choice and that White Winston would no longer fund any company operations.  Shortly thereafter, White Winston stopped paying its on-site consultants, and they left the company.

36.    Not wanting to file for bankruptcy at that time, my mother loaned $400,000 into the busines to fund operations.

**Crisis Point**

37.    After the meeting in January, Mr. Enright became less communicative.  Prior to that meeting, I would receive multiple emails and/or phone calls from Mr. Enright every day; afterwards, for a period of time, I would only hear from him occasionally.

38.    Shortly before the COVID-19 lockdown began, Mr. Enright contacted me to find out whether we were going to file for bankruptcy.  When I told him about my mother's loan, he demanded that the amount be rolled into his loan balance.  He also contacted our largest customer, Pacific Beverage Distribution, and convinced them to pay in advance – with the money paid directly to White Winston.  White Winston would never release adequate funds for the company to generate positive cash flow.

39.    White Winston required the company to report its individual expenditures in advance.  Accordingly, Fig Mountain prepared weekly reports of checks to be written and transmitted them to Mr. Enright for approval.  White Winston then promised to fund Fig Mountain's expenses by transferring money from the lockbox account into an operating checking account at that same bank.

40.    I soon discovered, however, that Mr. Enright did not intend to honor his promise to fund normal operating expenses.  Soon, I discovered that checks which had been submitted to White Winston for approval would occasionally be returned for insufficient funds.  I was informed by Mr. Enright that he reserved the right to reject checks – even after they had already been issued – and even though they were for expenses required to operate the company and make beer.

41.    The company was in a downward spiral, and it fell further and further behind to its vendors and other creditors.  Then, the COVID-19 epidemic hit, and the State ordered all taprooms closed.

42.    After Congress passed the CARES Act, Fig Mountain applied for and received an approximately $900,000 PPP loan.  White Winston "swept" approximately $600,000 of PPP loan proceeds in June, despite repeated assurances from Mr. Enright that they would not do so.  Again, Fig Mountain found itself with no operating capital and at the mercy of White Winston.

43.    As he had done several times before, Mr. Enright contacted me and threatened the company, me, and my family with a variety of dire financial (and, in some instances, physical) consequences.  He demanded that I sign another forbearance agreement that did nothing for Fig Mountain but contained clauses seeking to release White Winston and himself from all liability.  At that point, I realized that Mr. Enright would never permit the company to succeed, and I refused to sign the forbearance agreement.

44.    In response, on August 24, 2020, White Winston sued Fig Mountain, me, and my mother (as guarantors) in federal court in Boston for an alleged loan balance of over $9.5 million dollars.  Based on the company's reconciliations, at no point has the actual out-of-pocket loan balance exceeded $900,000.  After it swept Fig Mountain's PPP loan proceeds, White Winston had collected approximately $500,000 more than it had ever funded.

45.    Fig Mountain's entire business relationship with White Winston has lasted only slightly more than a year.  During that time, White Winston has charged Fig Mountain more than $1 million dollars in interest and fees.  It has also charged Fig Mountain an additional $1 million plus in legal fees and "consulting and monitoring" fees as well as reimbursement charges for Todd Enright's travel.  A notable example:  For a meeting in January 2020, White Winston charged Fig Mountain $2,000 for Mr. Enright's

airfare to LAX, $900 for Enright to be chauffeur-driven to Buellton, more than $1,800 for a one-night hotel stay at the Four Seasons in Los Angeles, over $900 for meals, more than $1,100 in "other" travel expenses, including a $700 charge for private car storage. The same night that Mr. Enright stayed at the Four Seasons, White Winston also charged Fig Mountain for a one-night stay at hotel in Connecticut plus $653 in meals.

**DIP Financing**

46.    To operate, Fig Mountain needs cash, but White Winston has made it abundantly clear that it will never allow Fig Mountain to obtain the cash necessary to operate.

47.    To operate and restructure its finances, Fig Mountain has negotiated a DIP Loan Agreement with Creekstone LLC, an investment vehicle for a fund based in New York.  The proposed DIP Loan would provide the Debtor with up to $1.4 million to be used for the Debtor's operations and expenses during the bankruptcy case.  The DIP Loan Agreement provides that the Debtor will request advances of funds from Creekstone as needed.

48.    The proposed DIP Loan will provide the Debtor with sufficient funds to pay its continuing expenses necessary for the operation of its business during the pendency of this case.  I believe that the interests of creditors and other parties in interest will be served under the DIP Loan.  Any debt incurred will be used to maintain business operations and pay costs associated with the bankruptcy case to enable the Debtor to reorganize and propose a plan that would offer creditors more than they would receive in a liquidation.

49.    The DIP Loan will provide new liquidity to the Debtor and will enable the Debtor to (a) minimize disruption to its business and ongoing operations, (b) preserve and maximize the value of the Debtor's estate for the benefit of all the Debtor's stakeholders, (c) avoid immediate and irreparable harm to the Debtor, its creditors, its business, its employees and its assets, and (d) permit the Debtor to propose a plan of

reorganization that will offer more to creditors than if the Debtor were to cease operating and liquidate.

50.     Such financing is the sole means of preserving and enhancing the Debtor's going-concern value.  Indeed, without the proposed DIP Loan, the Debtor will not be able to meet its direct operating expenses, including payroll, and the Debtor will suffer irreparable harm.

51.     The terms and conditions of the DIP Agreement, including the fees and expenses, are fair and reasonable and were negotiated by the parties in good faith and at arm's length.

52.     Creekstone has agreed to provide the financing without "priming" any pre-petition liens.  The DIP Loan proceeds will be secured by a first-priority lien on post-petition collateral and a junior lien on pre-petition collateral.

### The Debtor's Employees & Payroll Practices

53.     The Debtor employs approximately 77 individuals— 3 insider employees [me, Stephan Almaraz (the President), and Jen Pommier (the Controller)] and 74 non-insider employees, of which approximately 63 are paid on an hourly basis and 11 are salaried employees.  Many of these individuals have specific and hard-to-replace skills and knowledge of the Debtor's operations, and keeping them is essential to the Debtor's ability to operate its business as a going concern.

54.     The Debtor pays its employees twice a month.  It issues paychecks on the 20th for the pay period covering the 1st through the 15th of every month and on the 5th of the month for the pay period covering the 16th through the end of the prior month.  The total payroll for the period of September 16-30, 2020, that would customarily be paid on October 5, 2020 is approximately $110,000 for non-insider employees.

55.     In addition, the Debtor's employees have accrued varying amounts of pre-petition vacation and leave benefits.  None of the employees is owed more than $13,650 in pre-petition wages and benefits.

56.    Some of the payroll checks from the prior pay period have not cleared as of the Petition Date.

57.    In the highly competitive craft brewery business, Fig Mountain must maintain its specially trained and knowledgeable staff.  Fig Mountain must be able to pay employee wages and honor accrued vacation and benefits in the ordinary course of business, or the staff will almost certainly leave and find employment elsewhere. Moreover, even if Fig Mountain is able to replace any staff that leave, the turnover will almost assuredly have an impact on the service and quality associated with Fig Mountain's performance.  To maintain employee morale and to prevent employee attrition and the accompanying disruption to its business, Fig Mountain believes it must pay or honor its non-insider employees' pre-petition wage and vacation and leave benefits up to the amount authorized in Section 507.

58.    If the Emergency Motion of Debtor for Order Authorizing Debtor to Pay and Honor Prepetition Wages, Salaries and Other Compensation and Benefits is granted, the source of funds to be used to pay and/or honor the pre-petition wages and accrued vacation and leave benefits of the employees will be the DIP Loan.

**Taxes**

59.    In the ordinary course of business, the Debtor incurs certain tax liability, including for sales tax, payroll tax, state and federal beer manufacturing taxes, and property taxes.  Certain taxes attributable to the pre-petition period have accrued and will not come due or be processed until after the Petition Date.

60.    The Debtor collects sales taxes that are paid to the State of California on a quarterly basis and are due at the end of the month following the quarter.  Thus, sales taxes collected during the third quarter of 2020 in the amount of approximately $69,000 have not yet been paid to the State and will come due on October 31, 2020.

61.    The Debtor is also liable for federal beer manufacturing taxes paid to the Alcohol and Tobacco Tax and Trade Bureau (TTB) and state beer manufacturing taxes

paid to the California Department of Tax and Fee Administration (CDTFA).  Federal beer manufacturing taxes are collected monthly and come due on the 15th day after the end of every month.  Accordingly, beer manufacturing taxes for the month of September in the approximate amount of $9,000 are not yet paid and will come due on October 15, 2020.  State beer manufacturing taxes are paid on a quarterly basis and are due on the 15th day of the month following the quarter.  Thus, taxes for the third quarter of 2020 are due on October 15, 2020.  They are being reported and have not yet been paid.  They are anticipated to total approximately $32,000.

62.    Payroll taxes are paid at the time that payroll is processed on the 20th and 5th of every month.  Accordingly, payroll taxes associated with the pay period from September 16 to September 30th in the approximate amount of $110,000 for non-insider employees have not yet been paid.  Nor have taxes associated with the pay period of October 1 to October 15.

63.    Lastly, property taxes in the approximate amount of $120,000 for four properties owned by Fig Mountain will come due to the County of Santa Barbara in approximately June 2021.  A portion of the property tax liability will be attributable to the pre-petition period from July 1, 2020 to the Petition Date.

64.    Any failure to pay the taxes and fees could materially disrupt Fig Mountain's operations because the authorities may initiate audits, which would divert the company's attention away from business operations and a successful reorganization.  Further, the authorities could pursue other penalties, including fees, interest, or license revocation.

### Utilities

65.    Listed below are the names of the Utility Companies that are currently providing utility services to the Debtor, the type of utility services provided by the Utility Companies, the account numbers with the Utility Companies, and the amount of the

cash deposit proposed to be paid to each of the Utility Companies as adequate

assurance of payment:

| Utility Company | Service | Account No. | Proposed Cash Deposit |
|---|---|---|---|
| Pacific Gas & Electric | Electricity | 0809075473-3 | $5,845.95 |
| Pacific Gas & Electric | Electricity | 3244986606-3 | $1,425.16 |
| Pacific Gas & Electric | Electricity | 1253422886-6 | $3,445.92 |
| Pacific Gas & Electric | Electricity | 5424292423-8 | $841.60 |
| Pacific Gas & Electric | Electricity | 0226088516-1 | $2,599.31 |
| Southern California Gas | Gas | 10495093865 | $3,716.61 |
| Southern California Gas | Gas | 09953373470 | $102.58 |
| Southern California Edison | Electricity | 3-040-3454-58 3-040-3455-10 | $2,572.54 |
| City of Buellton | Water | 02-15700-005 02-15800-003 02-16500-003 02-16600-002 | $7,569.94 |
| Comcast | Internet | 8155700030227170 | $130.49 |
| Comcast | Internet | 8155700061441910 | $125.64 |
| Comcast | Internet | 8155700030225453 | $503.96 |
| Comcast | Internet | 8155700040227540 | $553.28 |
| Comcast | Internet | 8155700030213980 | $37.95 |
| COX Communications | Internet | 001-3011-027084201 | $732.19 |
| Waste Management | Trash | 18-29527-13003 | $359.69 |
| MarBorg Industries | Trash | 5-2289 0 | $283.12 |
| MarBorg Industries | Trash | 5-1399 8 | $930.93 |
| **TOTAL** | | | **$31,776.86** |

66.    The proposed cash deposit for each Utility Company represents the approximate average payment for the last 3 months for that particular utility.

67.    The source of the funds to be used to pay the proposed Cash Deposits to the Utility Companies will be the DIP Loan.  In addition to the Cash Deposits, the Utility Companies will be kept current on all post-petition amounts payable to such Utility Companies.

### Customer Obligations And Loyalty Programs

68.    Since opening its doors in 2010, the Debtor has sold Gift Cards in various amounts, starting at a minimum of $1, in the ordinary course of its business, that are valid toward future purchases at the brewery, website, or taprooms.  Customers can purchase Gift Cards by submitting a request at the following website https://figueroamountainbrewingco.alohaenterprise.com/memberlink/GiftCards.html, contacting the Debtor via telephone, or purchasing them in person.  Gift Cards have also occasionally been issued to customers based on customer service issues or as part of a promotion.  All Gift Cards are non-returnable and non-refundable.  The Gift Cards are sold to individual customers, and I believe that any particular Gift Card does not exceed $3,025 in value.  As of the Petition Date there is no more than approximately $20,000 worth of unredeemed Gift Cards outstanding.

69.    Fig Mountain also participates in an annual membership program called the "Mug Club" whereby members pay an annual fee to obtain certain discounts and other benefits (the "Mug Club Memberships").  For an annual fee of $150.00,  customers can become members of the "Mug Club" loyalty program, which entitles them to certain benefits, including $2 off mugs every Monday in the Fig Mountain taprooms, 15% off beer to-go orders and merchandise, specials around the time of a customer's birthday, and various other benefits, including occasional promotions exclusive to Mug Club members.  Membership fees for the Mug Club are paid to Figueroa Mountain Mug Club, LLC, a separate affiliate that operates a membership loyalty program for Fig Mountain

and its affiliate-owned taprooms.  Fig Mountain honors certain Mug Club member discounts and other privileges at its own taprooms.  Fig Mountain does not pay the Mug Club for operating the program, and the Mug Club does not pay Fig Mountain for honoring the discounts.  The loyalty program benefits Fig Mountain by creating customer loyalty and driving business.

70.    There are approximately 1,500 "Mug Club" members with current annual memberships, and the Debtor approximates that it provides approximately $15,000 worth of discounts through the Mug Club annually.

71.    Fig Mountain has received certain orders, for which customers have paid but which Fig Mountain has not yet fulfilled (the "Prepaid Orders").  Fig Mountain accepts orders for beer, including 6-packs, cases of beer, and special bottle packs, through its website, which are fulfilled via mail, typically within 3 days after the order is placed (the "Mail Orders").  Fig Mountain also sells beer to certain distributors, including Pacific Beverage, who prepay for product.  These pre-payments have been directed to White Winston, and we are in the process of reconciling payments with orders to determine whether any prepaid orders remain unfulfilled.

72.    The Gift Cards, Mug Club Memberships, and Mail Orders are to individuals for their personal consumption, and the Debtor believes the pre-petition obligations due to the customers on an individual basis will likely not exceed the individual priority amount of $3,025.

73.    The Debtor has honored the Gift Cards, Mug Club Memberships, and Prepaid Orders in the ordinary course of business, and their validity is expected and relied upon by the Debtor and its customers.  If the Debtor is unable to honor its obligations, the Debtor risks losing certain customers to its competitors, and it will suffer losses that could harm its prospects for a successful organization.  In the highly competitive brewery business, it is necessary for the Debtor to avoid alienating customers and to maintain customer loyalty.  In the modern day of social media,

customers dissatisfied with the service and quality can post harmful reviews that may cause additional damage to the Debtor and its reputation.  Honoring the Gift Cards, Mug Club Memberships, and Prepaid Orders, on the other hand, will help to ensure the success of the Debtor pending its reorganization and maximize the estate's assets to the benefit of its creditors.

**Extension of Time To File Schedules and Statement of Financial Affairs**

74.    I and other Fig Mountain staff have been working to compile and analyze information needed to complete the Schedules and Statement of Financial Affairs (together, "Schedules"), Fig Mountain needs additional time to complete the Schedules accurately. Although Fig Mountain is not an enormous company, it has a large number of creditors (which can be seen from the Mailing Matrix filed with the Petition).  At the same time, the company has only a few employees sufficiently familiar with the books and records to prepare the Schedules, address the company's business and financial issues and work on the first-day motions.  Most employees are involved with the production and sale of beer and operating the taprooms.

///

75.     The Debtor has been expending its resources and attention to prepare first day motions that were necessary for continuing its operations and avoiding irreparable harm to the estate, including a Motion to Approve Debtor In Possession Financing, a Motion Authorizing the Debtor to Pay and Honor Prepetition Wages, Salaries and Other Compensation, a Motion Authorizing the Debtor to Pay Certain Tax Claims in the Ordinary Course of Business, a Motion Authorizing the Debtor to Honor Certain Pre-Petition Obligations to Customers, and a Motion Authorizing the Debtor to Provide Adequate Assurance of Payment to Utility Companies.  The Debtor will also need to spend time preparing the 7-day package for the Office of the United States Trustee.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 5, 2020 at ___BUELLTON___, California.

Jaime Dietenhofer

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
Lesnick Prince & Pappas LLP, 315 W. Ninth St., Suite 705, Los Angeles, CA 90015

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF JAIME DIETENHOFER IN SUPPORT OF FIRST DAY MOTIONS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 10/05/2020, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Brian D Fittipaldi**    brian.fittipaldi@usdoj.gov
- **Christopher E Prince**    cprince@lesnickprince.com, jmack@lesnickprince.com;cprince@ecf.courtdrive.com
- **United States Trustee (ND)**    ustpregion16.nd.ecf@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*)10/05/2020, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**PERSONAL DELIVERY**
Honorable Martin R. Barash
21041 Burbank Blvd., Suite 342
Woodland Hills, CA 91367

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 10/05/2020 | Janet A. Mack | /s/Janet A. Mack |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.