1   EVE H. KARASIK (State Bar No. 155356)
    JULIET Y. OH (State Bar No. 211414)
2   LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
3   10250 Constellation Boulevard, Suite 1700
    Los Angeles, California 90067
4   Telephone: (310) 229-1234
    Facsimile: (310) 229-1244
5   Email:  EHK@LNBYB.COM; JYO@LNBYB.COM

6   JEFFREY D. STERNKLAR (Mass. State Bar No. 549561)
7   JEFFREY D. STERNKLAR LLC
    101 Federal Street, Suite 1900
8   Boston, Massachusetts 02110
    Telephone: (617) 207-7800
9   Facsimile:  (617) 507-6530
    Email:  JEFFREY@STERNKLARLAW.COM
10  (Pro Hac Vice Admission To Be Requested)

11  Counsel for White Winston Select Asset Funds, LLC
12

13              **UNITED STATES BANKRUPTCY COURT**

14              **CENTRAL DISTRICT OF CALIFORNIA**

15                   **NORTHERN DIVISION**

16
    In re:                              Case No. 9:20-bk-11208-MB
17
    FIGUEROA MOUNTAIN BREWING,          Chapter 11
18  LLC,
                                        **OPPOSITION TO EMERGENCY MOTION**
19          Debtor in Possession.       **OF DEBTOR FOR ORDER AUTHORIZING**
                                        **POSTPETITION DIP FINANCING UNDER**
20                                      **§ 364(c)(1), (2) AND (3)**
21
                                        [DECLARATION OF TODD M. ENRIGHT
22                                      FILED CONCURRENTLY HEREWITH]
23
                                        Hearing:
24                                      Date:  October 7, 2020
                                        Time:  2:30 p.m.
25                                      Place:  Courtroom "201" (ZoomGov)
                                                1415 State Street
26                                              Santa Barbara, California 93101
27
28

                                    1

1

# TABLE OF CONTENTS

I.    INTRODUCTORY STATEMENT ........................................................................ 2

II.   STATEMENT OF FACTS ................................................................................ 5

    A.    The White Winston Loan And The Debtor's Obligations Thereunder ...... 5

    B.    The Debtor's Defaults And Ensuing Litigation. ............................. 9

    C.    The Diversion, Dissipation And Concealment Of White Winston's
          Collateral By The Debtor And Jaime .............................................. 10

III.  ARGUMENT ............................................................................................. 14

    A.    The DIP Loan Provides Creekstone With A "Priming" Lien On White
          Winston's Collateral Without Offering Any Adequate Protection ............ 14

    B.    The Debtor Has Not Demonstrated That It Was Unable To Obtain
          Financing On An Unsecured Or Junior Secured Basis Or That The
          Terms Of The DIP Loan Are Fair, Reasonable And Adequate .................. 16

    C.    The Restrictions Placed On The Debtor Pursuant To The DIP Loan
          Agreement Are Unreasonable ......................................................... 18

    D.    The Debtor has Failed to Meet its Burden of Complying with
          Fed.R.Bankr.P. 4001(c)(2) ........................................................... 19

IV.   CONCLUSION ....................................................................................... 19

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Aqua Assoc.*,
    123 B.R. 192 (Bankr. E.D.Pa. 1991).................................................................16

*In re Crouse Group, Inc.*,
    71 B.R. 544 (Bankr. E.D.Pa. 1987)..................................................................16

**Federal Statutes**

11 U.S.C. § 361 ................................................................................................15

11 U.S.C. § 363 ..................................................................................................3

11 U.S.C. § 364 ..................................................................................................4

11 U.S.C. § 364(b) ............................................................................................16

11 U.S.C. § 364(c).................................................................................4, 16, 17

11 U.S.C. § 364(d) ...................................................................................... 4, 17

11 U.S.C. § 364(d)(1)...............................................................................3, 15, 16

11 U.S.C. § 552(b)(1)........................................................................................15

**Federal Rules**

Fed.R.Bankr.P. 4001(c)(2) ...............................................................................19

**Other State Statutes**

Uniform Commercial Code....................................................................................7

White Winston Select Asset Funds, LLC ("White Winston"), a secured creditor of Figueroa Mountain Brewing, LLC, the debtor and debtor-in-possession in the above-captioned chapter 11 bankruptcy case (the "Debtor"), hereby respectfully submits this opposition to the *Emergency Motion Of Debtor For Order Authorizing Postpetition DIP Financing Under § 364(c)(1), (2) And (3)* [Doc. No. 9] (the "Motion").

**I.**

**INTRODUCTORY STATEMENT**

As of the Petition Date (*i.e.*, October 5, 2020), White Winston was owed more than $9,400,000 by the Debtor.[1]  The foregoing debt is noncontingent, liquidated and secured by a valid and properly perfected senior security interest and lien against substantially all of the Debtor's assets.  Although the Debtor has not submitted any information (much less evidence) regarding the value of the Debtor's assets, White Winston believes that the aggregate value of such assets totals less than $1,800,000.

Pursuant to the Motion, the Debtor seeks Court authority to obtain postpetition debtor-in-possession financing in a sum up to $1,392,673.94 (the "DIP Loan") from Creekstone Mountain LLC ("Creekstone").

---

[1] The Debtor has indicated in its Voluntary Petition that it is electing to proceed as a small business debtor under Subchapter V of chapter 11 of the Bankruptcy Code.  For a debtor to qualify as a Subchapter V debtor, the debtor must have aggregate noncontingent liquidated secured and unsecured debts (excluding debts owed to insiders or affiliates) totaling $7,500,000 or less. While it is unclear how much total debt the Debtor contends it has from the Debtor's filings to date, the secured debt currently owed by the Debtor to White Winston alone exceeds $9,400,000.

Conservatively, White Winston estimates that the Debtor has total debts of at least $20 million, comprised of (i) secured debt owed to White Winston of more than $9,400,000, (ii) debts to Montecito Bank & Trust Co. of approximately $3,500,000, (iii) third party accounts payable (the Debtor represented to White Winston that it owed $4,636,679 as of June 9, 2020, pursuant to the payables schedule it provided to White Winston showing the Debtor's payables in excess of $10,000, a true and correct copy of which is attached as **Exhibit "V"** to the Declaration of Todd M. Enright filed concurrently herewith), (iv) unpaid taxes of approximately $1,700,000; (v) approximately $1,000,000 in PPP loan debt from a lending institution, (vi) approximately $300,000 owed to a private lender, (vii) approximately $250,000 owed to the seller of a taproom location owned by the Debtor, and (viii) at least $375,000 owed to various judgment creditors and "payday" lenders from whom the Debtor obtained funding in its downward spiral.  Based on the foregoing, the Debtor does not qualify as a Subchapter V debtor.  White Winston intends to file a separate motion in this case to contest the Debtor's election to proceed under Subchapter V.

1    Although the Debtor states in the Motion that it is not seeking to "prime" any existing lien,

2    the DIP Loan Agreement reflects otherwise.  The post-petition assets against which Creekstone is

3    proposed to receive a first-priority lien appear to include White Winston's collateral (*e.g.*,

4    accounts receivable and rights to payment of money), and would therefore confer upon Creekstone

5    a lien which "primes" the lien currently held by White Winston against such collateral to the

6    extent such accounts receivable and rights to payment of money are collected or received by the

7    Debtor post-petition.  Based on the foregoing, the Debtor is required to provide White Winston

8    with adequate protection in accordance with 11 U.S.C. § 364(d)(1).  However, the Debtor does not

9    offer – or even discuss – adequate protection in its Motion.  The Motion must therefore be denied.

10    The Debtor contends that the DIP Loan will enable it to pay its operating expenses,

11    preserve its business and on-going operations, and permit it to propose a plan of reorganization

12    that will offer more to creditors than if the Debtor were to cease operating and liquidate.

13    However, the Debtor fails to demonstrate the reasonableness or adequacy of the DIP Loan when

14    (i) Creekstone is not obligated to provide any advances beyond an "Initial Advance" of $250,000,

15    (ii) the Debtor has sought Court authority to pay more than $350,000 of expenses (including

16    payroll, taxes, and utility deposits) during the first few weeks of this bankruptcy case, which the

17    Initial Advance will not be able to cover in full, (iii) the Debtor is not seeking Court approval to

18    use cash collateral,[2] and (iv) the Debtor has not submitted an operating budget to demonstrate

19    whether the proceeds of the DIP Loan alone (if approved) will be sufficient to enable the Debtor to

20    continue operating its business through the conclusion of its bankruptcy case.  Under the express

21    terms of the DIP Loan Agreement, Creekstone may decline to provide the Debtor with any

22    financing beyond the Initial Advance of $250,000, in which event the Debtor is simply delaying

23    (rather than preventing) the cessation of its business only long enough to allow the Debtor to pay

24    [2] The Debtor's existing cash and cash generated postpetition from prepetition accounts
receivable are White Winston's cash collateral. White Winston does not consent to the use of its
25    cash collateral. Furthermore, the Debtor provides no evidence (let alone any argument) that it will
provide adequate protection for White Winston for the use of its cash collateral as required by
26    Bankruptcy Code section 363. Pursuant to Bankruptcy Code section 363(p), the Debtor has the
burden to demonstrate that White Winston is adequately protected. The Debtor has failed to meet
27    this burden and the Debtor should not be permitted to use White Winston's cash collateral.

28

1    its legal fees, employee wages, payroll taxes, sales taxes, and other expenses for which the

2    Debtor's principals may potentially be personally liable.

3        The reasonableness of the proposed DIP Loan is further called into question since the

4    Motion is devoid of any information about the efforts that the Debtor made to identify and secure

5    post-petition financing.  Although the Debtor and its principal conclude (without any evidence)

6    that the Debtor is unable to obtain financing strictly on an unsecured basis, the Debtor does not

7    explain how it reaches that conclusion.  Without the foregoing information, it is impossible to

8    make a finding that the Debtor was unable to obtain financing on an unsecured and/or junior

9    secured basis, as required by 11 U.S.C. § 364(c)-(d).  Similarly, the Motion lacks any information

10   about how and to what extent the terms of the DIP Loan were negotiated with Creekstone.

11   Without such information, it is difficult (if not impossible) for this Court to make a finding about

12   the fairness and/or reasonableness of the DIP Loan terms.

13       Finally, the DIP Loan Agreement includes unreasonable restrictions which prevent the

14   Debtor from obtaining post-petition financing on a secured or administrative super-priority basis

15   and/or seeking to sell all or any portion of the Debtor's assets outside the ordinary course of

16   business, without Creekstone's prior written consent (which consent may be withheld by

17   Creekstone in its sole and absolute discretion).  The restriction on the Debtor's ability to obtain

18   post-petition financing is particularly troubling since Creekstone may refuse to provide the Debtor

19   with any financing beyond the Initial Advance of $250,000, in which event the Debtor will very

20   likely need post-petition financing from another lender, and may only be able to obtain such

21   financing on a secured or administrative super-priority basis.  The Debtor's statutory ability to

22   obtain necessary financing and/or to sell its assets should not be controlled by Creekstone,

23   particularly since Creekstone (like any other creditor or party in interest in the Debtor's case) has

24   the right to object to any proposed new financing and/or sale after notice and a hearing, and is

25   sufficiently protected as a result thereof.

26       Based on the foregoing, the Debtor has failed to meet the standards for approving post-

27   petition financing under 11 U.S.C. § 364.  The Motion should therefore be denied.

28

## II.

## STATEMENT OF FACTS

**A.**    ***The White Winston Loan And The Debtor's Obligations Thereunder.***

1.    On or about February 11, 2020, Jaime, as President of the Debtor, executed and delivered a Terms Letter to White Winston, a true and correct copy of which is attached as **Exhibit A-1** to the Declaration of Todd M. Enright filed concurrently herewith (the "Enright Declaration") and incorporated herein by this reference.  The Terms Letter set forth the basic terms of the transactions between and among White Winston and the Debtor that were to follow. Pursuant to the last sentence of paragraph 14(f) of the Terms Letter (at 13), the Debtor authorized White Winston "to file UCC-1 financing statements . . . ***upon the Parties' execution of this Letter.***" (emphasis added).  The Terms Letter was amended on July 16, 2019 (as modified, a true and correct copy of the amended Terms Letter is attached as **Exhibit A-2** to the Enright Declaration).  The amended Terms Letter has identical language in paragraph 14(f) authorizing White Winston to file the financing statement that in fact was filed.

2.    On or about July 26, 2019, White Winston and the Debtor executed a Loan Agreement (the "Original Agreement"), a true and correct copy of which is attached as **Exhibit "A-3"** to the Declaration of Todd M. Enright filed concurrently herewith (the "Enright Declaration") and incorporated herein by this reference.  Pursuant to the Original Agreement, White Winston agreed to make an interim bridge loan to be used for general working capital purposes in the original principal amount of $750,000 (the "Bridge Loan").

3.    Concurrently with the Original Agreement, on or about July 26, 2019, the Debtor executed and delivered to White Winston a Secured Promissory Note ("Bridge Loan Note") in the original principal amount of $750,000 for the Bridge Loan.  A true and correct copy of the Bridge Loan Note is attached as **Exhibit "B"** to the Enright Declaration and incorporated herein by this reference.

4.    On or about July 26, 2019, the Debtor executed and delivered a security agreement (the "Security Agreement") to White Winston, a true and correct copy of which is attached as **Exhibit "C"** to the Enright Declaration and incorporated herein by this reference.  Pursuant to the

Security Agreement, the Debtor granted White Winston a security interest in and to substantially all of the Debtor's assets. Pursuant to sections 1 and 6 of the Security Agreement, White Winston's security interest secured all "Obligations" defined as "all of the indebtedness, obligations and liabilities of [the Debtor] to [White Winston], individually or collectively, whether direct or indirect, joint or several, absolute or contingent, due or to become due, now existing or hereafter arising under or in respect of the [Original Agreement], the [Bridge Loan] Note, [the] Security Agreement or any other Loan Document or any other instruments or agreements executed and delivered pursuant to the foregoing or in connection therewith."

5.     Also on or about July 26, 2019, the Debtor executed and delivered to White Winston that certain Intellectual Property Security Agreement (the "**IP Agreement**"), a true and correct copy of which is attached as **Exhibit "D"** to the Enright Declaration and incorporated herein by this reference.

6.     Pursuant to the IP Agreement, the Debtor granted White Winston a lien in all right, title and interest of the Debtor in substantially all of the Debtor's intellectual property, including, without limitation, all of the Debtor's "Trademarks" (as defined in the IP Agreement).

7.     White Winston's security interest pursuant to the Security Agreement is senior to, and has priority over, any and all competing rights, claims, liens, and encumbrances in and to the Debtor's assets, except for a security interest (the "Bank Security Interest") granted to Montecito Bank & Trust Co. ("Montecito Bank"). Montecito Bank has contractually subordinated the Bank Security Interest to White Winston's security interest with respect to certain of the Debtor's assets and, therefore, White Winston's security interest is senior to the Bank Security Interest to secure White Winston up to the principal amount of $1,500,000 in those assets. White Winston believes that the foregoing assets have an aggregate value of less than $1,500,000 and, accordingly, White Winston's security interest in the Debtor's assets is senior to any and all competing claims, interests, liens and encumbrances, including, without limitation, those asserted by Montecito Bank.

8.     White Winston's security interest pursuant to the IP Security Agreement is senior to, and has priority over, any and all competing rights, claims, liens and encumbrances in and to

the Debtor's intellectual property, including the Debtor's Trademarks.

9.     White Winston's security interests pursuant to the Security Agreement and the IP Security Agreement are, and at all material times have been, properly perfected under the applicable provisions of the Uniform Commercial Code ("<u>UCC</u>"), including by the filing of the a UCC-1 financing statement.

10.     At certain times subsequent to July 25, 2019, the Debtor and the Debtor's principals, Jaime Dietenhofer and Judith Dietenhofer, requested that White Winston increase the amount of the Bridge Loan, including by refinancing pre-existing debt owed to third parties (including Taylor Judkins and his company).  Pursuant to such requests, (i) the parties amended the Bridge Loan Note and the Original Agreement by that certain Loan Modification Agreement dated as of November 12, 2019 (a true and correct copy of which is attached as **<u>Exhibit "E"</u>** to the Enright Declaration and incorporated herein by this reference), (ii) the parties further amended the Bridge Loan Note and the Original Agreement by that certain Second Loan Modification Agreement dated as of January 16, 2020 (a true and correct copy of which is attached as **<u>Exhibit "F"</u>** to the Enright Declaration and incorporated herein by this reference), and (iii) the parties further amended the Bridge Loan Note and the Original Agreement by that certain Third Loan Modification Agreement dated as of April 7, 2020 (a true and correct copy of which is attached as **<u>Exhibit "G"</u>** to the Enright Declaration and incorporated herein by this reference).

11.     The Obligations (as that term is defined below) owed by the Debtor to White Winston are comprised of multiple tranches.  First, White Winston advanced several millions of dollars of cash.  White Winston's records indicate that it collected approximately $1,800,000 in cash less than the amount of cash that it advanced.  Second, approximately $4,000,000 of the Obligations constitute pre-existing debts that the Debtor owed to third parties.  At the Debtor's request, White Winston essentially "refinanced" this indebtedness, and provided the Debtor with incentives (in the form of discounted payoffs) for prompt payment.  The "refinancing" occurred through an assignment of the preexisting debt to White Winston, which White Winston essentially paid for by giving the creditors a participating interest in the Obligations.  Although the Debtor ultimately did not take advantage of these incentives, White Winston nevertheless provided

1  substantial value and consideration to the Debtor when it agreed to refinance this indebtedness.

2      12.    Pursuant to the Loan Modification Agreement, the principal amount of the Bridge

3  Loan was increased to $6,250,000.  Pursuant to the Second Loan Modification Agreement, the

4  principal amount of the Bridge Loan was further increased to $8,000,000.  Pursuant to the Third

5  Loan Modification Agreement, the principal amount of the Bridge Loan was further increased to

6  $10,500,000.  As amended, the amounts due under the Bridge Loan Note as modified by the Loan

7  Modification Agreement, the Second Loan Modification Agreement and the Third Loan

8  Modification Agreement, including, without limitation, interest, costs, fees (including attorney's

9  fees) and other charges due thereunder and under applicable law are referred to herein as the

10  "Obligations.").

11      13.    Jaime Dietenhofer (individually and on behalf of the James and Judith Dietenhofer

12  Family Trust (the "Trust")) and Judith Dietenhofer (on behalf of the Trust) each executed and

13  delivered a written guaranty to White Winston, whereby each unconditionally guaranteed the

14  faithful payment and performance by the Debtor of its Obligations to White Winston.  True and

15  correct copies of the guaranties delivered by Jaime and Judith (the "Guaranties") are attached as

16  **Exhibit "H"** and **Exhibit "I,"** respectively, to the Enright Declaration and incorporated herein by

17  this reference.

18      14.    White Winston is informed and believes that the capitalization of the Debtor

19  consists of 23,000,000 Series A Common Units and 2,000,000 Series B Common Units.  Judith

20  and Jaime, as trustees of the Trust, and Jaime, individually, each are record holders of 9,000,000

21  "Series A Common Membership Units" of the Debtor ("Series A Units").  Judith and Jaime, as

22  trustees of the Trust, and Jaime, individually, each are record holders of 864,130 "Series B

23  Common Units" of the Debtor ("Series B Units" and with the Series A Units, the "Units").  White

24  Winston is informed and believes that the holders of the Series A Units are entitled to vote on

25  account of all matters upon which the members of the Debtor are entitled to vote, and holders of

26  Series B Units have no voting rights. Jaime, individually and as trustee of the Trust, and Judith, as

27  trustee of the Trust, each executed and delivered to White Winston a "Securities Pledge

28  Agreement" dated as of November 12, 2019, whereby each of Jaime (individually and as trustee of

1  the Trust) and Judith (as trustee of the Trust) pledged to White Winston a continuing security

2  interest in all of their respective shares in the Debtor ("Units") to secure their obligations under

3  their respective guaranties.  True and correct copies of the executed Securities Pledge Agreement

4  delivered to White Winston by Jaime and Judith are attached as **Exhibit "J"** and **Exhibit "K,"**

5  respectively, to the Enright Declaration and incorporated herein by this reference.

6       15.     White Winston's pledge and security interest in and to the Units held by Jaime and

7  Judith are and at all material times have been valid, enforceable, perfected and senior to any and

8  all competing interests, claims, liens and encumbrances in and to such Units.

9       16.     The principal amount of the Obligations and accrued interest totaled $9,465,740.58,

10  as of September 30, 2020.  Interest has continued to accrue, and will continue to accrue, pursuant

11  to the Loan Documents until the Obligations are paid in full.

12       17.     As part of the loan arrangement, the Debtor agreed to establish certain accounts at

13  Boston Private Bank ("BPB") in Boston, Massachusetts.  The Debtor and White Winston

14  established a "Lock-Box Account" at BPB.  Under the Original Agreement among the Debtor,

15  Jaime, and White Winston and the Lock-Box Agreement (a true and correct copy of which is

16  attached as **Exhibit "L"** to the Enright Declaration), all of the proceeds of the Debtor's inventory

17  sales for cash, must be deposited into the Lock-Box Account.  The Debtor was required to "direct

18  every Customer, by writing . . . to send all payments . . . directly to White Winston for deposit into

19  the Lock-Box Account."  The Lock-Box Agreement (at paragraph 5) makes clear that the Debtor

20  "shall not, at any time, make any withdrawals from the Lock-Box Account, or have any access to

21  any of the sums. . . held therein" and that White Winston had "sole dominion, control of, and

22  unrestricted access to, the Lock-Box Account. . . ."

23       18.     The Debtor also established its operating account, referred to by the parties as the

24  "Control Account" at BPB.  As noted below, the Control Account is central to Jaime's diversion,

25  dissipation and concealment of White Winston's cash collateral.

26  **B.**     ***The Debtor's Defaults And Ensuing Litigation.***

27       19.     The Debtor defaulted on the Bridge Loan.  White Winston has taken a number of

28  steps to enforce its rights arising from the Debtor's default.  First, White Winston commenced the

civil action against the Debtor, Jaime and Judith numbered and styled <u>White Winston Select Asset Funds, LLC v. Figueroa Mountain Brewing, LLC, et. al</u>, civil action number 1:20-cv-11577 in the United States District Court for the District of Massachusetts (the "<u>MA Litigation</u>") on August 24, 2020.   The MA Litigation action remains pending.[3]   Second, White Winston has begun to foreclose on its pledge of the Units.  That foreclosure remains pending.  Third, White Winston has begun efforts to foreclose on its security interests in the Debtor's assets.  Those efforts remain pending, but are stayed as a result of the filing of the Debtor's bankruptcy case.

**C.**   ***The Diversion, Dissipation And Concealment Of White Winston's Collateral By The Debtor And Jaime.***

20.    Jaime and the Debtor have diverted White Winston's cash collateral from the Control Account and Lock-Box Account, have concealed the disposition and use of the diverted cash collateral, and have made numerous false statements and representations to White Winston that White Winston believes were fraudulent, all in an effort to address the Debtor's cash shortfalls.  This has occurred in at least the following respects:[4]

21.    Jaime and the Debtor diverted funds that were to be deposited into the Control Account (and thereafter swept into the Lock-Box Account) to a secret account that the Debtor maintained at Mechanics Bank (numbered *7136) (hereinafter, the "<u>Secret Account</u>").   White Winston does not have a security interest in and to the Secret Account.

22.    Among other sales, the Debtor sells beer to end users who pay by credit cards. Historically, the Debtor's credit card processor was I3 Verticals, LLC ("<u>I3</u>").  I3 regularly would deposit the net proceeds of credit card purchases it processed for the Debtor into the Control Account.

23.    Inexplicably,  for  reasons  still  not  explained  to  White  Winston,  I3  stopped

---

[3] The Bridge Loan documents among the Debtor, Jaime and Judith contain forum selection clauses mandating that litigation occur in the state of Massachusetts.

[4] White Winston's investigation of the fraudulent activities by the Debtor and Jaime is ongoing and, accordingly, White Winston reserves the right to supplement or modify its findings regarding this fraud as new facts emerge.

1   depositing funds into the Control Account.  As evidenced by the bank statement for the Control

2   Account for the month of September, 2020 attached as **Exhibit "M"** to the Enright Declaration,

3   the final deposit by I3 into the Control Account occurred on September 8, 2020.  Indeed,

4   subsequently, the Debtor overdrew the Control Account significantly, in large measure because it

5   concealed the fact that the I3 deposits stopped after September 8.  White Winston subsequently

6   covered the overdrawn amounts by additional advances on account of the Obligations.

7   Parenthetically, there are two "sweeps" of the Control Account into the Lock-box Account (for

8   $57,732.55 on September 9 and $42,858.74 on September 10), representing the Control Account

9   balances appearing on the statement for the immediately preceding day.  White Winston made

10   advances to the Debtor's payroll account at BPB that largely tracked these sweeps – White

11   Winston advanced $40,726.04 on September 8, $63,648.42 on September 9, and $19,571.30 on

12   September 10 into the payroll account, as evidenced by the payroll account statement for the

13   month of September, 2020, a true and correct copy of which is attached as **Exhibit "N"** to the

14   Enright Declaration and incorporated herein by this reference.

15        24.    The Debtor and Jaime made numerous false representations to White Winston to

16   cover up their diversion of White Winston's cash collateral.  Indeed, White Winston was not told

17   that I3 stopped depositing money into the Control Account.  Noticing the large overdraw in the

18   Control Account, White Winston sent an e-mail on September 15, 2020 to Jaime (a true and

19   correct copy of which is attached as **Exhibit "O"** to the Enright Declaration and incorporated

20   herein by this reference) advising (on page 2) that White Winston was "trying to get visibility on

21   the large [overdraft] at [BPB] and requesting documentation and information to help explain why

22   the overdraft occurred (it should not have occurred if I3 had not stopped depositing cash into the

23   Control Account).  Rather than disclose that I3 had stopped depositing money, Jaime instead

24   dissembled, and promised by e-mail on September 15 to get White Winston the requested

25   information "ASAP."

26        25.    Days went by, and White Winston did not receive the promised information from

27   the Debtor or Jaime.  On September 18, 2020, Jenn Pommier, the chief financial officer for the

28   Debtor, sent White Winston an e-mail (a true and correct copy of which is attached as **Exhibit "P"**

to the Enright Declaration and incorporated herein by this reference) disclosing that I3 was holding funds in the amount of $96,580.08.  On that same day, September 18, Ms. Pommier sent White Winston another e-mail (a true and correct copy of which is attached as **Exhibit "Q"** to the Enright Declaration and incorporated herein by this reference), a copy of which e-mail allegedly was sent to "Jasmine" who White Winston believes is an individual employed at I3.  The e-mail represents that [White Winston] would like to have the funds [from I3] deposited into the [Control Account]" and asks Jasmine "[h]ow soon will that be possible to initiate?"  Ms. Pommier continued to create the false appearance to White Winston in that e-mail that the diversion of I3 funds was simply an error that would be quickly rectified.

26.    In point of fact, the "error" was never rectified.  The funds from I3 were never returned to the Control Account.  White Winston later was informed by I3 that a few days later, on September 22, I3 deposited $75,513.00 into the Secret Account.  Neither I3, the Debtor nor Jaime has accounted for or turned over to White Winston either these or any other funds after the last deposit by I3 into the Control Account on September 8, 2020.  White Winston repeatedly asked Jaime and the Debtor to rectify the overdraft, including in an e-mail that was sent to Jaime on September 24, 2020 (a true and correct copy of which is attached as **Exhibit "R"** to the Enright Declaration and incorporated herein by this reference), asking him to call because the overdraft remained.  Jaime continued concealing his diversion of these funds in his September 24 responsive e-mail (at the top of **Exhibit "R"** to the Enright Declaration).  White Winston expressed frustration with Jaime's dissembling in a further e-mail dated September 24, 2020 (a true and correct copy of which is attached as **Exhibit "S"** to the Enright Declaration), in which White Winston noted to Jaime that "[t]his has all the hallmarks of a check kiting scheme."  Jaime tried to further conceal his diversion of White Winston's collateral by claiming, falsely, that "the [I3] funds are in the account" and that the press of other business was too much to enable Jaime to provide truthful information or rectify his diversion of White Winston's collateral.  Inconsistently, on September 29, 2020, Jaime sent White Winston an e-mail (a true and correct copy of which is attached as **Exhibit "T"** to the Enright Declaration and incorporated herein by this reference) in which he dropped all pretense of claiming he had provided all requested information (he had not),

1    and instead claimed that he "assumed [reporting] was not necessary since [White Winston] would

2    not be funding [due to the Debtor's default and diversion of funds]." Subsequently, Mechanics

3    Bank agreed to freeze the funds in the Debtor's accounts, including the Secret Account, as

4    Mechanics Bank apparently realized that Jaime was improperly moving money among accounts,

5    including the Secret Account, in an effort to conceal those funds from White Winston.

6        27.    The foregoing sequence of events demonstrates that (i) I3 last deposited funds in

7    the Control Account on September 8, (ii) Jaime and the Debtor created a false impression that they

8    were rectifying the overdraft caused by the termination of deposits into the Control Account by I3,

9    (iii) Jaime and the Debtor were diverting this cash – White Winston's cash collateral – and

10    concealing this diversion through intentionally false and misleading statements to White Winston,

11    made to White Winston with the intent that White Winston rely on them. Consequently, White

12    Winston has not been told how much of its cash collateral has been diverted, where it has been

13    diverted to, how much, if any, has been consumed or used in operations or otherwise transferred to

14    third parties, and whether any of the diverted cash collateral remains intact for collection by White

15    Winston.

16        28.    White Winston is very concerned that its collateral position is declining if the

17    diverted funds are being consumed by the Debtor in operations. On September 22, 2020, White

18    Winston sent an e-mail to, among others, Jaime (a true and correct copy of which is attached as

19    **Exhibit "U"** to the Enright Declaration and incorporated herein by this reference) explaining its

20    analysis of the Debtor's operations. As Jaime was informed in that e-mail, the Debtor has a

21    "negative margin." This means that it costs more for the Debtor to produce in direct costs (*e.g.*,

22    grain, hops, packaging, labor, and variable utilities) than in receives in sales for those products—

23    in short (and not considering any other costs of overhead costs including rent, payroll, insurance,

24    or the millions of dollars it takes to operate the Debtor each year), the Debtor is not profitable and

25    on information and belief is losing is excess of $300,000 per month. The value of White

26    Winston's accounts receivable and inventory (sold to generate these accounts receivable and

27    cash), therefore, inevitably is declining. White Winston is unable to confirm the magnitude of this

28

1    reduction in value of its collateral because the Debtor has failed to provide any information

2    regarding its assets and liabilities.

3                                                    **III.**

4                                              **ARGUMENT**

5    A.    ***The DIP Loan Provides Creekstone With A "Priming" Lien On White Winston's***

6          ***Collateral Without Offering Any Adequate Protection.***

7          The Debtor states in the Motion that Creekstone will receive a "first-priority lien on all

8    post-petition assets (which are currently unencumbered), and a junior lien on all prepetition

9    assets." *See* Motion p. 3, lines 5-7.  However, the post-petition assets against which Creekstone is

10   proposed to receive a first-priority lien appear to include White Winston's collateral, and would

11   therefore confer upon Creekstone a lien which "primes" the lien currently held by White Winston

12   against such collateral.

13         As reflected in the Security Agreement between the Debtor and White Winston (a copy of

14   which is attached as Exhibit "C" to the Enright Declaration), White Winston holds a security

15   interest in "all personal property of the Debtor of every kind and nature, whether tangible or

16   intangible, including without limitation all goods (including inventory, equipment and any

17   accessions thereto), instruments (including promissory notes), documents, ***accounts*** (including

18   insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-

19   credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other

20   investment property, supporting obligations, any other contract rights or ***rights to the payment of***

21   ***money***, insurance claims and proceeds, and all general intangibles (including all intellectual

22   property and payment intangibles)."  *See*, Security Agreement, Section 2(a) (emphasis added).

23   Accordingly, White Winston's collateral includes the Debtor's pre-petition accounts receivable

24   and rights to the payment of money which may ultimately be collected post-petition.

25         However, the DIP Loan Agreement effectively provides Creekstone with a first-priority

26   lien which "primes" White Winston's existing lien against the Debtor's pre-petition accounts

27   receivable and rights to the payment of money to the extent such accounts and rights are collected

28   or received by the Debtor post-petition.  Specifically, section 1.b of the DIP Loan Agreement

                                                    14

1 provides that Creekstone will receive a "first priority lien on any and all post-petition assets,

2 including but not limited to inventory, ***accounts receivables, cash and cash equivalents***,

3 equipment, merchandise, real and intellectual property and all other tangible and intangible assets

4 of [the Debtor] and the estate....***collected, generated or in any way received on or after the***

5 ***commencement of the Bankruptcy Case [and all proceeds]***..., which shall be senior in all

6 respects to any other creditor of Debtor[.]"  *See* DIP Loan Agreement, Section 1.b (emphasis

7 added).

8     First, proceeds from the sales of existing inventory are subject to White Winston's security

9 interest, even if those proceeds are generated by postpetition sales.  11 U.S.C. §552(b)(1).  The

10 Debtor clearly contemplates it will sell existing inventory to generate these proceeds, and proposes

11 to pledge them as collateral to Creekstone.  Second, since the Debtor's accounts receivable and

12 rights to the payment of money existing as of the Petition Date constitute White Winston's

13 collateral, and the proposed DIP Loan Agreement provides Creekstone with a first priority

14 "priming" lien on such assets to the extent they are collected post-petition, the Debtor must

15 provide White Winston with adequate protection in accordance with 11 U.S.C. § 364(d)(1).

16     11 U.S.C. § 364(d)(1) provides that the Court may authorize a debtor to obtain credit or

17 incur a debt secured by "a senior or equal lien on property of the estate that is subject to a lien only

18 if … (B) there is adequate protection of the interest of the holder of the lien on the property of the

19 estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  The

20 Bankruptcy Code notes that adequate protection may be provided to a secured creditor like White

21 Winston by, among other things, requiring the Debtor to make a cash payment or periodic cash

22 payments and/or providing an additional or replacement lien to the extent that there is a decrease

23 in the value of the secured creditor's interest in such property.  11 U.S.C. § 361.

24     The Debtor does not offer – or even discuss – adequate protection in its Motion.  In

25 addition, the Debtor has failed to submit a proposed operating budget as part of the Motion (or any

26 of its other first-day pleadings) so it is not clear whether the Debtor intends to make any loan

27 payments or adequate protection payments to White Winston.  11 U.S.C. § 364(d)(1) requires that

28 a debtor provide adequate protection to a lienholder whose interest in property of the estate is

1    being primed in favor of a post-petition lender before the debtor may obtain such post-petition

2    financing.   Here, the Debtor has not offered any adequate protection to White Winston even

3    though White Winston's interest in its collateral is being primed in favor of Creekstone.   The

4    Motion should therefore be denied.

5    **B.**    ***The Debtor Has Not Demonstrated That It Was Unable To Obtain Financing On An***

6    ***Unsecured Or Junior Secured Basis Or That The Terms Of The DIP Loan Are Fair,***

7    ***Reasonable And Adequate.***

8        Two factors courts considered in determining whether to authorize post-petition financing

9    which contemplates the granting of a security interest in favor of the lender are (1) whether the

10   debtor is unable to obtain unsecured credit per 11 U.S.C. § 364(b), *i.e.*, by allowing a lender only

11   an administrative claim per 11 U.S.C. § 364(b)(1)(A); and (2) whether the terms of the transaction

12   are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the

13   proposed lender.  *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D.Pa. 1987); *see also In re*

14   *Aqua Assoc.*, 123 B.R. 192, 195 (Bankr. E.D.Pa. 1991).

15       If a debtor is seeking to grant a senior (priming) security interest and lien to a post-petition

16   lender, the Bankruptcy Code requires the debtor to demonstrate that it is unable to obtain such

17   credit otherwise.  11 U.S.C. § 364(d)(1)(A).  Even if a debtor is seeking to grant a junior (non-

18   priming) security interest and lien to a post-petition lender, the debtor must still demonstrate that it

19   was unable to obtain credit on an unsecured basis.  11 U.S.C. § 364(c).

20       Here, the Motion is devoid of any information about the efforts that the Debtor made to

21   identify and secure post-petition financing.  Although the Debtor and its principal conclude in the

22   Motion that the Debtor is unable to obtain financing strictly on an unsecured basis, the Debtor

23   does not explain how it reaches that conclusion.  There is no evidence submitted regarding (i) who

24   the Debtor reached out to and/or spoke to regarding post-petition financing, (ii) what financing

25   terms, if any, the Debtor was offered by potential lenders, (iii) whether any potential lenders

26   offered more money and/or a lower interest rate than Creekstone is offering, and (iv) how the

27   Debtor concluded that the financing offered by Creekstone was the best available option.  Without

28   the foregoing information, it is impossible to make a finding that the Debtor was unable to obtain

1  financing on an unsecured and/or junior secured basis, as required by 11 U.S.C. § 364(c)-(d).

2       In addition, the Debtor has failed to demonstrate that the terms of the proposed DIP Loan

3  are fair, reasonable and adequate, given the circumstances of this bankruptcy case.  Although the

4  Debtor indicates in the Motion that the terms of the DIP Loan were negotiated with Creekstone in

5  good faith and at arms' length, the Debtor provides no information about how and to what extent

6  the terms of the DIP Loan were negotiated.  Without such information, it is difficult (if not

7  impossible) for this Court to make a finding about the fairness and/or reasonableness of the DIP

8  Loan terms.

9       The Debtor argues in its Motion that the DIP Loan will enable the Debtor to meet its direct

10  operating expenses, "minimize disruption to its business and on-going operations," and "permit

11  the Debtor to propose a plan of reorganization that will offer more to creditors than if the Debtor

12  were to cease operating and liquidate."  *See* Motion, p. 4, lines 2-11.  However, the DIP Loan

13  Agreement appears to bind Creekstone to provide only the "Initial Advance" of $250,000, with

14  any additional advances to be approved at Creekstone's "sole and absolute discretion."

15  Accordingly, under the express terms of the DIP Loan Agreement, Creekstone may decline to

16  provide the Debtor with any financing beyond the Initial Advance of $250,000, in which event the

17  Debtor is simply delaying (rather than preventing) the cessation of its business only long enough

18  to allow the Debtor to pay its legal fees, employee wages, payroll taxes, sales taxes, and other

19  expenses for which the Debtor's principals may potentially be personally liable.

20       Since the Debtor has not submitted an operating budget with the Motion, it is unclear how

21  the proceeds of the DIP Loan (if approved) will be utilized and whether such proceeds will be

22  sufficient to enable the Debtor to continue operating its business through the conclusion of its

23  bankruptcy case.  However, based on the Debtor's other first-day motions, it appears that the

24  Debtor will easily go through the Initial Advance of $250,000 within the first few weeks of this

25  bankruptcy case, as demonstrated below:

26       • Payroll for September 16-30, 2020 (payable on October 5):        $110,000

27       • Payroll for October 1-15, 2020 (payable on October 20):        $110,000

28       • State beer manufacturing taxes (payable on October 15):        $ 32,000

|  |  |  |
|---|---|---|
| • | Collected sales taxes (payable on October 30): | $ 69,000 |
| • | Proposed utility deposits: | $ 31,777 |
|  | TOTAL: | $352,777 |

The Debtor has indicated in the Motion that the DIP Loan is "the sole means of preserving and enhancing the Debtor's going concern value" and the Debtor has not sought approval from this Court for the use of any cash collateral (and White Winston does not consent to the Debtor's use of its cash collateral). Given the foregoing, the Debtor has not demonstrated that the terms of the DIP Loan are fair, reasonable or adequate under the circumstances presented in this case. The Motion should therefore be denied.

**C.**     ***The Restrictions Placed On The Debtor Pursuant To The DIP Loan Agreement Are Unreasonable.***

Section 3 of the DIP Loan Agreement restricts the Debtor's ability to obtain post-petition financing on a secured or administrative super-priority basis without Creekstone's prior written consent (which may be withheld in Creekstone's "sole and absolute discretion"). This restriction is particularly troubling since Creekstone may refuse to provide the Debtor with any financing beyond the Initial Advance of $250,000 (again in Creekstone's "sole and absolute discretion"), in which event the Debtor will very likely need post-petition financing from another lender, and may only be able to obtain such financing on a secured or administrative super-priority basis. The Debtor's statutory ability to obtain necessary financing should not be controlled by Creekstone. In the event that the Motion is granted and the DIP Loan is approved, Creekstone's interests will be protected by the requirement for notice and a hearing prior to the approval of any new financing.

Section 3 of the DIP Loan Agreement also restricts the Debtor's ability to sell all or any portion of the Debtor's assets outside the ordinary course of business without Creekstone's prior written consent (which may be withheld in Creekstone's "sole and absolute discretion"). This restriction unreasonably impedes the Debtor's ability to administer its bankruptcy estate and gives Creekstone the potential power to dictate (or prevent) the Debtor's exit strategy in this case. The Debtor's statutory ability to sell its assets outside the ordinary course of business should not be controlled by Creekstone, particularly since Creekstone (like any other creditor or party in interest

1    in the Debtor's case) has the right to object to any bidding process or sale after notice and a

2    hearing.

3    **D.    _The Debtor has Failed to Meet its Burden of Complying with Fed.R.Bankr.P. 4001(c)(2)_**

4        Where, as here, the Debtor seeks emergency authorization to incur debt within 14 days of

5    the commencement of the case, Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure

6    limits the power of the Court to "authorize the obtaining of credit only to the extent necessary to

7    avoid immediate and irreparable harm to the estate pending a final hearing."  That same rule

8    provides that "[t]he court may commence a final hearing on a motion for authority to obtain credit

9    no earlier than 14 days after service of the motion."  The Debtor does not even pretend to meet its

10    burden of demonstrating how much credit, if any, it must obtain to avoid "immediate and

11    irreparable harm to the estate pending a final hearing."  If for no other reason, the Court should not

12    grant any interim authorization to obtain credit under these circumstances.

13    IV.

14    **CONCLUSION**

15        Based on the foregoing, White Winston respectfully requests that the Court enter an order

16    denying the Motion, alternatively granting White Winston adequate protection as required by the

17    Bankruptcy Code, and granting such other and further relief as the Court deems just and proper

18    under the circumstances of the Debtor's bankruptcy case.

19    October 7, 2020                         WHITE WINSTON SELECT ASSET FUNDS, LLC

20                                        _/s/ Juliet Y. Oh_

21                                         EVE H. KARASIK
                                         JULIET Y. OH

22                                         LEVENE, NEALE, BENDER, YOO
                                              & BRILL L.L.P.

23                                         -and-

24

25                                         Jeffrey D. Sternklar (Pro Hac Vice Requested)
                                         JEFFREY D. STERNKLAR LLC

26

27                                         Counsel for Secured Creditor,
                                         White Winston Select Asset Funds, LLC

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **OPPOSITION TO EMERGENCY MOTION OF DEBTOR FOR ORDER AUTHORIZING POSTPETITION DIP FINANCING UNDER § 364(c)(1), (2) AND (3)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **October 7, 2020**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Brian D Fittipaldi    brian.fittipaldi@usdoj.gov**
- **Eve H Karasik    ehk@lnbyb.com**
- **Matthew A Lesnick    matt@lesnickprince.com, matt@ecf.inforuptcy.com;jmack@lesnickprince.com**
- **Juliet Y Oh    jyo@lnbyb.com, jyo@lnbrb.com**
- **Christopher E Prince    cprince@lesnickprince.com, jmack@lesnickprince.com;cprince@ecf.courtdrive.com;hbaig@lesnickprince.com**
- **United States Trustee (ND)    ustpregion16.nd.ecf@usdoj.gov**

**2.  SERVED BY UNITED STATES MAIL**: On **October 7, 2020**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ *Service information continued on attached page*

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **October 7, 2020**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

***Served by Attorney Service***
Hon. Martin R. Barash
United States Bankruptcy Court
Central District of California
21041 Burbank Boulevard, Suite 342 / Courtroom 303
Woodland Hills, CA 91367

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| October 7, 2020 | Stephanie Reichert | */s/ Stephanie Reichert* |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.