EVE H. KARASIK (State Bar No. 155356)
JULIET Y. OH (State Bar No. 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email:  EHK@LNBYB.COM; JYO@LNBYB.COM

JEFFREY D. STERNKLAR (Mass. State Bar No. 549561)
JEFFREY D. STERNKLAR LLC
101 Federal Street, Suite 1900
Boston, Massachusetts 02110
Telephone: (617) 207-7800
Facsimile:  (617) 507-6530
Email:  JEFFREY@STERNKLARLAW.COM
(Pro Hac Vice Admission)

Counsel for White Winston Select Asset Funds, LLC

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### NORTHERN DIVISION

| | |
|---|---|
| In re:<br><br>FIGUEROA MOUNTAIN BREWING, LLC,<br><br>     Debtor in Possession. | Case No. 9:20-bk-11208-MB<br><br>Chapter 11<br><br>**NOTICE OF MOTION AND MOTION TO CONVERT DEBTOR'S CHAPTER 11 CASE TO CHAPTER 7; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[DECLARATION OF ROBERT P. MAHONEY AND APPLICATION FOR ORDER SETTING HEARING ON SHORTENED TIME FILED CONCURRENTLY HEREWITH]<br><br>Date:  [To be set]<br>Time:  [To be set]<br>Place:  ZoomGov |

1

1

**TABLE OF CONTENTS**

2

**MEMORANDUM OF POINTS AND AUTHORITIES** ....................................................**5**

3

**I.**    **INTRODUCTORY STATEMENT** ...............................................................**5**

4

**II.**    **STATEMENT OF FACTS** ...........................................................................**9**

5

   **A.**    **Background** ...................................................................................**9**

6

   **B.**    **The White Winston Loan And The Debtor's Obligations Thereunder** .....**10**

7

   **C.**    **The Debtor's Largely Unsuccessful Efforts To Obtain Use Of Cash Collateral Over White Winston's Objections And the DIP Financing** .....**16**

8

   **D.**    **The First Motion to Convert and the Second DIP Loan Motion** ...............**20**

9

10

   **E.**    **The Debtor's Performance in 2021** ....................................................**21**

11

   **F.**    **Creekstone/Dietenhofer Sale Process and Sale Motions** ...........................**23**

12

13    **III.**    **ARGUMENT** ...........................................................................................**27**

14

   **A.**    **There Is Cause To Convert Or Dismiss The Debtor's Case Due To The Continuing Loss To Or Diminution Of The Estate, The Absence Of A Reasonable Likelihood Of Rehabilitation, And the Biased and Unfair Sale Process Designed to Benefit Creekstone and the Debtor's Insider** ...........................................................................................**28**

15

16

17

   **B.**    **There Are No Unusual Circumstances Barring The Conversion Or Dismissal Of The Debtor's Case, And The Debtor Cannot Demonstrate A Reasonable Likelihood That A Plan Will Be Confirmed Within A Reasonable Period Of Time** .......................................**32**

18

19

20

   **C.**    **Conversion Of The Debtor's Chapter 11 Case Is In The Best Interests Of Creditors** .................................................................**33**

21

22    **IV.**    **CONCLUSION** ........................................................................................**35**

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Brutsche,*
   476 B.R. 298 (Bankr.D.N.M.2012) .......................................................................... 29

*In re Catalina Sea Ranch, LLC,*
   2020 WL 1900308 (Bankr. C.D. Cal. Apr. 13, 2020) .......................................... 30

*In re Citi-Toledo Partners,*
   170 B.R. 602 (Bankr. N.D. Ohio 1994) .................................................................. 28

*Clarkson v. Cooke Sales And Service Co. (In re Clarkson),*
   767 F.2d 417 (8th Cir. 1985) ................................................................................... 28

*In re Consolidated Loan Mtg. Entities,*
   248 B.R. 368 (9th Cir. BAP 2000) .......................................................................... 28

*Farmers Ins. Exch. v. RNK, Inc.,*
   632 F.3d 777 (1st Cir. 2011) ................................................................................... 14

*In re Fisher,*
   2008 WL 1775123 (Bankr.D.Mont.2008) .............................................................. 29

*In re Great American Pyramid Joint Venture,*
   144 B.R. 780 (Bankr. W.D. Tenn. 1992) ........................................................ 29, 30

*Hall v. Vance,*
   887 F.2d 1041 (10th Cir.1989) ................................................................................ 29

*In re Hinesley Family Ltd. Partnership No. 1,*
   460 B.R. 547 (Bankr. D. Mont. 2011) .................................................................... 32

*Koerner v. Colonial Bank (In re Koerner),*
   800 F.2d 1358 (5th Cir. 1986) ................................................................................. 27

*In re Picacho Hills Util. Co., Inc.,*
   518 B.R. 75 (Bankr. D.N.M. 2014) ......................................................................... 29

*In re SB Props. Inc.,*
   185 B.R. 198 .............................................................................................................. 29

*In re SGL Carbon Corp.,*
   200 F.3d 154 (3d Cir. 1999) .................................................................................... 27

*In re Sillerman*,
   605 B.R. 631 (Bankr. S.D.N.Y. 2019) ............................................................................... 29

*Stage I Land Co. v. U.S. Dept. of H.U.D.*,
   71 B.R. 225 (D. Minn. 1986) ............................................................................................. 29

**Other State Cases**

*Cormier v. Central Mass. Chapter of National Safety Council*,
   416 Mass. 286 (1993) ........................................................................................................ 14

*Crocker v. Townsend Oil Co., Inc.*,
   438 Mass. 592 (2003) ........................................................................................................ 14

*Sharon v. City of Newton*,
   437 Mass. 99 (2002) .......................................................................................................... 14

*White Winston Select Asset Funds, LLC v. Figueroa Mountain Brewing, LLC, et. al*,
   Case Number 1:20-cv-11577 ................................................................................... 2, 5, 15

**Federal Statutes**

11 U.S.C. § 363 ........................................................................................................... 30, 31

11 U.S.C. § 1104 ................................................................................................................ 29

11 U.S.C. § 1112 ............................................................................................. 2, 4, 5, 27, 32

11 U.S.C. § 1112(b) ........................................................................................... 27, 28, 29, 32

11 U.S.C. § 1112(b)(2) ................................................................................................. 32, 33

11 U.S.C. § 1112(b)(4) ................................................................................................. 27, 28, 29

11 U.S.C. § 1112(b)(4)(A) ..................................................................................... 3, 8, 28, 31

11 U.S.C. § 1112(b)(4)(B) ................................................................................................. 3, 8

**Other State Statutes**

Uniform Commercial Code ................................................................................................ 13

**Other Authorities**

Federal Rules of Bankruptcy Procedure 2004 ................................................................... 27

Federal Rules of Evidence 201 ............................................................................... 9, 10, 11

H. Rep. 595, 95th Cong., 1st Sess. 406 (1977) ................................................................. 27

Local Bankruptcy Rule 2081-1 ........................................................................................... 4

White Winston Select Asset Funds, LLC ("White Winston"), a secured creditor of Figueroa Mountain Brewing, LLC, the debtor and debtor-in-possession in the above-captioned chapter 11 bankruptcy case (the "Debtor"), hereby files this motion ("Motion") for the entry of an order converting the Debtor's Chapter 11 case to one under Chapter 7, pursuant to 11 U.S.C. § 1112.  The specific grounds for the Motion are set forth in detail in the Memorandum of Points and Authorities annexed hereto.

The Debtor has filed motions to engage two separate brokers, to approve bid procedures and a sale, and to preclude White Winston from credit bidding (collectively, the "Sale Motions"), which collectively purport to strip away White Winston's lien and create equity for the Debtor's principal, Jaime Dietenhofer, where none exists [Doc. Nos. 394, 396, and 397].  As set forth in detail in White Winston's oppositions to the Sale Motions (filed concurrently with this Motion), the Sale Motions propose an unfair and biased sale process with numerous "poison pills" to deter competitive bidding, designed to result in the Debtor's post-petition lender, Creekstone Mountain, LLC ("Creekstone"), acquiring the Debtor's assets using the financing funds as currency and retaining the Debtor's principal in a controlling capacity yet to be fully disclosed, and to raise funds to pay the Debtor's professionals.  The Debtor's proposed bid procedures provide for a truncated sale process based on sales efforts undertaken in 2019 and during the height of the pandemic, which are not reflective of today's market given the COVID-19 vaccines and the lifting of restrictions, do not require Creekstone to provide any deposit, permit Creekstone to credit bid $1.0 million in funds that have not been used by the Debtor, give Creekstone a very high break-up fee of almost 5% when it is not coming out of pocket any cash, preclude White Winston from credit bidding, and provide for incomprehensible treatment for the senior lenders Montecito Bank & Trust and White Winston.

As the Debtor itself acknowledges in the Sale Motions, it "sees no path to confirmation of a chapter 11 plan" [Doc. No. 396, p. 19, line 2].   In addition, that Debtor states that "because of the large priority tax claims, the Debtor believes it is unlikely that it could confirm a plan that would satisfy its obligation to pay those claims in full" [Doc. No, 396, p. 19, lines 4-6].  Yet nowhere does the Debtor meet its burden of demonstrating a sound business purpose of selling

substantially all of the Debtor's assets outside of a plan or outside of a chapter 7 liquidation. The Debtor's apparent approach is to stay in Chapter 11 to retain control and conduct an unfair sale process, and then when the sale closes to Creekstone, either dismiss or more likely convert the case to Chapter 7. White Winston believes there is no reason to keep the Debtor in Chapter 11 as it continues to run up administrative expenses that it cannot pay in the name of preserving nonexistent going concern value. The Court should reconsider a sale if one is proposed by a truly disinterested chapter 7 trustee, free from the infection of Jaime's animus towards White Winston. It is now time to appoint an independent fiduciary who can determine the resolution for the Debtor's bankruptcy case that is in the best interests of creditors and, if that resolution is a sale, conduct a sale in a fair and unbiased manner that maximizes value for the estate and all creditors.

Based on the foregoing and as set forth in detail in the attached Memorandum of Points and Authorities, there is cause which mandates the conversion or dismissal of the Debtor's bankruptcy case pursuant to 11 U.S.C. § 1112(b)(4)(A) and (B). It is implausible that the Debtor will be able to stem the continuing loss to and diminution of its estate, and the Debtor concedes that there is no reasonable likelihood of rehabilitation in the Debtor's case. Furthermore, there are no unusual circumstances to prevent the conversion or dismissal of the Debtor's case, particularly given that the Debtor has admitted that no plan can be confirmed in its case. Given this showing of cause, the conversion of the Debtor's case to Chapter 7 and corresponding appointment of a Chapter 7 trustee are the most efficient and cost-effective way to ensure an orderly wind-down of the Debtor's business operations and liquidation of the Debtor's assets. Accordingly, pursuant to this Motion, White Winston requests that the Court convert the Debtor's bankruptcy case to Chapter 7.

All three Sale Motions are currently set to be heard by the Court on April 19, 2021 at 10:00 a.m. Although White Winston prepared this Motion as quickly as possible after receiving notice of the Sale Motions, it was not able to prepare and file the Motion in time to have it heard on the same date and at the same time as the Sale Motions (particularly since the Sale Motions were filed on the evening of March 29, 2021, exactly 21 days before the scheduled hearing on such motions). It would make little sense and would potentially waste judicial resources for the Court to consider

approval of bidding procedures and/or a sale, or the employment of brokers, if the sale proposed by the Debtor is not permitted to proceed and the Debtor's bankruptcy case is ultimately converted to Chapter 7.  Accordingly, White Winston has filed an *ex parte* application concurrently with this Motion for an order setting a hearing on the Motion on shortened notice, **so that the Motion may be heard simultaneously with the Debtor's Sale Motions, on April 19, 2021 at 10:00 a.m.**[1]

The Motion is based upon Local Bankruptcy Rule 2081-1, 11 U.S.C. § 1112, this Notice of the Motion and Motion, the Memorandum of Points and Authorities annexed hereto, the Declaration of Robert P. Mahoney filed concurrently herewith, the entire record of the Debtor's bankruptcy case, the statements, arguments and representations of counsel to be made at the hearing on the Motion, and any other evidence properly presented to the Court at, or prior to, the hearing on the Motion.

**WHEREFORE**, White Winston respectfully requests that the Court enter an order:

1.    granting this Motion;

2.    converting the Debtor's Chapter 11 bankruptcy case to Chapter 7, effective immediately upon the entry of an order granting the Motion; and

3.    granting such other and further relief as the Court deems just and proper.

Dated: April 5, 2021          WHITE WINSTON SELECT ASSET FUNDS, LLC

                                          */s/ Eve H. Karasik*
                                          Eve H. Karasik
                                          Juliet Y. Oh
                                          LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
                                          -and-
                                          Jeffrey D. Sternklar (Pro Hac Vice Admission)
                                          JEFFREY D. STERNKLAR LLC
                                          Counsel for White Winston Select Asset Funds, LLC

---

[1] As an alternative, White Winston has filed a motion concurrently herewith seeking to continue the April 19, 2021 hearing on the Sale Motions by one week, to April 26, 2021 at 1:30 p.m., so that this Motion may be heard on regular notice simultaneously with the Sale Motions. The Debtor has not indicated anywhere that time is of the essence with respect to the proposed sale transactions or that the Debtor's business is a "melting ice cube" which requires the immediate approval of a sale.  To the contrary, the Debtor has noted that it is holding approximately $1 million of cash.  Accordingly, there would be no harm or prejudice to the Debtor if the hearing on the Sale Motions were to be continued by one week.

**MEMORANDUM OF POINTS AND AUTHORITIES**

Pursuant to 11 U.S.C. § 1112, White Winston Select Asset Funds, LLC ("White Winston"), a secured creditor of Figueroa Mountain Brewing, LLC, the debtor and debtor-in-possession herein (the "Debtor"), respectfully moves this Court to convert the Debtor's Chapter 11 case to Chapter 7.

**I.**

**INTRODUCTORY STATEMENT**

This is the second motion to convert the Debtor's case from chapter 11 to chapter 7. White Winston filed the first motion to convert the Debtor's case from chapter 11 to chapter 7 at the end of 2020 (the "First Motion to Convert"). After a two month cash collateral battle that culminated in an extensive evidentiary hearing, the Court permitted the use of cash collateral for a brief two week period because the Debtor asserted that it would be filing a motion to obtain a debtor in possession financing loan from Creekstone Mountain, LLC ("Creekstone") as a junior secured loan with a superpriority administrative expense (the "Second DIP Financing Motion"). Creekstone also was the proposed lender in the Debtor's first day motion seeking approval of debtor in possession financing, which was filed lacking sufficient evidentiary basis, including no proposed budget for the use of the financing, and which motion the Court deemed "dead on arrival." Because absent the financing, the Debtor and its business could no longer operate, White Winston prepared the First Motion to Convert to be heard by the Court in the event the proposed financing did not materialize. When the financing was approved and funded (the "DIP Financing"), White Winston agreed to the use of cash collateral in accordance with the Debtor's reworked cash collateral budget (the "New Cash Collateral Budget") and withdrew the first motion to convert without prejudice anticipating that there might come a day when a second motion to convert was necessary. That day has come.

The Second DIP Financing Motion that was approved by the Court provided for a $1.0 million cash infusion to be used by the Debtor for operations, including $150,000 in supposed urgent capital expenditures. The Debtor's New Cash Collateral Budget projected that without the $1.0 million the Debtor would be cash flow negative in January 2021. However, notwithstanding that the Debtor has failed to meet its sales projections nearly every week since the New Cash Collateral Budget was approved, for some reason the Debtor's cash position has not changed much and the

1    Debtor seems to always have in excess of $1.0 million in cash. As White Winston pointed out in its

2    reply to the Debtor's opposition to White Winston's relief from stay motion to pursue the

3    nonaffiliate debtor receivables, the Debtor seems to be paying fast and loose with its operations.  As

4    of the end of January 2021, there were significant past due postpetition payables, significantly lower

5    than projected sales, cash collections, and raw materials purchases, and no labor expenses for three

6    weeks. As noted below, these factors have been exacerbated as of the end of February 2021. Indeed,

7    while this Motion was being drafted, Tank2Tap, which provides brewery equipment to the Debtor

8    through a lease with a non-debtor affiliate, filed its motion for relief from the automatic stay on the

9    grounds that the Debtor has paid no installment payments for two (2) years, but continued to use the

10   Tank2Tap equipment. [Doc. No. 409]. What the Debtor actually appears to be doing is slow-paying

11   (or not paying) its post-petition payables, shifting expenses to different categories, and maintaining

12   the barest minimum of operations to present the illusion that the Debtor is meeting its projections

13   and operating as a profitable enterprise. The wheels are falling off the truck and the Debtor is in

14   hibernation mode.

15          Moreover, the Debtor appears not to be using the Creekstone $1.0 million for operations,

16   even though the Debtor's Chief Restructuring Office provided testimony to the Court that such

17   funding was necessary for the Debtor's continued operations. Further, the Debtor had told the Court

18   that it had to have $150,000 for crucial capital expenditures; indeed, the Debtor was concerned that

19   the brewery might have to shut down without these capital improvements. Despite their purported

20   urgency, no such capital expenditures appear to have been made. Rather than use the financing

21   funds, the Debtor is now in a stasis mode.

22          Meanwhile, while the Debtor seeks to conceal its postpetition losses with accounting

23   gimmicks and gamesmanship, the Debtor and Creekstone have proposed a contrived sale that (i)

24   only benefits Creekstone, Jaime Dietenhofer ("Jaime") and the Debtor's professionals, and (ii) seeks

25   to use the Debtor's cash to pay Creekstone's purchase price as if it was Creekstone's money.  Instead

26   of using the proceeds of Creekstone's loan to fund operations, the Debtor and Creekstone secretly

27   have kept the proceeds isolated, precisely so Creekstone could attempt to use that money as its

28   principal, if not sole, cash payment towards the purchase price.  In essence, Creekstone agreed to

1  provide the DIP Financing because it was interested in acquiring FMB. [Doc. 396, p.4, lines 11-13],

2  and not, as represented, to fund postpetition operations. While the Second DIP Financing Motion

3  was premised on Creekstone making a loan to the Debtor to finance operations until a chapter 11

4  plan could be confirmed or a sale process could be consummated, the Debtor was actually borrowing

5  money it was not going to use for operations so that Creekstone could become a manufactured

6  secured creditor and credit bid for the assets, even though Creekstone's secured claim was

7  subordinated to MBT's secured claim and White Winston's secured claim. The Debtor's statements

8  that the Creekstone is "not willing to sponsor a plan" [Doc. No. 396, p. 15] is true, but should be

9  qualified as Creekstone was never willing to sponsor a plan.

10     The Debtor has filed motions to engage a broker (two firms), preclude White Winston from

11  credit bidding, and to approve sale procedures and a sale (the "Sale Motions") that simultaneously

12  purport to strip away White Winston's lien and create equity for Mr. Dietenhofer where none exists.

13  [Doc. Nos. 394, 396, and 397] As set forth in detail in White Winston's oppositions to the Sale

14  Motions (which are being filed concurrently with this Motion and are incorporated herein by this

15  reference), the Sale Motions propose an unfair and biased sale process with numerous "poison pills"

16  to deter competitive bidding, designed to result in Creekstone acquiring the FMB assets using the

17  financing funds as currency, retaining the Debtor's principal in a controlling capacity yet to be

18  disclosed and, to raise funds to pay the Debtor's professionals. The proposed bid procedures provide

19  for a truncated sale process based on sales efforts undertaken in 2019 and during the height of the

20  pandemic, which are not reflective of today's market given the COVID-19 vaccines and the lifting

21  of related restrictions, do not require Creekstone to provide a deposit, permit Creekstone to credit

22  bid $1.0 million in funds that have not been used by the Debtor, gives Creekstone a very high break-

23  up fee of almost 5% when it is not coming out of pocket for given the illusory $7,750,000 purchase

24  price, precludes White Winston from credit bidding, and provides for incomprehensible treatment

25  for the senior lenders Montecito Bank & Trust ("MBT") and White Winston. As the Court has said

26  previously in this when the Debtor declined to collect over $800,000 in affiliate non-debtor

27  receivables, this just "stinks."

28     As the Debtor states in the Sale Motions, it "sees no path to confirmation of a chapter 11

7

1  plan." [Doc. No. 396, p. 19, line 2] In addition, that Debtor states that "because of the large priority

2  tax claims, the Debtor believes it is unlikely that it could confirm a plan that would satisfy its

3  obligation to pay those claims in full." [Doc. No, 396, p. 19, lines 4-6].  Yet nowhere does the Debtor

4  meet its burden of demonstrating a sound business purpose of selling substantially all of the Debtor's

5  assets outside of a plan or outside of a chapter 7 liquidation. The Debtor's apparent approach is to

6  stay in Chapter 11 to retain control and conduct an unfair sale process, and then when the sale closes

7  to Creekstone, either dismiss or more likely convert the case to Chapter 7. White Winston believes

8  there is no reason to keep the Debtor in Chapter 11 as it runs up more and more administrative

9  expenses that it can't pay in the name of preserving nonexistent going concern value. The Court

10  should reconsider a sale if, as and when proposed by a truly disinterested chapter 7 trustee, free from

11  the infection of Jaime's animus towards White Winston.  It is now time to appoint an independent

12  fiduciary that can determine the resolution for this case that is in the best interests of creditors and

13  if that resolution is a sale, will conduct  this sale and fair and unbiased manner that maximizes value

14  for  the estate and all creditors.

15  Based on the foregoing and as set forth below, there is cause which mandates the conversion

16  or dismissal of the Debtor's bankruptcy case pursuant to 11 U.S.C. § 1112(b)(4)(A) and (B).  It is

17  implausible that the Debtor will be able to stem the continuing loss to and diminution of its estate,

18  and the Debtor concedes that there is no reasonable likelihood of rehabilitation in the Debtor's case.

19  Further, the Debtor has shown that it will not conduct a fair sale process designed to maximize value

20  for creditors and the estate.  The Court should convert this case to a chapter 7 case rather than permit

21  the Debtor to pursue a *sub rosa* plan through a purported chapter 11 sale that cannot be approved,

22  that contemplates inverting the subordination of Creekstone's junior, subordinated lien, that benefits

23  Jaime but provides no benefit or payment to any priority or general unsecured creditor, that creates

24  value only by stripping it away from White Winston based only on Jaime's unsubstantiated

25  allegations that are inconsistent with the very documents he signed.  Furthermore, there are no

26  unusual circumstances to prevent such conversion or dismissal, particularly given that the Debtor

27  has admitted that no plan will be confirmed in the Debtor's case.  Given this showing of cause, the

28  conversion of the Debtor's case to Chapter 7 and corresponding appointment of a Chapter 7 trustee

1    are the best and most cost-effective way to ensure an orderly and efficient wind-down of the

2    Debtor's business operations and liquidation of the Debtor's assets.  Based on the foregoing, White

3    Winston respectfully submits that the Debtor's bankruptcy case should be converted to Chapter 7.

**II.**

**STATEMENT OF FACTS**

*A.    Background.*

6    1.    The Debtor commenced its Chapter 11 bankruptcy case by filing a voluntary petition

8    for relief under Chapter 11 of the Bankruptcy Code on the Petition Date, *i.e.*, October 5, 2020.

9    2.    Jaime is the Managing Member and Chief Executive Officer of the Debtor, and owns

10   approximately 39% of the membership interests in the Debtor.  The James and Judith Dietenhofer

11   Family Trust (the "Trust"), of which Judith Dietenhofer (who is Jaime's mother) is trustee, owns

12   another approximately 39% of the membership interests in the Debtor.  Accordingly, Jaime and the

13   Trust together own approximately 78% of the membership interests in the Debtor.[2]

14   3.    The Debtor is a craft beer manufacturer that sells primarily to distributors (wholesale

15   customers) but also sells beer at retail to consumers through four taprooms.  In addition, the Debtor

16   also sells beer directly to two additional affiliated taprooms (the "Affiliated Taprooms") each of

17   which is beneficially owned by Jaime.  As of the Petition Date, the Affiliated Taprooms were

18   delinquent in the payment of beer shipped by the Debtor to the Affiliated Taprooms in excess of

19   $800,000 dating back some twelve months before the Petition Date, and the Affiliated Taprooms

20   are delinquent for payment of postpetition shipped beer in the amount of $82,690 as of the 15th week

21   of the New Cash Collateral Budget

22   4.    The Debtor's primary assets are its cash, accounts receivable, inventory, and beer

23   manufacturing equipment.  According to the Debtor's Schedules,[3] the aggregate value of the

---

[2] *See* Debtor's Schedules and Statement of Financial Affairs ("SOFA") filed on November 10, 2020 [Doc. No. 142], p. 198 of 205. Pursuant to Rule 201 of the Federal Rules of Evidence ("Evidence Rules"), White Winston respectfully requests that the Court take judicial notice of the foregoing court records and/or verifiable documents.

[3] *See* Schedule A/B of the Debtor's Schedules [Doc. No. 142], p. 24 of 205.

Debtor's assets as of the Petition Date totaled $870,672.76.[4]

5.     The Debtor's primary liabilities consist of an undisputed secured debt of more than $4,200,000 owed to MBT as set forth in the MBT proof of claim, and a so-called disputed secured debt of more than $9,400,000 owed to White Winston.[5]  In addition, the Debtor listed approximately $575,000 of priority debt and approximately $4,500,000 of general unsecured debt in its Schedules.[6]

**B.     *The White Winston Loan And The Debtor's Obligations Thereunder.***

6.     White Winston is an entity that from time to time makes loans to businesses who are unable to obtain traditional bank financing.  The Debtor is such an entity. The Debtor concedes it has suffered significant losses over the past several years.  The Debtor previously provided documentation to White Winston which reflects ordinary losses in excess of $1,300,000 in 2016, and ordinary losses in excess of $2,400,000 in 2017.  In the Debtor's 2018 tax return, which is attached to the Voluntary Petition filed in this case, the Debtor reported that it suffered a staggering ordinary business loss of $3,425,526 on gross receipts of $8,640,187 in 2018.[7]  While the Debtor has not disclosed its operating results for 2019, in its response to question 1 on its SOFA,[8] the Debtor concedes it only increased its gross revenue from business operations in 2019 to $9,539,754.45, which represents an increase of less than a third of its ordinary loss in 2018.  Consistently, the Debtor

---

[4] As discussed in detail in the First Motion Convert, the Debtor has repeatedly reported inconsistent values for its cash, accounts receivable and inventory as of the Petition Date. [Doc. Nos. 208 and 209] Accordingly, it is still not clear what the total aggregate value of the Debtor's assets was as of the Petition Date. The First Motion to Convert and supporting pleadings are incorporated herein by this reference. White Winston respectfully requests that the Court take judicial notice of the foregoing court records and/or verifiable documents.

[5] *See* WW POC and Proof of Claim No. 48 filed by MBT in the Debtor's case.

[6] *See* Summary of Assets and Liabilities for Non-Individuals of the Debtor's Schedules [Doc. No. 142], p. 16 of 205. Proofs of claims filed in the case exceed the amounts listed in the Debtor's Schedules, including priority tax claims filed in the amount of approximately $1.5 million. *See* Proofs of Claim Nos. 21, 63, 64, and 65.

[7] *See* Voluntary Petition filed on October 5, 2020 [Doc. No. 1], page 96 of 167.  Pursuant to Evidence Rule 201, White Winston respectfully requests that the Court take judicial notice of the foregoing court record and/or verifiable document.

[8] *See* SOFA filed on November 10, 2020 [Doc. No. 142], page 186 of 205.  Pursuant to Evidence Rule 201, White Winston respectfully requests that the Court take judicial notice of the foregoing court record and/or verifiable document.

1  provided White Winston with financial statements revealing that it suffered an operating loss in

2  2019 in excess of $1,600,000, and with interest, depreciation and amortization, a loss in excess of

3  $6,900,000 in 2019.  Worse, gross receipts appear to be dropping precipitously in 2020.  As of the

4  Petition Date of October 5, 2020, the Debtor reported in response to question 1 of its SOFA that its

5  2020 gross revenue from business operations to date was only $5,635,500.35.  Thus, the Debtor

6  would have needed to achieve unprecedented gross sales in the three post-petition months of

7  October, November and December (totaling $3,900,000), just to match the Debtor's reported gross

8  sales from 2019, which were not sufficient to cover the massive losses that the Debtor sustained in

9  2018.

10      7.      On or about February 11, 2019, Jaime, on behalf of the Debtor, executed and

11  delivered a Terms Letter to White Winston.[9]  The Terms Letter set forth the basic terms of the

12  transactions between White Winston and the Debtor that were to follow.  Pursuant to the last

13  sentence of paragraph 14(f) of the Terms Letter (at 13), the Debtor authorized White Winston "to

14  file UCC-1 financing statements . . . upon the Parties' execution of this Letter."  The Terms Letter

15  was amended on July 16, 2019[10] and contained identical language in paragraph 14(f) authorizing

16  White Winston to file a financing statement.

17      8.      In accordance with the terms of the Terms Letter (as modified), on February 20,

18  2019, White Winston filed a UCC-1 financing statement against the Debtor, pursuant to which

19  White Winston asserts a security interest and lien in "[a]ll tangible and intangible property now

20  owned by Debtor or to be acquired in the future including, without limitation: accounts receivable

21  together with all instruments, notes, claims, choses in action and other types of obligations arising

22  therefrom, inventory, real property, machinery and equipment, other tangible and intangible

23  property, patents, trademarks, and all future credit balances and reserves, goods, merchandise, other

24

25          [9] *See* White Winston Proof of Claim, No.57 (the "<u>WW POC</u>"), Exhibit 2.  Pursuant to

26  Evidence Rule 201, White Winston respectfully requests that the Court take judicial notice of the
foregoing court record and/or verifiable document.

27          [10] *See* Declaration of Todd M. Enright in Support of Opposition to Debtor's First

28  Emergency Motions (the "Enright Declaration") [Doc. No. 23], Exhibit A-2.

property in the possession of Debtor or any of its subsidiaries and affiliates" (the "<u>Financing Statement</u>").[11]

9.      On or about July 26, 2019, White Winston and the Debtor executed a Loan Agreement (the "<u>Original Agreement</u>")[12], pursuant to which White Winston agreed to make an interim bridge loan to be used for general working capital purposes in the original principal amount of $750,000 (the "<u>Bridge Loan</u>").

10.      Concurrently with the Original Agreement, on or about July 26, 2019, the Debtor executed and delivered to White Winston a Secured Promissory Note ("<u>Bridge Loan Note</u>") in the original principal amount of $750,000[13] and a security agreement (the "<u>Security Agreement</u>").[14] Pursuant to the Security Agreement, the Debtor granted White Winston a security interest in and to substantially all of the Debtor's assets.  Pursuant to sections 1 and 6 of the Security Agreement, White Winston's security interest secured all "Obligations" defined as "all of the indebtedness, obligations and liabilities of [the Debtor] to [White Winston], individually or collectively, whether direct or indirect, joint or several, absolute or contingent, due or to become due, now existing or hereafter arising under or in respect of the [Original Agreement], the [Bridge Loan] Note, [the] Security Agreement or any other Loan Document or any other instruments or agreements executed and delivered pursuant to the foregoing or in connection therewith."

11.      White Winston's security interest pursuant to the Security Agreement is senior to, and has priority over, any and all competing rights, claims, liens, and encumbrances in and to the Debtor's assets, except for a security interest granted to MBT (the "<u>MBT Security Interest</u>"). However, pursuant to a Priority Agreement[15] entered into by and between White Winston and MBT, the MBT Security Interest was contractually subordinated to White Winston's security interest making White Winston's security interest senior with respect to certain of the Debtor's assets, including inventory up to the principal amount of $1,500,000 in such assets, and therefore, White

---

[11] *See* WW POC, Exhibit 3.
[12] *See* WW POC, Exhibit 4.
[13] *See* WW POC, Exhibit 5.
[14] *See* WW POC, Exhibit 6.
[15] *See* WW POC, Exhibit 7.

Winston's security interest is senior to the MBT Security Interest.  White Winston believes that the foregoing assets have an aggregate value of less than $1,500,000 (which is confirmed by the Debtor's Schedules) and, accordingly, White Winston's security interest in the Debtor's assets is senior to any and all competing claims, interests, liens and encumbrances, including, without limitation, those asserted by MBT.

12.    Concurrently with the Original Agreement, on or about July 26, 2019, the Debtor also executed and delivered to White Winston that certain Intellectual Property Security Agreement (the "IP Security Agreement"),[16] pursuant to which the Debtor granted to White Winston a lien in all right, title and interest of the Debtor in substantially all of the Debtor's intellectual property, including, without limitation, all of the Debtor's "Trademarks" (as defined in the IP Agreement).

13.    White Winston's security interests pursuant to the Security Agreement and the IP Security Agreement are, and at all material times have been, properly perfected under the applicable provisions of the Uniform Commercial Code, including by the filing of the Financing Statement.

14.    At certain times subsequent to July 25, 2019, the Debtor, Jaime, and his mother Judith Dietenhofer ("Judith") requested that White Winston increase the amount of the Bridge Loan, including by refinancing pre-existing debt owed by the Debtor to third parties.  Pursuant to such requests, the parties amended the Bridge Loan Note and the Original Agreement by (i) that certain Loan Modification Agreement dated as of November 12, 2019[17]; (ii) that certain Second Loan Modification Agreement dated as of January 16, 2020[18]; and (iii) that certain Third Loan Modification Agreement dated as of April 7, 2020.[19]

15.    The Obligations (as that term is defined below) owed by the Debtor to White Winston are comprised of multiple tranches.  First, White Winston over time advanced several millions of dollars of cash.  White Winston's records indicate that it collected approximately $1,800,000 in cash less than the amount of cash that it advanced.  Second, approximately $4,000,000

---

[16] *See* WW, POC, Exhibit 8.
[17] *See* WW POC, Exhibit 9.
[18] *See* WW POC, Exhibit 10.
[19] *See* WW POC, Exhibit 11.

of the Obligations constitute pre-existing debts that the Debtor owed to third parties.  At the Debtor's request, White Winston essentially "refinanced" this indebtedness, and provided the Debtor with incentives (in the form of discounted payoffs) for prompt payment.  The "refinancing" occurred through an assignment of the preexisting debt to White Winston, which White Winston essentially paid for by giving the creditors a participating interest in the Obligations.  Although the Debtor ultimately did not take advantage of these incentives, White Winston nevertheless provided substantial value and consideration to the Debtor when it agreed to refinance this indebtedness.

16.    Pursuant to the initial Loan Modification Agreement dated as of November 12, 2019, the principal amount of the Bridge Loan was increased to $6,250,000.  Pursuant to the Second Loan Modification Agreement dated as of January 16, 2020, the principal amount of the Bridge Loan was further increased to $8,000,000.  Pursuant to the Third Loan Modification Agreement dated as of April 7, 2020, the principal amount of the Bridge Loan was further increased to $10,500,000.  As amended, the amounts due under the Bridge Loan Note as modified by the three Loan Modification Agreements, including, without limitation, interest, costs, fees (including attorney's fees) and other charges due thereunder and under applicable law, are referred to herein as the "Obligations."  Pursuant to Loan Modification Agreements, the Debtor has repeatedly acknowledged and confirmed the balance due under the Bridge Loan, has reaffirmed all of the terms, covenants and conditions set forth in the parties' Bridge Loan documents (including with respect to the effectiveness and enforceability of White Winston's security interests and liens in collateral), and has provided waivers and releases of claims for White Winston's benefit.  Accordingly, there is no legitimate basis for the Debtor to dispute White Winston's secured claim and lien.[20]

17.    Jaime (individually and as trustee of the Trust) and Judith (as trustee of the Trust)

---

[20] There is no serious dispute that the Loan Documents, including the Loan Modification Agreements are enforceable according to their terms.  Massachusetts law (the governing law pursuant to the Loan Documents), routinely favors the enforcement of releases, waivers of defenses and acknowledgements of debt, as exist in the Loan Modification Agreements.  *Sharon v. City of Newton*, 437 Mass. 99, 105 (2002).  The releases are enforceable according to their terms.  *See Farmers Ins. Exch. v. RNK, Inc.,* 632 F.3d 777, 784 (1st Cir. 2011); *see, e.g., Crocker v. Townsend Oil Co., Inc.,* 438 Mass. 592 (2003); *Cormier v. Central Mass. Chapter of National Safety Council*, 416 Mass. 286, 288 (1993).

each executed and delivered a written guaranty to White Winston, whereby each unconditionally guaranteed the faithful payment and performance by the Debtor of its Obligations to White Winston.[21]

18.    Jaime and Judith each executed and delivered to White Winston a Securities Pledge Agreement dated as of November 12, 2019, whereby Jaime (individually and as trustee of the Trust) and Judith (as trustee of the Trust) each pledged to White Winston a continuing security interest in all of their respective shares in the Debtor ("Units") to secure their obligations under their respective guaranties.[22]

19.    White Winston's pledge and security interest in and to the Units held by Jaime and Judith are and at all material times have been valid, enforceable, perfected and senior to any and all competing interests, claims, liens and encumbrances in and to such Units.

20.    Prior to the Petition Date, the Debtor defaulted on the Bridge Loan.  As a result, on August 24, 2020, White Winston commenced a civil action against the Debtor, Jaime and Judith before the United States District Court for the District of Massachusetts, which action is numbered and styled _White Winston Select Asset Funds, LLC v. Figueroa Mountain Brewing, LLC, et. al_, Case Number 1:20-cv-11577 (the "MA Litigation").  The MA Litigation action remains pending but has been stayed due to the filing of the Debtor's bankruptcy case.

21.    White Winston also took steps to begin foreclosing on the Debtor's assets.  Such efforts remain pending but have been stayed due to the filing of the Debtor's bankruptcy case.

22.    Following the Debtor's default, White Winston also took steps to foreclose on the pledges of Units made by Jaime, Judith and the Trust.  On October 20, 2020, a few hours before the scheduled foreclosure sale for the Units, Jaime filed his own personal Chapter 11 bankruptcy case, which case is also pending before this Court and bears the number 9:20-bk-11262-MB.[23]

/ / /

---

[21] _See_ Enright Declaration, Exhibit H, pp. 39-45 of 117, and Exhibit I, pp. 47-53 of 117.
[22] _See_ Enright Declaration, Exhibit J, pp. 55-60 of 117.
[23] White Winston obtained relief from stay to pursue certain of its rights and remedies against the Trust. Jaime Gray Dietenhofer, 9:20-bk-11262-MB, [Doc. No. 83].

**C.** **_The Debtor's Largely Unsuccessful Efforts To Obtain Use Of Cash Collateral Over White_**
**_Winston's Objections And the DIP Financing._**

23.     The Debtor did not file a motion seeking authority to use cash collateral as part of its emergency "first day" motions.  Instead, the Debtor filed an emergency motion seeking authority to obtain debtor-in-possession financing [Doc. No. 9] (the "Emergency DIP Motion").White Winston filed an opposition to the Emergency DIP Motion [Doc. No. 22].

24.     As reflected in the Court order regarding the Emergency DIP Motion [Doc. No. 46] (the "Emergency DIP Order"), the Court declined to approve the Emergency DIP Motion as presented.  Only after the Debtor, White Winston, MBT, Creekstone, Jaime, and the Trust reached a consensual agreement about the funding of an unsecured debtor-in-possession financing to permit the Debtor to cover its outstanding non-insider October 9, 2020 payroll obligations (the "DIP Payroll Loan") did the Court approve the unsecured DIP Payroll Loan.

25.     Thereafter, at the Court's recommendation, on October 10, 2020, the Debtor filed its emergency motion for authority to use cash collateral [Doc. No. 62] (the "CC Motion").

26.     On October 13, 2020, White Winston filed an opposition to the CC Motion [Doc. No. 66].

27.     After considering the oral arguments of counsel at the emergency hearing on the CC Motion held on October 14, 2020, the Court indicated that it was not inclined to authorize the Debtor's use of cash collateral based upon the record presented by the Debtor.  In an effort to preserve the Debtor's business and assets, White Winston agreed to consent to the Debtor's use of cash collateral, on an interim basis pending a final hearing, to pay the expenses set forth in the Debtor's proposed budget attached to the CC Motion for the two weeks ending October 17, 2020 and October 24, 2020, conditioned on the Debtor's agreement to file with the Court the following weekly financial reports, authenticated by a declaration of an officer of the Debtor or the Debtor's Controller, including a weekly report comparing the Debtor's budgeted expenses to its actual expenses (the "Budget to Actual Report"). The Court entered a stipulated cash collateral order memorializing the terms of the parties' agreement on October 15, 2020 [Doc. No. 76] (the "First

CC Order").[24]

28.    On October 19, 2020, the Debtor, White Winston and MBT entered into a second cash collateral stipulation [Doc. No. 89] (the "Second CC Stipulation"), pursuant to which the parties consented to the Debtor's use of cash collateral, on an interim basis pending a final hearing, to pay the expenses set forth in the revised budget submitted with the Second CC Stipulation through the period ending November 8, 2020, and again conditioned on the Debtor's agreement to file the weekly reports described therein with the Court.  The Court entered an order approving the Second CC Stipulation on October 20, 2020 [Doc. No. 95] (the "Second CC Order").[25]

29.    On October 29, 2020, the Debtor submitted a second supplemental declaration of Jenn Pommier, its Controller, with a revised form of budget attached [Doc. No. 107] (the "October 29 Budget").[26]

30.    On November 3, 2020, White Winston filed its supplemental opposition to the CC Motion [Doc. No. 126].  As detailed in White Winston's supplemental opposition, the reporting provided by the Debtor to date was woefully deficient (commencing with the first weekly reports due after the entry of the First CC Order) and only raised additional issues that required substantive clarification.[27]  Although White Winston advised the Debtor of these deficiencies and provided the Debtor with comprehensive deficiency reports, the Debtor never remedied its reporting deficiencies.

31.    On November 5, 2020, the Debtor, White Winston and MBT entered into a third cash collateral stipulation [Doc. No. 140] (the "Third CC Stipulation"), pursuant to which the parties consented to the Debtor's use of cash collateral, on an interim basis pending a final hearing, to pay the expenses set forth in the October 29 Budget through the period ending November 15, 2020, once again conditioned on the Debtor's agreement to file the weekly reports described therein with the

---

[24] *See* First CC Order [Doc. No. 76].

[25] *See* Second CC Order [Doc. No. 95].

[26] *See Second Supplemental Declaration Of Jen Pommier In Support Of Motion Of Debtor For Order (1) Authorizing Debtor To Use Cash Collateral; And (2) Granting Adequate Protection To Secured Creditors* [Doc. No. 107].

[27] *See Supplemental Opposition To Emergency Motion Of Debtor For Order (1) Authorizing Debtor To Use Cash Collateral; And (2) Granting Adequate Protection To Secured Creditors* [Doc. No. 126], pp. 6-10 of 18.

1    Court.[28]   The Court entered an order approving the Third CC Stipulation on November 12, 2020

2    [Doc. No. 146] (the "Third CC Order").[29]

3            32.     On November 12, 2020, the Debtor, White Winston and MBT entered into a fourth

4    cash collateral stipulation [Doc. No. 147] (the "Fourth CC Stipulation"), pursuant to which the

5    parties consented to the Debtor's use of cash collateral, on an interim basis pending a final hearing,

6    to pay the expenses set forth in the October 29 Budget through the period ending December 6, 2020,

7    conditioned on the Debtor's agreement to engage James Wong of Armory Consulting Company as

8    the Debtor's CRO with specified controls and responsibilities for the CRO, and for the fourth time

9    confirming the Debtor's agreement to file the weekly reports described in the Fourth CC Stipulation

10   with the Court.[30]   The Court entered an order approving the Fourth CC Stipulation on November

11   13, 2020 [Doc. No. 155] (the "Fourth CC Order").[31]

12           33.     In the first week after Mr. Wong's engagement, the Debtor again failed to file with

13   the Court and/or provide to White Winston the reporting required by the terms of the First CC Order,

14   Second CC Order, the Third CC Order, and the Fourth CC Order.  Mr. Wong advised White Winston

15   that he needed more time to get up to speed, so White Winston agreed to extend the deadline to

16   provide the complete reporting package.  While some portions of the reporting was provided to

17   White Winston, the complete required reporting, including remedying the prior deficient reporting,

18   was ultimately never provided to White Winston.

19           34.     Subsequently, Mr. Wong advised White Winston that the Debtor was unable to

20   provide the complete reporting package that it had agreed to provide and requested that the reporting

21   requirements be truncated.  In the interests of assisting the CRO, White Winston agreed.

22           35.     As set forth in the fifth cash collateral stipulation entered into by the Debtor, White

23   Winston and MBT and filed with the Court on November 30, 2020 [Doc. No. 168] (the "Fifth CC

24

25

26   [28] *See* Third CC Stipulation [Doc. No. 140].
     [29] *See* Third CC Order [Doc. No. 146].
27   [30] *See* Fourth CC Stipulation [Doc. No. 147].
     [31] *See* Fourth CC Order [Doc. No. 155].
28

18

Stipulation")[32], and the Court order approving the Fifth CC Stipulation entered on December 1, 2020 [Doc. No. 170] (the "Fifth CC Order"),[33] the parties consented to the Debtor's use of cash collateral, on an interim basis pending a final hearing, to pay the expenses set forth in the October 29 Budget through the period ending December 13, 2020, conditioned on the Debtor's agreement to file truncated reporting (in lieu of the reporting required under the prior cash collateral orders).

36.    Even after White Winston agreed to the truncated reporting requested by the Debtor, the Debtor still failed to file the required reporting with the Court.  Further, the Debtor provided White Winston only with piecemeal and mostly deficient pieces of information, which fell far short of even the truncated reporting obligation set forth in the Fifth CC Stipulation

37.    On December 7, 2020, the Debtor submitted a declaration from the Debtor's CRO, James Wong [Doc. No. 178][34], with a revised form of budget attached (the "Wong Budget").

38.    On December 11, 2020, White Winston filed its second supplemental opposition to the CC Motion [Doc. No. 183], pursuant to which White Winston opposed the Debtor's continued use of cash collateral in accordance with the Wong Budget (the "Second Supplemental Opposition").[35]

39.    On December 15, 2020, the Court conducted a very lengthy evidentiary hearing on the CC Motion (as supplemented by the Debtor) and White Winston's multiple oppositions thereto. At the conclusion of such hearing, the Court denied the CC Motion in part and granted the CC Motion in part.  Specifically, the Court authorized the Debtor to use limited cash collateral in accordance with the Wong Budget but only through December 30, 2020 at 11:59 p.m. (PST) and subject to the conditions described in the final order on the CC Motion entered by the Court on December 18, 2020 [Doc. No. 200] (the "Final CC Order"), including the requirement of the Debtor to file certified reporting with the Court.  Pursuant to the Final CC Order, the Court authorized the

---

[32] *See* Fifth CC Stipulation [Doc. No. 168].
[33] *See* Fifth CC Order [Doc. No. 170].
[34] *See Declaration Of James Wong In Support Of Motion Of Debtor For Order (1) Authorizing Debtor To Use Cash Collateral; And (2) Granting Adequate Protection To Secured Creditors* [Doc. No. 178].
[35] *See* Second Supplemental Opposition [Doc. No. 183].

1    Debtor to file a new motion for authority to use cash collateral and a motion for approval of proposed

2    debtor-in-possession financing in the sum of $350,000 (the "DIP Loan"), and authorized White

3    Winston to file a motion to terminate the Debtor's exclusive right to file a plan of reorganization

4    and/or a motion to convert the Debtor's case to Chapter 7 or dismiss the Debtor's case, with all such

5    motions to be heard on an expedited basis on December 30, 2020.

6          40.    As discussed in detail in the Second Supplemental Opposition and the Second

7    Supplemental Declaration of Robert P. Mahoney filed in support of the Second Supplemental

8    Opposition,[36] Mr. Wong acknowledged that the Debtor's cash will be depleted from $274,496 down

9    to $24,554 during the first five weeks of the Wong Budget.  Using the Debtor's own numbers set

10    forth in the Wong Budget, the Debtor projected that it would go "cash negative" in Week 6 of the

11    Wong Budget (*i.e.*, the week beginning on January 11, 2021), if not sooner, if the DIP Loan did not

12    materialize or get approved by the Court.

13    **D.**     ***The First Motion to Convert and the Second DIP Loan Motion.***

14          41.    As authorized by the Court, White Winston filed the First Motion to Convert so that

15    a chapter 7 trustee could be at the helm immediately if the Debtor was unable to obtain the proposed

16    financing.

17          42.    The Debtor filed a motion for approval of a $1.0 million DIP Loan from Creekstone

18    (the "Second DIP Loan Motion") on a junior secured and a superpriority administrative expense

19    basis, and the DIP loan funded. [Doc. No. 213] The Debtor also filed the New Cash Collateral

20    Budget, which was very similar to the Wong Budget. [Doc. No. 218] Given that $1.0 million in cash

21    provided an adequate protection equity cushion for White Winston, White Winston withdrew the

22    First Motion to Convert after the DIP Loan funded. The parties also agreed to a stipulated cash

23    collateral order, which was approved by the Court. [Doc. No. 233 and 243]

24          43.    The Second DIP Loan Motion provided that the Creekstone would loan the Debtor

25

26    _____

27    [36] *See Second Supplemental Declaration Of Robert P. Mahoney In Support Or White Winston Select Asset Funds, LLC's Second Supplemental Opposition To Emergency Motion Of Debtor For Order (1) Authorizing Debtor To Use Cash Collateral; And (2) Granting Adequate Protection To Secured Creditors* [Doc. No. 185].

28

$1.0 million immediately and that the Debtor would use those funds as needed in accordance with the New Cash Collateral Budget, including for $150,000 in capital expenditures purportedly needed for the brewery to prevent a potential shut down. However, based on the Debtor's weekly reporting, it does not appear that the $1.0 million has been used. The Debtor's cash has exceed $1.0 million for each weekly report filed since the Court granted the Second DIP Loan Motion. [Doc. Nos. 276, 284 294, 304, 314, 331, 345, 351, 361, 378, 387, 393] The most recent weekly report before this Motion was filed showed cash at $1,095,130 as of March 15, 2021. [Doc. No. 393]  This consistent retention of $1.0 million might make sense if the Debtor was at least meeting the sales projections in the New Cash Collateral Budget. As discussed below, however, the Debtor has been significantly below sale projections, is behind on payables, among other operational woes. It appears that the $1.0 million in financing was never intended to be used for the Debtor's operations, but instead was intended to give Creekstone an artificial leg up on the sale process to provide a credit bid right based on secured claim for funds the Debtor never used.[37]

### E.    The  Debtor's Performance in 2021

44.    White Winston is confounded by the Debtor's statements in pleadings that the Debtor has maintained its cash levels (of over $1,000,000 as of March 22, 2021) due to the Debtor's purportedly successful operation of its business and management of its expenses.  What the Debtor actually appears to be doing is slow-paying (or not paying) its post-petition payables, shifting expenses to different categories, and maintaining the barest minimum of operations to present the illusion that the Debtor is meeting its projections and operating on a profitable basis.  The Debtor's own reporting reflects the following irregularities (among others), which are difficult to reconcile with the Debtor's cash balances:

- _Unpaid Post-Petition Expenses._  The Debtor's February 2021 monthly operating report (the "February MOR") report reflects that, as of February 28, 2021, the

---

[37] Given that the Debtor's reporting shows that it maintained the $1.0 million in cash at the time the cash collateral stipulation was to expire in March 2021, White Winston agreed to a further cash collateral stipulation which required that the Debtor have at least $750,000 in cash or be required to file motion to use cash collateral, among other provisions.

Debtor had accrued unpaid post-petition expenses totaling $202,953, with more than half of such payables aged more than 30 days.[38]

- This is $50,000 more than the prior month. Moreover, the February MOR shows $135,000 in accrued and unpaid payroll. Given the Debtor's cash availability, it is unclear why the Debtor is not paying its expenses on a timely basis.

- *Significantly Lower Sales Than Projected.* The Debtor's weekly reporting reflects that, during fifteen weeks of the New Cash Collateral Budget, the Debtor's actual barrel sales to distribution customers (2,503) is forty percent (41%) lower than the barrel sales projected for such period (4,249). At an average price of $270 per barrel, this represents missed sales revenue totaling $471,420.

- *Significantly Lower Cash Collections Than Projected.* The Debtor's weekly reporting reflects that, during the fifteen weeks of the New Cash Collateral Budget, the actual cash collected from the Debtor's distribution customers ($890,618) is thirty seven percent (37%) less than the cash projected to be collected from distribution customers during such period ($1,415,272). This represents a total cash collection shortfall of $524,654.

- *Significantly Lower Raw Materials Purchases.* The Debtor's weekly reporting reflects that, during the fifteen weeks of the New Cash Collateral Budget, the actual amount of raw materials purchased ($551,593) is forty one percent (41%) less than the amount of raw material purchases projected for such period ($926,529). Given this drastic drop in raw material purchases, it is unclear how the Debtor is maintaining constant inventory values from week to week.

- *Significant Labor Expense Reduction.* During the 15 weeks of the New Cash Collateral Budget, the Debtor's labor cost was $121,337 less than projected in the Budget representing a 33% reduction in labor cost with no explanation. As White Winston previously advised the Court, during Weeks 8, 9 and 10 of the New Cash Collateral Budget, the Debtor spent $0 on labor expenses (distribution side), even

---

[38] *See* Debtor's February, 2021 monthly operating report [Doc. No. 379].

Case 9:20-bk-11208-MB    Doc 423    Filed 04/05/21    Entered 04/05/21 14:38:13    Desc
Main Document    Page 26 of 41

though the Debtor projected labor expenses totaling $102,604 during such period. It is unclear why the Debtor did not pay any distribution labor expenses during a three-week period where the Debtor originally projected making two payroll payments.[39]

45.     The foregoing irregularities (and others) call into serious question the Debtor's actual operational performance notwithstanding the Debtor's reporting of its cash balances and collateral values.

**F.     *Creekstone/Dietenhofer Sale Process and Sale Motions***

46.     On March 29, 2021, the Debtor filed the Sale Motions. White Winston has filed oppositions to all of the Sale Motions, which are designed to result in Creekstone owning the Debtor's assets with, what White Winston believes, includes a continued central role for Jaime. Except for MBT, no other creditor except for the Debtor's professionals will likely receive any recovery from the proposed sale transaction.

47.     The sale process and procedures are strikingly biased towards Creekstone. White Winston hereby incorporates its oppositions to the Sale Motions, but highlights a few of these egregious provisions for the Court. As noted, the sale process benefits only three parties, , to the detriment of White Winston, priority creditors and unsecured creditors, summarized as follows:

48.     <u>Benefit to Creekstone</u>. The sale benefits Creekstone in multiple ways. First, the bidding procedures are full of poison pills (like the minimum bid increments and the high breakup fee paid to Creekstone) that ensures Creekstone will be the successful bidder. Second, the sale procedures have no provisions actually requiring Creekstone to pay anything to anyone. How and whether Creekstone will pay MBT is a mystery – Creekstone may assume or pay MBT. If the former, then MBT should be required to give releases to the Debtor so that there is no deficiency

---

[39] It appears that the Debtor may have been "capitalizing" certain operating expenses (such as labor expenses) into its inventory, which may explain what appears to be material inventory overstatements in the Debtor's reporting. This has not been the historical practice of the Debtor but is noted by the CRO in the Debtor's January 2021 MOR [Doc. No. 336], p. 28 of 59: "[2] Payroll and payroll taxes: estimated based upon amounts incurred, including payroll service fees, *less an allocation for direct labor associated with cost of goods sold*, and pro-rated for the Stub Period" (emphasis added)

1    claim that dilutes creditors, and to the Trust, so that White Winston (the only other creditor with

2    claims against both the Debtor and the Trust) can be paid from the Trust assets.  There is nothing in

3    the Sale Motions suggesting, let alone demonstrating, that Creekstone has the wherewithal or

4    intention to fund payments in full to MBT or to White Winston, notwithstanding that the Sale

5    Motions stats that Creekstone will pay White Winston up to $1,500,000.  Without a cash escrow,

6    these payment provisions are illusory and a sham.  Third, the sale inverts the subordination of

7    Creekstone's junior lien.  Creekstone purports to "credit bid" the $.0 millionin DIP Financing it

8    secretly kept aside and unused, notwithstanding the promises that the money would be used to fund

9    operations, by somehow crediting against the purchase price the entire $1.0 million Creekstone

10   previously advanced.  Creekstone gets to use these financing proceeds as a deposit, again treating

11   those funds as if they belonged to Creekstone and not to the estate, while other bidders have to

12   provide a deposit $825,000, and is given a 4.8% break-up fee that is much higher than standard high

13   3% with no basis, given the illusory purchase price.  This $1.0 million should be used to fund

14   operations, or fund senior debt of MBT and/or White Winston, or all of the above.  Why Creekstone

15   is or should be entitled to use the Debtor's cash to pay the purchase price as if Creekstone owned

16   the cash is not explained.

17        49.    <u>Benefit to Jaime</u>.  The Sale Motions are intended to further Jaime's illicit goals of

18   retaining an interest in the post-sale business, preserving value in the Trust assets for himself and

19   litigating the White Winston's claim in the vain hope that he can create value by stripping it away

20   from White Winston for himself.  The Sale Motions vaguely suggest that Jaime may have an

21   undefined role in future operations.  This is entirely inadequate disclosure.  The consideration

22   diverted from the estate to Jaime nowhere is quantified, the role Jaime "may" play is unstated, and

23   it is simply implausible that these material elements of the contemplated transaction have not been

24   and could not be fully vetted and disclosed.  More fundamentally, why Jaime is entitled to any

25   benefit from this sale before payment in full to the Debtor's creditors is not explained. Next, the

26   Sale Motions carefully avoid stating what will happen to MBT's liens and claims after the sale,

27   including its mortgages on the Trust assets.  The sale seems designed to allow MBT to retain these

28   mortgages, as a "block" against White Winston's recourse to those assets, while all the time

1    contemplating payment to MBT from the Debtor's assets after the sale. This scheme conveniently

2    would allow Jaime, as the ultimate beneficiary of the Trust, to recover all of the Trust's real estate

3    free of MBT's claims for himself.

4        50.     <u>Benefit to the Debtor's professionals</u>. It is no secret the estate is administratively

5    insolvent and cannot pay its professionals in full, assuming the Court honors White Winston's

6    secured claim and Creekstone's subordination to the $1.0 million secretly set aside. This sale has

7    the earmarks of a transaction designed to ensure these professionals are paid from White Winston's

8    collateral and MBT's collateral (<u>i.e.</u>, the $10 million set aside and remaining cash on hand).

9    Protection of the professionals' unpaid fees is not a sound business purpose justifying a sale of

10   substantially all of the Debtor's assets in chapter 11.

11        51.     Just as clearly, the Sale Motions are an unlawful attempt to deprive White Winston

12   of the value of its liens against the collateral. First, the Debtor proposes to prohibit White Winston

13   from credit bidding with no grounds for such prohibition. The Debtor conveniently ignores that the

14   Debtor acknowledged and confirmed the White Winston debt and signed releases and waivers in

15   favor White Winston in multiple documents at multiple times prepetition, thereby undercutting the

16   Debtor's argument that there is a "bona fide" dispute with White Winston. By restricting White

17   Winston's right to credit bid, the sale motion risks a sale at a depressed price, which credit bidding

18   is intended to prevent.[40] Second, the Debtor seeks to divert the value stripped from White Winston

19

20        [40] As Collier's puts it:

21

22       The right of the creditor to offset its claim is of significant value. It enables a
creditor to purchase property, often without having to part with new funds,
and more easily permits the creditor to protect "against the risk that its

23       collateral will be sold at a depressed price." The creditor may bid in an
amount up to its entire claim; the offset is not limited to any previously
determined secured claim. Thus, the right is unaffected by any prior valuation

24       under section 506(a) or lack of a valuation that may have divided an allowed
claim into an allowed secured claim and an allowed unsecured claim due to
a perceived lack of collateral value. If the creditor purchases the property, the

25       allowed unsecured claim may be bid in its entirety as long as it would have

26       been    secured    but    for    the    valuation    under    section    506(a).

27       <u>3 Collier on Bankruptcy P 363.09</u> (16th 2021) (footnotes and citations
omitted).

28

1    for the benefit of Creekstone, Mr. Dietenhofer and the Debtor's professionals.  Why and how the

2    estate benefits from such conduct nowhere is explained or justified.

3          52.      The truncated "marketing process" is equally without benefit to anyone other than

4    Creekstone, Jaime and the Debtor's professionals.  The Debtor's proposed brief marketing comes

5    without evidence that time is of the essence for a sale, which makes sense since there is $1.0 million

6    in available funding, and none of the assets being sold are declining in value) based on a purported

7    marketing effort done in 2019 and during the highpoint of the pandemic. There is no evidence

8    submitted as to the form and extent of marketing; only bare statements from Jaime that he previously

9    hired Mr. Robert Parzick to market the assets. Surely, now that the world is opening up and the

10   Debtor has $1 million in cash for operations, a more robust sell effort is mandated.

11         53.      The bidding procedures are full of other poison pills.  All bidders have to pay

12   $500,000 above the purchase price at closing except for Creekstone and the buyers must provide

13   $750,000 to fund administrative expenses plus funds for the Debtor's sales agent, while Creekstone

14   gets to offset that requirement with the Debtor's cash on hand. Creekstone receives a 4.8% break-

15   up, which is higher than the standard 3.0% ceiling, and with no basis given the illusory purchase

16   price.  This is not a sale set up to foster competitive bidding; this is a sale to Creekstone for $1.0

17   million less cash on hand.

18         54.      Finally, the Debtor touts the sale as a going concern sale. However, the Debtor has

19   nowhere shown that the going concern value of its money-losing operations exceeds the liquidation

20   value of its assets, or that this sale will produce a greater return for anyone other than Creekstone

21   and Jaime that exceeds what is available under chapter 7.  Consistently, Creekstone was negotiating

22   with the Debtor prepetition for a "contract brewing project." [Doc. No. 396 p. 3, line 18].  Contract

23   brewing means that a third party would brew the Debtor's beer pursuant to a license agreement,

24   which means that the Debtor's brewery and taproom operations likely would close. The Debtor has

25   indicated in its Sale Motions that Creekstone intends now to operate FMB as going concern although

26   it has provided no disclosure as to the nature of this "going concern". White Winston does not

27   _____

28

knowwhether Creekstone's proposed "going concern" purchase of FMB is really this same contract brewing proposal, which effectively would result in the shutdown of FMB's operations, whether Creekstone intends to continue the Debtor's operations at a loss, or make other changes to the operations.

### III.

### ARGUMENT

11 U.S.C. § 1112(b) requires that, absent "unusual circumstances," a court "shall" dismiss a chapter 11 case if the movant establishes cause.  11 U.S.C. § 1112(b).  Bankruptcy Code section 1112(b) affords courts broad discretion in deciding whether cause exists and does not define what constitutes "cause" warranting dismissal, although Bankruptcy Code section 1112(b) does contain examples of what could constitute "cause" under appropriate circumstances.  The list of factors that a Court can consider for purposes of finding "cause" is not exhaustive.  As set forth in the legislative history of Section 1112, "[t]he court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases." H. Rep. 595, 95th Cong., 1st Sess. 406 (1977); *see also Koerner v. Colonial Bank (In re Koerner)*, 800 F.2d 1358, 1367-1368 (5th Cir. 1986); *In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999).

11 U.S.C. § 1112(b)(4) provides that "cause," among other things, includes:

(A)  substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

(B)  gross mismanagement of the estate;

(C)  failure to maintain appropriate insurance that poses a risk to the estate or to the public;

(D)  unauthorized use of cash collateral substantially harmful to 1 or more creditors;

(E)  failure to comply with an order of the court;

(F)  unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

(G)  failure to attend the meeting of creditors convened under section 341 (a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;

(H)  failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);

(I)  failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

(J)  failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

(K)  failure to pay any fees or charges required under chapter 123 of title 28;

(L)  revocation of an order of confirmation under section 1144;

(M)  inability to effectuate substantial consummation of a confirmed plan;

(N)  material default by the debtor with respect to a confirmed plan;

(O)  termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

(P)  failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition."

11 U.S.C. § 1112(b)(4).  The Court has broad discretion to determine whether cause exists under Section 1112(b), and under its equitable powers, it may consider factors other than those listed in Section 1112(b).  *In re Consolidated Loan Mtg. Entities*, 248 B.R. 368, 376 (9th Cir. BAP 2000).

Here, "cause" exists to convert the Debtor's Chapter 11 case to Chapter 7 because there is (i) a substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, (ii) no reasonable likelihood that the Debtor will be able to confirm a plan of reorganization within a reasonable period of time, and (iii) conflicts of interest and gross mismanagement of the estate in connection with the proposed sale process and sale.

A.    ***There Is Cause To Convert Or Dismiss The Debtor's Case Due To The Continuing Loss To Or Diminution Of The Estate, The Absence Of A Reasonable Likelihood Of Rehabilitation, And the Biased and Unfair Sale Process Designed to Benefit Creekstone and the Debtor's Insider.***

Under Section 1112(b)(4) of the Bankruptcy Code, cause exists where there is both "continuing loss to or diminution of the estate" and "absence of a reasonable likelihood of rehabilitation."  11 U.S.C. § 1112(b)(4)(A); *see Clarkson v. Cooke Sales And Service Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir. 1985) (bankruptcy court properly dismissed case under Section 1112(b)(1) upon finding of an absence of sufficient financial data and "certain sources of income" coupled with an erosion in creditors' positions).  Diminution of an estate exists where, for example, the debtor's business has ceased.  *In re Citi-Toledo Partners*, 170 B.R. 602, 606 (Bankr.

1    N.D. Ohio 1994).  A debtor lacks a reasonable likelihood of rehabilitation where, for example, it

2    lacks income or operating funds.  *In re Great American Pyramid Joint Venture*, 144 B.R. 780, 791

3    (Bankr. W.D. Tenn. 1992).  Where a court finds that no reasonable possibility of reorganization

4    exists, it should not be compelled to wait a certain period of time, to the detriment of creditors,

5    before ordering conversion or dismissal of a case.  *Stage I Land Co. v. U.S. Dept. of H.U.D.*, 71 B.R.

6    225, 231 (D. Minn. 1986) (debtor's chapter 11 case should be dismissed at the outset for cause

7    where no reasonable possibility of a reorganization exists).

8    As noted above, while Bankruptcy Code section 1112(b)(4) lists sixteen grounds that

9    constitute "cause" for conversion or dismissal, the list is not exhaustive. *Hall v. Vance*, 887 F.2d

10   1041, 1044 (10th Cir.1989) (list of enumerated grounds is not exhaustive); *In re Picacho Hills Util.*

11   *Co., Inc.*, 518 B.R. 75, 80–81 (Bankr. D.N.M. 2014); *In re SB Props. Inc.*, 185 B.R. 198, 203

12   (E.D.Penn.1995) (stating that the "legislative history of § 1112(b) confirms that what may constitute

13   'cause' is non-exhaustive.) In *In re Sillerman*, 605 B.R. 631, 657 (Bankr. S.D.N.Y. 2019), the court

14   applied Bankruptcy code section 1104 analysis for appointment of a trustee or examiner, and on

15   those grounds, including conflicts of interest, also found cause to convert a case to chapter 7 because

16   the "totality of circumstances of this case reflect gross mismanagement of the estate (§

17   1112(b)(4)(B)."

18   Debtors in possession have "a fiduciary duty to maximize the value of the estate." *In re*

19   *Picacho Hills*, 518 B.R. at 81-82. Courts have found grounds for conversion where the debtor in

20   possession has a conflict of in interest in investigating and pursuing avoidable transfers. *See, e.*g.,

21   *In re Brutsche*, 476 B.R. 298, 309 (Bankr.D.N.M.2012) (finding "cause" under § 1112(b) where the

22   court had serious doubts "about whether [d]ebtor would adequately investigate ... and pursue

23   potential [fraudulent transfer] claims against his spouse"); *In re Fisher*, 2008 WL 1775123, at *12

24   (Bankr.D.Mont.2008) (remarking that conversion was appropriate because "a Chapter 7 would ...

25   no doubt, investigate [d]ebtors' alleged fraudulent conveyances"). Here, while the pursuit of

26   avoidable transfers is not at issue, the Debtor likewise, as a debtor in possession, has a fiduciary

27   duty to conduct a fair and fulsome sale process that maximizes value for the estate and all creditors.

28

1    The Debtor concedes it cannot propose a plan.  The only question is whether the Debtor has

2    articulated a sound business purpose to sell its assets under Bankruptcy Code section 363 rather than

3    convert to chapter 7 immediately.  The Debtor nowhere even attempts to demonstrate that such a

4    sound business purpose exists, and indeed, it cannot.  *See*, *In re Catalina Sea Ranch, LLC*, 2020 WL

5    1900308 (Bankr. C.D. Cal. Apr. 13, 2020) (examining the factors a Court must evaluate to determine

6    whether a sound business purpose for a 363 sale exists).  In addressing the reasonable likelihood of

7    the rehabilitation causal element, the court in *In re Great American Pyramid Joint Venture* stated

8    that, in ascertaining whether the grounds for conversion or dismissal set forth are satisfied, a court

9    "must determine whether the causes of the debtors' continuing losses can be corrected," and

10   emphasized that "the purpose of the laws of Congress relating to bankruptcy are to encourage

11   financial restructuring and to encourage payments to creditors."  *In re Great American Pyramid*

12   *Joint Venture*, 144 B.R. at 791.  However, "when no or substantially no business is left to reorganize,

13   Chapter 11 cases do not serve those purposes, and 'cause' exists."  *Id.*

14   White Winston submits that even disregarding the Debtor's concession that it cannot

15   formulate and propose a plan, there is ample evidence in this case to establish "cause" for the

16   conversion or dismissal of the Debtor's bankruptcy case on the grounds that there is a continuing

17   loss to or diminution of the estate and no reasonable likelihood of rehabilitation for the Debtor.

18   As described in detail above, the Debtor has suffered from staggering historical losses as

19   reflected in its 2018 tax return, and its SOFA admissions.  As of the Petition Date of October 5,

20   2020, the Debtor reported in response to question 1 of its SOFA that its 2020 gross revenue from

21   business operations to date was only $5,635,500.35. Thus, the Debtor would have had to achieve

22   unprecedented gross sales post-petition through December just to match its reported gross sales from

23   2019 of $9,539,754.45, which were nowhere near enough to cover the massive losses that the Debtor

24   sustained in 2018, notwithstanding the COVID shutdown order in California that the Debtor has

25   argued would depress its operating results.

26   As the Debtor itself acknowledged in the Wong Budget and the New Cash Collateral Budget,

27   the Debtor's cash would have been depleted from $274,496 (in Week 1) to $24,554 (in Week 5),

28   and was set to go negative in Week 6 (if not sooner) without the proposed financing.  Clearly,

1    without the financing, there will be a "substantial or continuing loss to or diminution of the estate"

2    without any reasonable likelihood of rehabilitation, in which event the Court must convert or dismiss

3    the Debtor's bankruptcy case pursuant to 11 U.S.C. § 1112(b)(4)(A).

4    However, while the Debtor's February 2021 MOR and weekly reports now shows that the

5    Debtor owes over $200,000 for past due postpetition payables, has accrued $135,000 in unpaid

6    payroll, has to slow pay its professionals who have an allowed interim fee award of $175,000, have

7    significantly missed its sale projections and cash collections, and have reduced the purchase of raw

8    materials significantly. It appears the Debtor is growing more and more administratively insolvent

9    by the day. This is not a thriving business; this is a business in hibernation sleeping until the sale

10    can be consummated by Creekstone credit bidding the $1.0 million it loaned the Debtor, which the

11    Debtor never used.

12    Further, the Debtor has said it can't confirm a chapter 11 plan. Instead, the Debtor has filed

13    the Sale Motions to effect a quick sale for the benefit of Creekstone and Jaime, and possibly MBT.

14    In the event a sale is the best resolution for this case, then the sale process and the sale should be

15    handled by an objective and independent Chapter 7 trustee who will act in the best interest of the

16    estate and creditors.

17    Moreover, the Debtor has breached its fiduciary duty as a debtor in possession to conduct a

18    fair and fulsome sale process. The Debtor's proposed sale process and sale is a farce. As noted

19    above, the sale process is not designed to foster competitive bidding given the proposed truncated

20    marketing effort and bid requirements that are overwhelming favorable for the proposed stalking

21    horse, Creekstone. The proposed treatment of the senior secured claims of MBT and White Winston

22    are illusory or incomprehensible at best. White Winston simultaneously is being precluded from

23    credit bidding while having its lien stripped down while the Debtor has provided no basis to do

24    either. The proposed sale process and sale are biased and the Debtor has failed to provide a sound

25    business purpose justifying a chapter 11 sale under Bankruptcy Code section 363 requires. In the

26    event a sale is the appropriate resolution for this case, it should be conducted by an independent

27    fiduciary – a chapter 7 trustee –to ensure a fair process that maximizes value for all stakeholders,

28    without the taint of Jaime's personal animus for White Winston.

1    Under the foregoing circumstances, it is unlikely that the Debtor will be able to stem the

2    continuing loss to and diminution of its estate and, given the continuing depletion of the Debtor's

3    cash, there is no reasonable likelihood of rehabilitation in this case. Further, the Debtor's proposed

4    unfair sale process is evidence of gross mismanagement of the estate and other compelling grounds

5    for conversion as it is designed to chill bidding so that Creekstone can acquire the Debtor's assets

6    using the Debtor's cash and Jaime can retain a controlling role with the Debtor.   Based on the

7    foregoing, there is cause under 11 U.S.C. § 1112which mandates the conversion or dismissal of the

8    Debtor's bankruptcy case.

9    **B.**    ***There Are No Unusual Circumstances Barring The Conversion Or Dismissal Of The***

10    ***Debtor's Case, And The Debtor Cannot Demonstrate A Reasonable Likelihood That A***

11    ***Plan Will Be Confirmed Within A Reasonable Period Of Time.***

12    11 U.S.C. § 1112(b)(2) provides that, even upon a showing of "cause," this Court may not

13    convert the Debtor's case to Chapter 7 or dismiss the Debtor's case if the Court "finds and

14    specifically identifies unusual circumstances establishing that converting or dismissing the case is

15    not in the best interests of creditors and the estate, and the debtor or any other party in interest

16    establishes that (A) there is a reasonable likelihood that a plan will be confirmed….within a

17    reasonable period of time[.]" 11 U.S.C. § 1112(b)(2).  Although Section 1112(b) does not define or

18    otherwise explain what constitutes "unusual circumstances," courts have found that such phrase

19    contemplates conditions that are not common in most Chapter 11 case.  *In re Hinesley Family Ltd.*

20    *Partnership No. 1,* 460 B.R. 547, 552 (Bankr. D. Mont. 2011) ("Although each chapter 11 case is

21    to some extent unique, and unusual circumstances may exist in any particular case regardless of its

22    size or complexity, the import of section 1112(b) is that, if cause exists, the case should be converted

23    or dismissed unless unusual facts or circumstances demonstrate that the purposes of chapter 11

24    would be better served by maintaining the case as a chapter 11 proceeding.").

25    White Winston submits that there are no "unusual circumstances" of the type contemplated

26    by 11 U.S.C. § 1112(b)(2) to prevent the conversion or dismissal of the Debtor's Chapter 11 case.

27    While White Winston anticipates that the Debtor will argue that COVID 19 is just such unusual

28    circumstances that is not the case here. COVID 19 would be an unusual circumstance for a business

1  that was profitable before the pandemic. The Debtor has suffered significant losses for two years

2  prior to COVID 19 so it is evident that COVID 19 is not the nail that deflated the tire. The tire and

3  the Debtor were flat before the pandemic.

4      While the wind-down and liquidation of an operating business is never an ideal solution,

5  the record in this case demonstrates that the Debtor's business has been, and will continue to be,

6  unprofitable and will continue to bleed cash each week that it operates.   The Debtor cannot be

7  permitted to convert White Winston's collateral to pay administrative claims (or any other claims)

8  of the Debtor's estate without adequate protection.

9      White Winston agrees with the Debtor that there is no reasonable likelihood that a plan of

10  reorganization will be confirmed in this case, given (i) the magnitude of the secured claims held by

11  MBT and White Winston, which would need to be addressed in any proposed plan of reorganization

12  or sale; (ii) the fact that the Debtor has zero equity in its assets, as the total amount of the Debtor's

13  secured claims (*i.e.,* at least $12,800,000) is many multiples of the estimated aggregate value of the

14  Debtor's assets (*i.e.*, $870,672), (iii) the unprofitability of the Debtor's business operations, (iv) the

15  projected dissipation of the Debtor's cash and other assets (including the Debtor's accounts

16  receivable and inventory), (v) the difficulty that the Debtor appears to have had obtaining debtor-

17  in-possession financing and/or an equity infusion, and (vi) the uncertainties posed by the Covid-19

18  pandemic and the government shutdown orders arising therefrom.

19      Based on the foregoing, and given the showing of "cause" to convert or dismiss the Debtor's

20  bankruptcy case demonstrated in this case, there are no unusual circumstances or other basis under

21  11 U.S.C. § 1112(b)(2) to prevent the conversion or dismissal of the Debtor's bankruptcy case.

22  **C.**      ***Conversion Of The Debtor's Chapter 11 Case Is In The Best Interests Of Creditors.***

23      Upon a showing of "cause" to convert or dismiss the Debtor's bankruptcy case, the Court

24  must next determine whether it is in the best interests of creditors to convert the Debtor's case to

25  Chapter 7, dismiss the Debtor's case, or appoint a trustee or an examiner in the Debtor's case.

26      White Winston respectfully submits that the conversion of the Debtor's case to Chapter 7 is

27  in the best interests of the Debtor's creditors and the estate.  The conversion of the Debtor's case to

28  Chapter 7 and appointment of a Chapter 7 trustee are the best way to ensure an orderly and efficient

1  wind-down of the Debtor's business operations and liquidation of the Debtor's assets.  Since the

2  Debtor's projections and its admission that it cannot propose and confirm a chapter 11 plan all but

3  concede its business is terminal, keeping the case in Chapter 11 would substantially increase the

4  administrative cost to the Debtor's estate arising from the imposition of United States Trustee

5  quarterly fees and Chapter 11 compliance matters, which can be burdensome and costly, without

6  any hope of a turnaround or corresponding benefit to the Debtor's estate.  In addition, there is no

7  need for a Chapter 11 liquidating plan which would be the goal of a liquidating Chapter 11 case.

8          On the other hand, if the Debtor's case is simply dismissed, the Debtor's current

9  management which caused the Debtor's problems in the first place, will be responsible for the

10  Debtor's business and operations with zero oversight, and creditors of the Debtor will effectively be

11  taken back to "square one" with no efficient way to recover on their claims.  What little cash remains

12  on hand and not consumed by the Debtor in losses will be free from creditor oversight and control

13  if the cash is dismissed.

14          Based on the foregoing, the Debtor's bankruptcy case should be converted to Chapter 7.

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

**IV.**

**CONCLUSION**

Based on the foregoing, White Winston respectfully requests that the Court enter an order:

1.    granting this Motion;

2.    converting the Debtor's Chapter 11 bankruptcy case to one under Chapter 7, effective immediately upon the entry of an order granting the Motion; and

3.    granting such other and further relief as the Court deems just and proper.

Dated: April 5, 2021                    WHITE WINSTON SELECT ASSET FUNDS, LLC


_____*/s/ Eve H. Karasik*_____
EVE H. KARASIK
JULIET Y. OH
LEVENE, NEALE, BENDER, YOO
      & BRILL L.L.P.

-and-

Jeffrey D. Sternklar (Pro Hac Vice Requested)
JEFFREY D. STERNKLAR LLC

Counsel for Secured Creditor,
White Winston Select Asset Funds, LLC

35

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **NOTICE OF MOTION AND MOTION TO CONVERT DEBTOR'S CHAPTER 11 CASE TO CHAPTER 7; MEMORANDUM OF POINTS AND AUTHORITIES** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **April 5, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Robert D Bass    bob.bass47@icloud.com**
- **William C Beall    will@beallandburkhardt.com, carissa@beallandburkhardt.com**
- **Daren Brinkman    office@brinkmanlaw.com, 7764052420@filings.docketbird.com**
- **Joseph P Buchman    jbuchman@bwslaw.com, dwetters@bwslaw.com**
- **Debra E Cardarelli    dcardarelli@lesnickprince.com, jmack@lesnickprince.com**
- **Jamie P Dreher    jdreher@downeybrand.com,**
  **mfrazier@downeybrand.com;courtfilings@downeybrand.com**
- **Brian D Fittipaldi    brian.fittipaldi@usdoj.gov**
- **Moriah Douglas Flahaut (TR)    douglas.flahaut@arentfox.com, C194@ecfcbis.com**
- **Brian S Healy    brian@tw2law.com**
- **Eve H Karasik    ehk@lnbyb.com**
- **Paul J Laurin    plaurin@btlaw.com, slmoore@btlaw.com;jboustani@btlaw.com**
- **Matthew A Lesnick    matt@lesnickprince.com,**
  **matt@ecf.inforuptcy.com;jmack@lesnickprince.com**
- **Gordon G May    hpc@ggb-law.com**
- **Randall P Mroczynski    randym@cookseylaw.com**
- **Lisa J Nilmeier    lnilmeier@milano-ri.com, lisanilmeier@gmail.com**
- **Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com**
- **Juliet Y Oh    jyo@lnbyb.com, jyo@lnbrb.com**
- **Brian A Paino    bpaino@mcglinchey.com, irvineECF@mcglinchey.com**
- **Laura J Portillo    Attorneys@portilloronk.com**
- **Christopher E Prince    cprince@lesnickprince.com,**
  **jmack@lesnickprince.com;cprince@ecf.courtdrive.com;hbaig@lesnickprince.com**
- **Jonathan C Sandler    jsandler@bhfs.com, pherron@bhfs.com;sgrisham@bhfs.com**
- **Summer M Shaw    ss@shaw.law,**
  **shawsr70161@notify.bestcase.com;shawsr91811@notify.bestcase.com**
- **David B Shemano    dshemano@shemanolaw.com**
- **Felicita A Torres    torres@g-tlaw.com**
- **United States Trustee (ND)    ustpregion16.nd.ecf@usdoj.gov**
- **Beth Ann R Young    bry@lnbyb.com**
- **Christian J Younger    christian@youngerlawsb.com,**
  **youngercr88474@notify.bestcase.com**
- **Ryan D Zick    rzick@ppplaw.com, bnesbitt@ppplaw.com**

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                    **F 9013-3.1.PROOF.SERVICE**

**2. SERVED BY UNITED STATES MAIL**: On **April 5, 2021**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒ *Service information continued on attached page*

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **April 5, 2021**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

***Served by Overnight Mail***
Hon. Martin R. Barash
United States Bankruptcy Court
21041 Burbank Blvd, Suite 342 / Ctrm 303
Woodland Hills, CA 91367

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| April 5, 2021 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                    **F 9013-3.1.PROOF.SERVICE**

United States Trustee (ND)
915 Wilshire Blvd., Suite 1850
Los Angeles, CA 90017

Moriah Douglas Flahaut (TR)
555 W. Fifth Street, 48th Floor
Los Angeles, CA 90026

Figueroa Mountain Brewing, LLC
45 Industrial Way
Buellton, CA 93427

*Counsel to Debtor*
Matthew Lesnick, Esq.
Lesnick Prince & Pappas LLP
315 W Ninth St Ste 705
Los Angeles, CA 90015

Associated Winery System, Inc.
7787 Bell Road
Windsor, CA 95492

*Counsel to Creekstone Mountain*
David Shemano, Esq.
ShemanoLaw
1801 Century Park East, Suite 1600
Los Angeles, CA 90067

CFG Merchant Solutions, LLC
180 Maiden Lane
15th Floor, New York, NY 10038

*Counsel to Montecito Bank & Trust*
Steven E. Abelman, Esq.
Brownstein Hyatt Farber Schreck LLP
410 Seventeenth St., Suite 2200
Denver, CO 80202-4432

*Counsel to Jaime Gray Dietenhofer*
Summer M Shaw, Esq.
Shaw & Hanover, PC
75100 Mediterranean Avenue
Palm Desert, CA 92211

National Funding, Inc.
9820 Town Centre Dr
Suite 200, San Diego, CA 92121

Funding Metrics, LLC
884 Town Center Dr
Langhorne, PA 19047

State of California
PO Box 826880
Lien Group, MIC 92G
Sacramento, CA 94280

Nissan Motor Acceptance Corp
8900 Freeport Parkway
Irving, TX 75063

Tank2Tap
2313 Thayer St.
Evanston, IL 60201

Tognazzini Beverage Service
241 Roemer Way
Santa Maria, CA 93454

U.S. Small Business Administration
1545 Hawkins Blvd
Suite 202, El Paso, TX 79925