EVE H. KARASIK (State Bar No. 155356)
JULIET Y. OH (State Bar No. 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: EHK@LNBYB.COM; JYO@LNBYB.COM

JEFFREY D. STERNKLAR (Mass. State Bar No. 549561)
JEFFREY D. STERNKLAR LLC
101 Federal Street, Suite 1900
Boston, Massachusetts 02110
Telephone: (617) 207-7800
Facsimile: (617) 507-6530
Email: JEFFREY@STERNKLARLAW.COM
(Pro Hac Vice Admission)

Counsel for White Winston Select Asset Funds, LLC

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**NORTHERN DIVISION**

| | |
|---|---|
| In re: | Case No. 9:20-bk-11208-MB |
| FIGUEROA MOUNTAIN BREWING, LLC, | Chapter 11 |
| Debtor in Possession. | **DECLARATION OF ROBERT P. MAHONEY IN SUPPORT OF MOTION TO CONVERT DEBTOR'S CHAPTER 11 CASE TO CHAPTER 7** |
| | [APPLICATION FOR ORDER SETTING HEARING ON SHORTENED TIME FILED CONCURRENTLY HEREWITH] |
| | Date:    [To be set]<br>Time:   [To be set]<br>Place:   ZoomGov |

1

**DECLARATION OF ROBERT P. MAHONEY**

I, Robert P. Mahoney, hereby declare as follows:

1. I am over 21 years of age. I have personal knowledge of all statements I make in this declaration, and they are all true and correct, except for those statements made upon information and belief, and as to those statements, I believe them to be true and correct.

2. I am a Partner in White Winston Select Asset Funds, LLC ("White Winston") where I also serve as its Chief Financial Officer. I have extensive experience in underwriting and managing loans and investments in businesses, and in financial reporting and administration. Prior to joining White Winston, I was the managing member of Hillcrest Capital Partners, L.P. which was originally organized in 2006, and prior to that, I was a managing member of Middlebury Venture Partners, L.P. originally organized in 1995. Both of the Hillcrest and Middlebury funds were comprised of investment entities that focused on making investments in expansion and later-stage companies. Prior to my involvement as a principal in the Middlebury fund, I was employed for twelve years by The Continental Group, Inc., a Fortune 50 company, where my last position was General Manager of Development and Real Estate. I hold a Bachelor of Arts degree with a major in Mathematics from The University of Rochester, and a Masters of Business Administration, with a concentration in Finance, from New York University.

3. I submit this declaration in support of White Winston's "*Motion To Convert Debtor's Chapter 11 Case to Chapter 7*" (the "Motion"). All capitalized terms not specifically defined herein shall have the meanings ascribed to them in the Opposition.

4. I have reviewed the Motion, and believe that the factual statements set forth in the Opposition are true and accurate to the best of my knowledge.

*A.* *Background.*

1. The Debtor commenced its Chapter 11 bankruptcy case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on the Petition Date, *i.e.*, October 5, 2020.

2. The Debtor is a craft beer manufacturer that sells primarily to distributors (wholesale customers) but also sells beer at retail to consumers through four taprooms. In addition, the Debtor also sells beer directly to two additional affiliated taprooms (the "Affiliated Taprooms") each of

which is beneficially owned by Jaime.  As of the Petition Date, the Affiliated Taprooms were delinquent in the payment of beer shipped by the Debtor to the Affiliated Taprooms to the tune of some $800,000 dating back some twelve months before the Petition Date, and the Affiliated Taprooms are delinquent for payment of postpetition shipped beer in the amount of $82,690 as of the 15th week of the New Cash Collateral Budget.

3.	The Debtor's primary assets are its cash, accounts receivable, inventory, and beer manufacturing equipment.

**B.	*The White Winston Loan And The Debtor's Obligations Thereunder.***

4.	White Winston is an entity that from time to time makes loans to businesses who are unable to obtain traditional bank financing.  The Debtor is such an entity. The Debtor concedes it has suffered significant losses over the past several years.  The Debtor previously provided documentation to White Winston which reflects ordinary losses in excess of $1,300,000 in 2016, and ordinary losses in excess of $2,400,000 in 2017.  In the Debtor's 2018 tax return, which is attached to the Voluntary Petition filed in this case, the Debtor reported that it suffered a staggering ordinary business loss of $3,425,526 on gross receipts of $8,640,187 in 2018.[1]  While the Debtor has not disclosed its operating results for 2019, in its response to question 1 on its SOFA,[2] the Debtor concedes it only increased its gross revenue from business operations in 2019 to $9,539,754.45, which represents an increase of less than a third of its ordinary loss in 2018.  Consistently, the Debtor provided White Winston with financial statements revealing that it suffered an operating loss in 2019 in excess of $1,600,000, and with interest, depreciation and amortization, a loss in excess of $6,900,000 in 2019.  Worse, gross receipts appear to be dropping precipitously in 2020.  As of the Petition Date of October 5, 2020, the Debtor reported in response to question 1 of its SOFA that its 2020 gross revenue from business operations to date was only $5,635,500.35.  Thus, the Debtor

---

[1] *See* Voluntary Petition filed on October 5, 2020 [Doc. No. 1]*,* page 96 of 167.  Pursuant to Evidence Rule 201, White Winston respectfully requests that the Court take judicial notice of the foregoing court record and/or verifiable document.

[2] *See* SOFA filed on November 10, 2020 [Doc. No. 142], page 186 of 205.  Pursuant to Evidence Rule 201, White Winston respectfully requests that the Court take judicial notice of the foregoing court record and/or verifiable document.

would have needed to achieve unprecedented gross sales in the three post-petition months of October, November and December (totaling $3,900,000), just to match the Debtor's reported gross sales from 2019, which were not sufficient to cover the massive losses that the Debtor sustained in 2018.

5.   On or about February 11, 2019, Jaime, on behalf of the Debtor, executed and delivered a Terms Letter to White Winston.[3] The Terms Letter set forth the basic terms of the transactions between White Winston and the Debtor that were to follow. Pursuant to the last sentence of paragraph 14(f) of the Terms Letter (at 13), the Debtor authorized White Winston "to file UCC-1 financing statements . . . upon the Parties' execution of this Letter." The Terms Letter was amended on July 16, 2019 and contained identical language in paragraph 14(f) authorizing White Winston to file a financing statement.

6.   In accordance with the terms of the Terms Letter (as modified), on February 20, 2019, White Winston filed a UCC-1 financing statement against the Debtor, pursuant to which White Winston asserts a security interest and lien in "[a]ll tangible and intangible property now owned by Debtor or to be acquired in the future including, without limitation: accounts receivable together with all instruments, notes, claims, choses in action and other types of obligations arising therefrom, inventory, real property, machinery and equipment, other tangible and intangible property, patents, trademarks, and all future credit balances and reserves, goods, merchandise, other property in the possession of Debtor or any of its subsidiaries and affiliates" (the "Financing Statement").[4]

7.   On or about July 26, 2019, White Winston and the Debtor executed a Loan Agreement (the "Original Agreement")[5], pursuant to which White Winston agreed to make an interim bridge loan to be used for general working capital purposes in the original principal amount of $750,000 (the "Bridge Loan").

8.   Concurrently with the Original Agreement, on or about July 26, 2019, the Debtor

---

[3] *See* White Winston Proof of Claim, No.5*7* (the "WW POC"), Exhibit 2.
[4] *See* WW POC, Exhibit 3.
[5] *See* WW POC, Exhibit 4.

executed and delivered to White Winston a Secured Promissory Note ("Bridge Loan Note") in the original principal amount of $750,000[6] and a security agreement (the "Security Agreement").[7] Pursuant to the Security Agreement, the Debtor granted White Winston a security interest in and to substantially all of the Debtor's assets. Pursuant to sections 1 and 6 of the Security Agreement, White Winston's security interest secured all "Obligations" defined as "all of the indebtedness, obligations and liabilities of [the Debtor] to [White Winston], individually or collectively, whether direct or indirect, joint or several, absolute or contingent, due or to become due, now existing or hereafter arising under or in respect of the [Original Agreement], the [Bridge Loan] Note, [the] Security Agreement or any other Loan Document or any other instruments or agreements executed and delivered pursuant to the foregoing or in connection therewith."

9.  White Winston's security interest pursuant to the Security Agreement is senior to, and has priority over, any and all competing rights, claims, liens, and encumbrances in and to the Debtor's assets, except for a security interest granted to MBT (the "MBT Security Interest"). However, pursuant to a Priority Agreement[8] entered into by and between White Winston and MBT, the MBT Security Interest was contractually subordinated to White Winston's security interest making White Winston's security interest senior with respect to certain of the Debtor's assets, including inventory up to the principal amount of $1,500,000 in such assets, and therefore, White Winston's security interest is senior to the MBT Security Interest. White Winston believes that the foregoing assets have an aggregate value of less than $1,500,000 (which is confirmed by the Debtor's Schedules) and, accordingly, White Winston's security interest in the Debtor's assets is senior to any and all competing claims, interests, liens and encumbrances, including, without limitation, those asserted by MBT.

10. Concurrently with the Original Agreement, on or about July 26, 2019, the Debtor also executed and delivered to White Winston that certain Intellectual Property Security Agreement

---

[6] *See* WW POC, Exhibit 5.
[7] *See* WW POC, Exhibit 6.
[8] *See* WW POC, Exhibit 7.

(the "IP Security Agreement"),[9] pursuant to which the Debtor granted to White Winston a lien in all right, title and interest of the Debtor in substantially all of the Debtor's intellectual property, including, without limitation, all of the Debtor's "Trademarks" (as defined in the IP Agreement).

11. White Winston's security interests pursuant to the Security Agreement and the IP Security Agreement are, and at all material times have been, properly perfected under the applicable provisions of the Uniform Commercial Code, including by the filing of the Financing Statement.

12. At certain times subsequent to July 25, 2019, the Debtor, Jaime, and Judith Dietenhofer ("Judith") requested that White Winston increase the amount of the Bridge Loan, including by refinancing pre-existing debt owed by the Debtor to third parties. Pursuant to such requests, the parties amended the Bridge Loan Note and the Original Agreement by (i) that certain Loan Modification Agreement dated as of November 12, 2019[10]; (ii) that certain Second Loan Modification Agreement dated as of January 16, 2020[11]; and (iii) that certain Third Loan Modification Agreement dated as of April 7, 2020.[12]

13. The Obligations (as that term is defined below) owed by the Debtor to White Winston are comprised of multiple tranches. First, White Winston over time advanced several millions of dollars of cash. White Winston's records indicate that it collected approximately $1,800,000 in cash less than the amount of cash that it advanced. Second, approximately $4,000,000 of the Obligations constitute pre-existing debts that the Debtor owed to third parties. At the Debtor's request, White Winston essentially "refinanced" this indebtedness, and provided the Debtor with incentives (in the form of discounted payoffs) for prompt payment. The "refinancing" occurred through an assignment of the preexisting debt to White Winston, which White Winston essentially paid for by giving the creditors a participating interest in the Obligations. Although the Debtor ultimately did not take advantage of these incentives, White Winston nevertheless provided substantial value and consideration to the Debtor when it agreed to refinance this indebtedness.

---

[9] *See* WW, POC, Exhibit 8.
[10] *See* WW POC, Exhibit 9.
[11] *See* WW POC, Exhibit 10.
[12] *See* WW POC, Exhibit 11.

14. Pursuant to the initial Loan Modification Agreement dated as of November 12, 2019, the principal amount of the Bridge Loan was increased to $6,250,000. Pursuant to the Second Loan Modification Agreement dated as of January 16, 2020, the principal amount of the Bridge Loan was further increased to $8,000,000. Pursuant to the Third Loan Modification Agreement dated as of April 7, 2020, the principal amount of the Bridge Loan was further increased to $10,500,000. As amended, the amounts due under the Bridge Loan Note as modified by the three Loan Modification Agreements, including, without limitation, interest, costs, fees (including attorney's fees) and other charges due thereunder and under applicable law, are referred to herein as the "Obligations." Pursuant to Loan Modification Agreements, the Debtor has repeatedly acknowledged and confirmed the balance due under the Bridge Loan, has reaffirmed all of the terms, covenants and conditions set forth in the parties' Bridge Loan documents (including with respect to the effectiveness and enforceability of White Winston's security interests and liens in collateral), and has provided waivers and releases of claims for White Winston's benefit. Accordingly, there is no legitimate basis for the Debtor to dispute White Winston's secured claim and lien.

15. Jaime (individually and as trustee of the Trust) and Judith (as trustee of the Trust) each executed and delivered a written guaranty to White Winston, whereby each unconditionally guaranteed the faithful payment and performance by the Debtor of its Obligations to White Winston.

16. Jaime and Judith each executed and delivered to White Winston a Securities Pledge Agreement dated as of November 12, 2019, whereby Jaime (individually and as trustee of the Trust) and Judith (as trustee of the Trust) each pledged to White Winston a continuing security interest in all of their respective shares in the Debtor ("Units") to secure their obligations under their respective guaranties.

17. White Winston's pledge and security interest in and to the Units held by Jaime and Judith are and at all material times have been valid, enforceable, perfected and senior to any and all competing interests, claims, liens and encumbrances in and to such Units.

18. Prior to the Petition Date, the Debtor defaulted on the Bridge Loan. As a result, on August 24, 2020, White Winston commenced a civil action against the Debtor, Jaime and Judith before the United States District Court for the District of Massachusetts, which action is numbered

and styled <u>White Winston Select Asset Funds, LLC v. Figueroa Mountain Brewing, LLC, et. al</u>, Case Number 1:20-cv-11577 (the "<u>MA Litigation</u>"). The MA Litigation action remains pending but has been stayed due to the filing of the Debtor's bankruptcy case.

19. White Winston also took steps to begin foreclosing on the Debtor's assets. Such efforts remain pending but have been stayed due to the filing of the Debtor's bankruptcy case.

20. Following the Debtor's default, White Winston also took steps to foreclose on the pledges of Units made by Jaime, Judith and the Trust. On October 20, 2020, a few hours before the scheduled foreclosure sale for the Units, Jaime filed his own personal Chapter 11 bankruptcy case, which case is also pending before this Court and bears the number 9:20-bk-11262-MB.[13]

### C. *The Debtor's Largely Unsuccessful Efforts To Obtain Use Of Cash Collateral Over White Winston's Objections And the DIP Financing.*

21. The Debtor did not file a motion seeking authority to use cash collateral as part of its emergency "first day" motions. Instead, the Debtor filed an emergency motion seeking authority to obtain debtor-in-possession financing [Doc. No. 9] (the "<u>Emergency DIP Motion</u>"). White Winston filed an opposition to the Emergency DIP Motion [Doc. No. 22].

22. As reflected in the Court order regarding the Emergency DIP Motion [Doc. No. 46] (the "<u>Emergency DIP Order</u>"), the Court declined to approve the Emergency DIP Motion as presented. Only after the Debtor, White Winston, MBT, Creekstone, Jaime, and the Trust reached a consensual agreement about the funding of an unsecured debtor-in-possession financing to permit the Debtor to cover its outstanding non-insider October 9, 2020 payroll obligations (the "<u>DIP Payroll Loan</u>") did the Court approve the unsecured DIP Payroll Loan.

23. Thereafter, at the Court's recommendation, on October 10, 2020, the Debtor filed its emergency motion for authority to use cash collateral [Doc. No. 62] (the "<u>CC Motion</u>").

24. On October 13, 2020, White Winston filed an opposition to the CC Motion [Doc. No. 66].

---

[13] White Winston obtained relief from stay to pursue certain of its rights and remedies against the Trust. Jaime Gray Dietenhofer, 9:20-bk-11262-MB, [Doc. No. 83].

25. After considering the oral arguments of counsel at the emergency hearing on the CC Motion held on October 14, 2020, the Court indicated that it was not inclined to authorize the Debtor's use of cash collateral based upon the record presented by the Debtor. In an effort to preserve the Debtor's business and assets, White Winston agreed to consent to the Debtor's use of cash collateral, on an interim basis pending a final hearing, to pay the expenses set forth in the Debtor's proposed budget attached to the CC Motion for the two weeks ending October 17, 2020 and October 24, 2020, conditioned on the Debtor's agreement to file with the Court the following weekly financial reports, authenticated by a declaration of an officer of the Debtor or the Debtor's Controller, including a weekly report comparing the Debtor's budgeted expenses to its actual expenses (the "<u>Budget to Actual Report</u>"). The Court entered a stipulated cash collateral order memorializing the terms of the parties' agreement on October 15, 2020 [Doc. No. 76] (the "<u>First CC Order</u>").

26. On October 19, 2020, the Debtor, White Winston and MBT entered into a second cash collateral stipulation [Doc. No. 89] (the "<u>Second CC Stipulation</u>"), pursuant to which the parties consented to the Debtor's use of cash collateral, on an interim basis pending a final hearing, to pay the expenses set forth in the revised budget submitted with the Second CC Stipulation through the period ending November 8, 2020, and again conditioned on the Debtor's agreement to file the weekly reports described therein with the Court. The Court entered an order approving the Second CC Stipulation on October 20, 2020 [Doc. No. 95] (the "<u>Second CC Order</u>").

27. On October 29, 2020, the Debtor submitted a second supplemental declaration of Jenn Pommier, its Controller, with a revised form of budget attached [Doc. No. 107] (the "<u>October 29 Budget</u>").

28. On November 3, 2020, White Winston filed its supplemental opposition to the CC Motion [Doc. No. 126]. As detailed in White Winston's supplemental opposition, the reporting provided by the Debtor to date was woefully deficient (commencing with the first weekly reports due after the entry of the First CC Order) and only raised additional issues that required substantive clarification. Although White Winston advised the Debtor of these deficiencies and provided the Debtor with comprehensive deficiency reports, the Debtor never remedied its reporting deficiencies.

29.  On November 5, 2020, the Debtor, White Winston and MBT entered into a third cash collateral stipulation [Doc. No. 140] (the "Third CC Stipulation"), pursuant to which the parties consented to the Debtor's use of cash collateral, on an interim basis pending a final hearing, to pay the expenses set forth in the October 29 Budget through the period ending November 15, 2020, once again conditioned on the Debtor's agreement to file the weekly reports described therein with the Court. The Court entered an order approving the Third CC Stipulation on November 12, 2020 [Doc. No. 146] (the "Third CC Order").

30.  On November 12, 2020, the Debtor, White Winston and MBT entered into a fourth cash collateral stipulation [Doc. No. 147] (the "Fourth CC Stipulation"), pursuant to which the parties consented to the Debtor's use of cash collateral, on an interim basis pending a final hearing, to pay the expenses set forth in the October 29 Budget through the period ending December 6, 2020, conditioned on the Debtor's agreement to engage James Wong of Armory Consulting Company as the Debtor's CRO with specified controls and responsibilities for the CRO, and for the fourth time confirming the Debtor's agreement to file the weekly reports described in the Fourth CC Stipulation with the Court. The Court entered an order approving the Fourth CC Stipulation on November 13, 2020 [Doc. No. 155] (the "Fourth CC Order").

31.  In the first week after Mr. Wong's engagement, the Debtor again failed to file with the Court and/or provide to White Winston the reporting required by the terms of the First CC Order, Second CC Order, the Third CC Order, and the Fourth CC Order. Mr. Wong advised White Winston that he needed more time to get up to speed, so White Winston agreed to extend the deadline to provide the complete reporting package. While some portions of the reporting was provided to White Winston, the complete required reporting, including remedying the prior deficient reporting, was ultimately never provided to White Winston.

32.  Subsequently, Mr. Wong advised White Winston that the Debtor was unable to provide the complete reporting package that it had agreed to provide and requested that the reporting requirements be truncated. In the interests of assisting the CRO, White Winston agreed.

33.  As set forth in the fifth cash collateral stipulation entered into by the Debtor, White Winston and MBT and filed with the Court on November 30, 2020 [Doc. No. 168] (the "Fifth CC

Stipulation"), and the Court order approving the Fifth CC Stipulation entered on December 1, 2020 [Doc. No. 170] (the "Fifth CC Order"), the parties consented to the Debtor's use of cash collateral, on an interim basis pending a final hearing, to pay the expenses set forth in the October 29 Budget through the period ending December 13, 2020, conditioned on the Debtor's agreement to file truncated reporting (in lieu of the reporting required under the prior cash collateral orders).

34. Even after White Winston agreed to the truncated reporting requested by the Debtor, the Debtor still failed to file the required reporting with the Court. Further, the Debtor provided White Winston only with piecemeal and mostly deficient pieces of information, which fell far short of even the truncated reporting obligation set forth in the Fifth CC Stipulation

35. On December 7, 2020, the Debtor submitted a declaration from the Debtor's CRO, James Wong [Doc. No. 178], with a revised form of budget attached (the "Wong Budget").

36. On December 11, 2020, White Winston filed its second supplemental opposition to the CC Motion [Doc. No. 183], pursuant to which White Winston opposed the Debtor's continued use of cash collateral in accordance with the Wong Budget (the "Second Supplemental Opposition").

37. On December 15, 2020, the Court conducted a very lengthy evidentiary hearing on the CC Motion (as supplemented by the Debtor) and White Winston's multiple oppositions thereto. At the conclusion of such hearing, the Court denied the CC Motion in part and granted the CC Motion in part. Specifically, the Court authorized the Debtor to use limited cash collateral in accordance with the Wong Budget but only through December 30, 2020 at 11:59 p.m. (PST) and subject to the conditions described in the final order on the CC Motion entered by the Court on December 18, 2020 [Doc. No. 200] (the "Final CC Order"), including the requirement of the Debtor to file certified reporting with the Court. Pursuant to the Final CC Order, the Court authorized the Debtor to file a new motion for authority to use cash collateral and a motion for approval of proposed debtor-in-possession financing in the sum of $350,000 (the "DIP Loan"), and authorized White Winston to file a motion to terminate the Debtor's exclusive right to file a plan of reorganization and/or a motion to convert the Debtor's case to Chapter 7 or dismiss the Debtor's case, with all such motions to be heard on an expedited basis on December 30, 2020.

38. As discussed in detail in the Second Supplemental Opposition and my Second Supplemental Declaration of Robert P. Mahoney filed in support of the Second Supplemental Opposition,[14] Mr. Wong acknowledged that the Debtor's cash will be depleted from $274,496 down to $24,554 during the first five weeks of the Wong Budget. Using the Debtor's own numbers set forth in the Wong Budget, the Debtor projected that it would go "cash negative" in Week 6 of the Wong Budget (*i.e.*, the week beginning on January 11, 2021), if not sooner, if the DIP Loan did not materialize or get approved by the Court.

**D.    *The First Motion to Convert and the Second DIP Loan Motion.***

39. As authorized by the Court, White Winston filed the First Motion to Convert so that a chapter 7 trustee could be at the helm immediately if the Debtor was unable to obtain the proposed financing.

40. The Debtor filed a motion for approval of a $1.0 million DIP Loan from Creekstone (the "Second DIP Loan Motion") on a junior secured and a superpriority administrative expense basis, and the DIP loan funded. [Doc. No. 213] The Debtor also filed the New Cash Collateral Budget, which was very similar to the Wong Budget. [Doc. No. 218] Given that $1.0 million in cash provided an adequate protection equity cushion for White Winston, White Winston withdrew the First Motion to Convert after the DIP Loan funded. The parties also agreed to a stipulated cash collateral order, which was approved by the Court. [Doc. No. 233 and 243]

41. The Second DIP Loan Motion provided that the Creekstone would loan the Debtor $1 million immediately and that the Debtor would use those funds as needed in accordance with the New Cash Collateral Budget, including for $150,000 in capital expenditures purportedly needed for the brewery to prevent a potential shut down. However, based on the Debtor's weekly reporting, it does not appear that the $1.0 million has been used. The Debtor's cash has exceed $1.0 million for each weekly report filed since the Court granted the Second DIP Loan Motion. [Doc. Nos. 276, 284

---

[14] *See Second Supplemental Declaration Of Robert P. Mahoney In Support Or White Winston Select Asset Funds, LLC's Second Supplemental Opposition To Emergency Motion Of Debtor For Order (1) Authorizing Debtor To Use Cash Collateral; And (2) Granting Adequate Protection To Secured Creditors* [Doc. No. 185].

294, 304, 314, 331, 345, 351, 361, 378, 387, 393] The most recent weekly report before this Motion was filed showed cash at $1,095,130 as of March 15, 2021. [Doc. No. 393] This consistent retention of $1.0 million might make sense if the Debtor was at least meeting the sales projections in the New Cash Collateral Budget. As discussed below, however, the Debtor has been significantly below sale projections, is behind on payables, among other operational woes. It appears that the $1.0 million in financing was never intended to be used for the Debtor's operations.

42. Given that the Debtor's reporting shows that it maintained the $1.0 million in cash at the time the cash collateral stipulation was to expire in March 2021, White Winston agreed to further cash collateral stipulation which required that the Debtor have at least $750,000 in cash or be required to file motion to use cash collateral, among other provisions.

### E. The Debtor's Performance in 2021

43. I am confounded by the Debtor's statements in pleadings that the Debtor has maintained its cash levels (of over $1,000,000 as of March 22, 2021) due to the Debtor's purportedly successful operation of its business and management of its expenses. What the Debtor actually appears to be doing is slow-paying (or not paying) its post-petition payables, shifting expenses to different categories, and maintaining the barest minimum of operations to present the illusion that the Debtor is meeting its projections and operating on a profitable basis. The Debtor's own reporting reflects the following irregularities (among others), which are difficult to reconcile with the Debtor's cash balances:

- *Unpaid Post-Petition Expenses.* The Debtor's February 2021 monthly operating report (the "February MOR") report reflects that, as of February 28, 2021, the Debtor had accrued unpaid post-petition expenses totaling $202,953, with more than half of such payables aged more than 30 days. [Doc. No. 379] This is $50,000 more than the prior month. Moreover, the February MOR shows $135,000 in accrued and unpaid payroll. Given the Debtor's cash availability, it is unclear why the Debtor is not paying its expenses on a timely basis.

- *Significantly Lower Sales Than Projected.* The Debtor's weekly reporting reflects that, during fifteen weeks of the New Cash Collateral Budget, the Debtor's actual barrel sales to distribution customers (2,503) is forty percent (41%) lower than the barrel sales projected for such period (4,249). At an average price of $270 per barrel, his represents missed sales revenue totaling $471,420.

- *Significantly Lower Cash Collections Than Projected.* The Debtor's weekly reporting reflects that, during the fifteen weeks of the New Cash Collateral Budget, the actual cash collected from the Debtor's distribution customers ($890,618) is thirty seven percent (37%) less than the cash projected to be collected from distribution customers during such period ($1,415,272). This represents a total cash collection shortfall of $524,654.

- *Significantly Lower Raw Materials Purchases.* The Debtor's weekly reporting reflects that, during the fifteen weeks of the New Cash Collateral Budget, the actual amount of raw materials purchased ($551,593) is forty one percent (41%) less than the amount of raw material purchases projected for such period ($926,529). Given this drastic drop in raw material purchases, it is unclear how the Debtor is maintaining constant inventory values from week to week.

- *Significant Labor Expense Reduction.* During the 15 weeks of the New Cash Collateral Budget, the Debtor's labor cost was $121,337 less than projected in the Budget representing a 33% reduction in labor cost with no explanation. As White Winston previously advised the Court, during Weeks 8, 9 and 10 of the New Cash Collateral Budget, the Debtor spent $0 on labor expenses (distribution side), even though the Debtor projected labor expenses totaling $102,604 during such period. It is unclear why the Debtor did not pay any distribution labor expenses during a three-week period where the Debtor originally projected making two payroll payments.[15]

44.  The foregoing irregularities (and others) call into serious question the Debtor's actual operational performance notwithstanding the Debtor's reporting of its cash balances and collateral values.

### F.   *Creekstone/Dietenhofer Sale Process and Sale Motions*

45.  On March 29, 2021, the Debtor filed the Sale Motions. White Winston has filed oppositions to all of the Sale Motions, which are designed to result in Creekstone owning the Debtor's assets with, what White Winston believes, includes a continued central role for Jaime. Except for MBT, no other creditor except for the Debtor's professionals will likely receive any recovery from the proposed sale transaction.

---

[15] It appears that the Debtor is now "capitalizing" certain operating expenses (such as labor expenses) into its inventory, which may explain what appears to be material inventory overstatements in the Debtor's reporting. This has not been the historical practice of the Debtor but is noted by the CRO in the Debtor's February 2021 MOR [Doc. No. 379: "[2] Payroll and payroll taxes: estimated based upon amounts incurred, including payroll service fees, ***less an allocation for direct labor associated with cost of goods sold***, and pro-rated for the Stub Period" (emphasis added).

46. The Debtor touts the sale as a going concern sale. However, the Debtor has nowhere shown that the going concern value of its money-losing operations exceeds the liquidation value of its assets, or that this sale will produce a greater return for any other than Creekstone and Jaime that exceeds what is available under chapter 7. Consistently, Creekstone was negotiating with the Debtor prepetition for a "contract brewing project." [Doc. No. 396 p. 3, line 18]. Contract brewing means that a third party would brew the Debtor's beer pursuant to a license agreement, which means that the Debtor's brewery and taproom operations likely would close. The Debtor has indicated in its Sale Motion that Creekstone intends now to operate FMB as going concern although has provided no disclosure as to the nature of this "going concern". White Winston does not know whether Creekstone's proposed "going concern" purchase of FMB is really this same contract brewing proposal, which effectively would result in the shutdown of FMB's operations, whether Creekstone intends to continue the Debtor's operations at a loss, or make other changes to the operations.

While White Winston anticipates that the Debtor will argue that COVID 19 is an unusual circumstance that would preclude conversion. COVID 19 would be an unusual circumstance for a business that was profitable before the pandemic. The Debtor has suffered significant losses for two years prior to COVID 19 so it is evident that COVID 19 is not the nail that deflated the tire. The tire and the Debtor were flat before the pandemic.

While the wind-down and liquidation of an operating business is never an ideal solution, the Debtor's business has been, and will continue to be, unprofitable and will continue to bleed cash each week that it operates.

I declare and verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 5th of April, 2021, at Trumbull, Connecticut.

_____
ROBERT P. MAHONEY

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **DECLARATION OF ROBERT P. MAHONEY IN SUPPORT OF MOTION TO CONVERT DEBTOR'S CHAPTER 11 CASE TO CHAPTER 7** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **April 5, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Robert D Bass**     bob.bass47@icloud.com
- **William C Beall**     will@beallandburkhardt.com, carissa@beallandburkhardt.com
- **Daren Brinkman**     office@brinkmanlaw.com, 7764052420@filings.docketbird.com
- **Joseph P Buchman**     jbuchman@bwslaw.com, dwetters@bwslaw.com
- **Debra E Cardarelli**     dcardarelli@lesnickprince.com, jmack@lesnickprince.com
- **Jamie P Dreher**     jdreher@downeybrand.com, mfrazier@downeybrand.com;courtfilings@downeybrand.com
- **Brian D Fittipaldi**     brian.fittipaldi@usdoj.gov
- **Moriah Douglas Flahaut (TR)**     douglas.flahaut@arentfox.com, C194@ecfcbis.com
- **Brian S Healy**     brian@tw2law.com
- **Eve H Karasik**     ehk@lnbyb.com
- **Paul J Laurin**     plaurin@btlaw.com, slmoore@btlaw.com;jboustani@btlaw.com
- **Matthew A Lesnick**     matt@lesnickprince.com, matt@ecf.inforuptcy.com;jmack@lesnickprince.com
- **Gordon G May**     hpc@ggb-law.com
- **Randall P Mroczynski**     randym@cookseylaw.com
- **Lisa J Nilmeier**     lnilmeier@milano-ri.com, lisanilmeier@gmail.com
- **Juliet Y Oh**     jyo@lnbrb.com, jyo@lnbrb.com
- **Juliet Y Oh**     jyo@lnbyb.com, jyo@lnbrb.com
- **Brian A Paino**     bpaino@mcglinchey.com, irvineECF@mcglinchey.com
- **Laura J Portillo**     Attorneys@portilloronk.com
- **Christopher E Prince**     cprince@lesnickprince.com, jmack@lesnickprince.com;cprince@ecf.courtdrive.com;hbaig@lesnickprince.com
- **Jonathan C Sandler**     jsandler@bhfs.com, pherron@bhfs.com;sgrisham@bhfs.com
- **Summer M Shaw**     ss@shaw.law, shawsr70161@notify.bestcase.com;shawsr91811@notify.bestcase.com
- **David B Shemano**     dshemano@shemanolaw.com
- **Felicita A Torres**     torres@g-tlaw.com
- **United States Trustee (ND)**     ustpregion16.nd.ecf@usdoj.gov
- **Beth Ann R Young**     bry@lnbyb.com
- **Christian J Younger**     christian@youngerlawsb.com, youngercr88474@notify.bestcase.com
- **Ryan D Zick**     rzick@ppplaw.com, bnesbitt@ppplaw.com

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9013-3.1.PROOF.SERVICE**

**2. SERVED BY UNITED STATES MAIL**: On **April 5, 2021**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ *Service information continued on attached page*

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **April 5, 2021**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

*Served by Overnight Mail*
Hon. Martin R. Barash
United States Bankruptcy Court
21041 Burbank Blvd, Suite 342 / Ctrm 303
Woodland Hills, CA 91367

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| April 5, 2021 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*    **F 9013-3.1.PROOF.SERVICE**

United States Trustee (ND)
915 Wilshire Blvd., Suite 1850
Los Angeles, CA 90017

Moriah Douglas Flahaut (TR)
555 W. Fifth Street, 48th Floor
Los Angeles, CA 90026

Figueroa Mountain Brewing, LLC
45 Industrial Way
Buellton, CA 93427

*Counsel to Debtor*
Matthew Lesnick, Esq.
Lesnick Prince & Pappas LLP
315 W Ninth St Ste 705
Los Angeles, CA 90015

Associated Winery System, Inc.
7787 Bell Road
Windsor, CA 95492

*Counsel to Creekstone Mountain*
David Shemano, Esq.
ShemanoLaw
1801 Century Park East, Suite 1600
Los Angeles, CA 90067

CFG Merchant Solutions, LLC
180 Maiden Lane
15th Floor, New York, NY 10038

*Counsel to Montecito Bank & Trust*
Steven E. Abelman, Esq.
Brownstein Hyatt Farber Schreck LLP
410 Seventeenth St., Suite 2200
Denver, CO 80202-4432

*Counsel to Jaime Gray Dietenhofer*
Summer M Shaw, Esq.
Shaw & Hanover, PC
75100 Mediterranean Avenue
Palm Desert, CA 92211

National Funding, Inc.
9820 Town Centre Dr
Suite 200, San Diego, CA 92121

Funding Metrics, LLC
884 Town Center Dr
Langhorne, PA 19047

State of California
PO Box 826880
Lien Group, MIC 92G
Sacramento, CA 94280

Nissan Motor Acceptance Corp
8900 Freeport Parkway
Irving, TX 75063

Tank2Tap
2313 Thayer St.
Evanston, IL 60201

Tognazzini Beverage Service
241 Roemer Way
Santa Maria, CA 93454

U.S. Small Business Administration
1545 Hawkins Blvd
Suite 202, El Paso, TX 79925