**NOT FOR PUBLICATION**

FILED & ENTERED

JUL 02 2021

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gasparia DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# NORTHERN DIVISION

| | |
|---|---|
| In re: | Case No.: 9:20-bk-11208-MB |
| | Chapter 11 |
| FIGUEROA MOUNTAIN BREWING, LLC, | **MEMORANDUM OF DECISION GRANTING DEBTOR'S MOTION TO RESTRICT WHITE WINSTON FROM CREDIT BIDDING PURSUANT TO § 363(k) AT PROPOSED SALE OF DEBTOR'S ASSETS** |
| Debtor. | **[CASE DKT. 397]** |
| | Evidentiary Hearing:<br>Date: June 1, 2021 and June 2, 2021<br>Time: 10:00 a.m. |
| | *ZoomGov |

On March 29, 2021, Figueroa Mountain Brewing, LLC (the "Debtor") filed its motion seeking to restrict White Winston Select Asset Funds, LLC ("White Winston") from credit bidding its secured claim in any sale of the Debtor's assets (the "Motion") pursuant to Bankruptcy Code section 363(k). Case Dkt. 397. On April 5, 2021, White Winston filed its opposition to the Motion. Case Dkt. 436. On April 12, 2021, the Debtor filed its reply. Case Dkt. 458. On April 19, 2021, the Court held a preliminary hearing on the Motion, and on June 1 and 2, 2021, the Court held an evidentiary hearing for the purposes of cross examination. For the reasons set forth below, the Court (i) finds "cause" under section 363(k) not to permit White Winston to credit bid its secured claim because the claim is subject to a genuine dispute, and (ii) therefore will grant the Motion.

## I. JURISDICTION AND AUTHORITY

The Motion seeks a determination of whether cause exists to deny a secured creditor the ability to credit bid pursuant to Bankruptcy Code section 363(k). 11 U.S.C. § 363(k). The Court has jurisdiction over this issue because it arises under a provision of title 11 of the United States Code. 28 U.S.C. § 1334(b). For the same reason, the Court has the constitutional authority to enter a final order disposing of the Motion. *See Wellness Int'l Network, Ltd. v. Sharif,* 135 S. Ct. 1932 (2015).

## II. BACKGROUND

On October 5, 2020, the Debtor filed a voluntary petition commencing this chapter 11 case (the "Petition Date"). Case Dkt. 1. Since then, the Debtor has been operating its business and managing its affairs as a debtor in possession. 11 U.S.C. §§ 1107(a) and 1108. The Debtor operates a craft beer company. The Debtor brews beer under the "Figueroa Mountain" brand, for distribution through various wholesale channels, as well as a series of tap rooms operated by the Debtor and certain non-debtor affiliates.

### A. The White Winston Proof of Claim

On April 5, 2021, White Winston filed its proof of claim in this case, which was assigned claim number 57 by the Clerk of Court (the "POC"). Claims Dkt. 57. The POC asserts a total claim, as of the Petition Date, of $9,490,718.30, which White Winston asserts is secured by substantially all the assets of the Debtor's estate.

White Winston asserts this liability under a certain bridge loan in the original stated principal amount of $750,000, (the "Bridge Loan"), which was entered into on or about July 26, 2019, and subsequently modified on November 12, 2019, January 16, 2020, and April 7, 2020. As modified, the stated principal balance of the Bridge Loan was ultimately increased to $10,500,000.

It appears that the bridge loan was structured and treated as a revolving loan, under which the Debtor's revenues were generally collected by White Winston through a so-called "lockbox" account and then readvanced to the Debtor. With this construct in mind, the POC contains a breakdown of the total asserted claim, detailing amounts purportedly advanced or charged to the loan, less the amount of collections, which are labeled as "repayments":

///
///
///
///
///
///

1

**MEMORANDUM OF DECISION**

| | |
|---|---:|
| Principal Advances to Debtor, Trade Creditors and Others | $9,067,560.80 |
| Advances for Accrued Interest (Capitalized) | $1,061,177.31 |
| Lender's Professional Fees (including those incurred from Third Parties) | $1,691,531.98 |
| Lender's Closing Fees, Discounts, and Late Charges | $1,948,366.48 |
| Total Advances | $13,27,918.27 |
| Less: Repayments (Customer Collections) | ($4,277,918.27) |
| TOTAL OBLIGATIONS | $9,490,718.30 |

In addition to the foregoing summary, the POC contains (i) a narrative explanation of the claim, (ii) 49 numbered "Disbursement Statements," beginning with July 26, 2019 and ending on July 24, 2020, POC Ex. 1, and (iii) copies of various agreements and instruments on which the claim is premised.  POC Exs. 2-15.  Notably, the four categories of charges to the loan that are shown in the foregoing chart do not neatly correspond to explicit labels in the Disbursement Statements and appear to have been categorized and totaled after the fact.  Further, the Disbursement Statements do not show any activity (such as accruals or reconciliations) after July 31, 2020.  Claims Dkt. 57 at Ex. 16.  The POC, however, asserts amounts shown above as of October 5, 2020.

In addition to the POC itself, there is additional information in the record regarding the basis and calculation of the amounts asserted in the POC.  *See* Case Dkt. 400 (Declaration of Matthew A. Lesnick) and Ex. 14 thereto.  These documents are spreadsheets providing line-by-line detail of advances, fees and expenses, and interest charged to the loan, as well as collections.  Although only the amount of the "Customer Collections" matches precisely with the amount shown above, the amounts reflected in these spreadsheets approximate the amounts summarized in the POC and are informative of the individual charges included in each category.  Matthew Lesnick, Debtor's counsel, testified that these documents were produced by White Winston "and are supposed to represent an accounting of White Winston's claim."  *Id.* at 2.  There was no objection to the admission of this declaration and Exhibit, and no argument offered suggesting that these spreadsheets do not reflect the detail supporting the POC.

The POC asserts that White Winston's security interest in the Debtor's assets is senior to all other competing rights, claims, liens, and encumbrances in those assets, except for certain senior security interests of Montecito Bank and Trust ("MBT").  MBT has filed a proof of claim asserting a claim in the amount of $4,257,285.70, secured by substantially all the Debtor's assets.  Claims Dkt. 48.  White Winston acknowledges that MBT's security interests in the Debtor's assets are senior to those of White Winston, except with respect to inventory and the proceeds thereof, up to the principal amount of $1,500,000.00.  White Winston asserts that this exception arises from a contractual subordination agreement, which is attached to White Winston's POC as Exhibit 7.

**B.  The Adversary Proceeding**

On January 21, 2021, White Winston commenced an adversary proceeding against the Debtor.  *See* Adversary No. 9:21-ap-01002-MB, Dkt. 1.  Pursuant to its first amended complaint (the "FAC"), White Winston seeks declaratory relief regarding the validity, extent and priority of its security interests and allowance of its claim.  Adv. Dkt. 4.

On March 25, 2021, the Debtor filed its answer, affirmative defenses, and counterclaims against White Winston, one of which is also a crossclaim against MBT. Adv. Dkt. 10.  The Debtor denies that White Winston is entitled to relief on its complaint, asserts 11 affirmative defenses to the complaint, and alleges 18 different causes of action.  *Id.*

The Debtor asserts the following as its affirmative defenses to the claim asserted in the POC (the "White Winston Claim"):

1. White Winston lacks capacity to sue because White Winston did not register in California as a foreign limited liability company doing intrastate business there;

2. The agreements between the Debtor and White Winston are void or voidable because White Winston did not register in California as a foreign company doing intrastate business there;

3. White Winston is not entitled to relief because it is guilty of usury, charging interest on interest, and other illegal acts;

4. White Winston's recovery is barred and/or subject to reduction because of the damages due the Debtor on its affirmative claims;

5. White Winston would be unjustly enriched if the requested relief were granted;

6. One or more of the agreements between the Debtor and White Winston are unenforceable because of fraud, mistake, duress and undue influence;

7. The White Winston Claim is barred because the agreements on which it is based are unenforceable as unconscionable contracts, including under California Civil Code § 1670.5;

8. White Winston is barred by the doctrine of unclean hands;

9. White Winston is barred by illegality, impossibility and impracticability of performance;

10. The Debtor's acts or omissions, if any, were justified;

11. The contracts on which the White Winston Claim are based have been satisfied.

The Debtor asserts the following as its counterclaims and cross-claim:

1. An action for declaratory relief against White Winston and MBT regarding the relative priority of the MBT and White Winston security interests;[1]

2. An objection to allowance of the White Winston Claim, pursuant to Bankruptcy Code section 502(b)(1);

3. An action to determine that the amounts charged by White Winston for interest and fees constitute usurious interest and therefore are void, unenforceable and recoverable;

4. An action for declaratory relief recharacterizing as equity the debt asserted by White Winston;

---

[1] This is the only crossclaim asserted against MBT.

5. An action to equitably subordinate the debt asserted by White Winston under Bankruptcy Code section 510(c)(1);

6. An action for fraud and fraudulent inducement with respect to the agreements under which White Winston asserts its claims, including releases contained therein;

7. An action to avoid the transactions related to the Bridge Loan, and to avoid and recover all transfers of money to White Winston within one year prior to the Petition Date as preferential transfers under Bankruptcy Code section 547;

8. An action for avoidance and recovery of constructive fraudulent transfers to White Winston under Bankruptcy Code section 544(b) and Cal. Civ. Code § 3439.04(a)(2);

9. An action for avoidance and recovery of intentional fraudulent transfers to White Winston under Bankruptcy Code section 544(b) and Cal. Civ. Code § 3439.04(a)(1);

10. An action for avoidance and recovery of constructive fraudulent transfers to White Winston under Bankruptcy Code section 548(a)(1)(B);

11. An action for avoidance and recovery of intentional fraudulent transfers to White Winston under Bankruptcy Code section 548(a)(1)(A);

12. An action to preserve avoided transfers for the benefit of the Debtor's estate under Bankruptcy Code section 551;

13. An action for negligence arising from White Winston's conduct in respect of the Debtor;

14. An action for breach of the contracts between the Debtor and White Winston;

15. An action for breach of the implied covenant of good faith inherent in the contracts between the Debtor and White Winston;

16. An action for breach of fiduciary duty regarding White Winston's conduct in respect of the Debtor;

17. An action for unjust enrichment; and

18. An action for predatory lending and unfair business practices under Cal. Bus. & Prof. Code § 17200.

Based on the foregoing, the Debtor seeks a determination of the relative lien priority between MBT and White Winston, disallowance of the White Winston Claim (or, alternatively, either recharacterization of the claim as equity or equitable subordination of the claim), avoidance and recovery of various transfers and obligations, and various compensatory, statutory and punitive damage awards against White Winston.

On June 16, 2021, the Court held a hearing on White Winston's motion to dismiss the Counterclaim (the "Motion to Dismiss"), which remains pending. The Court intends to issue a separate ruling on the Motion to Dismiss pursuant to a separate memorandum of decision in the adversary proceeding.

///
///

### C. The Debtor's Anticipated Sale of The Property

The Debtor has advised that it does not intend to pursue an "internal reorganization" under which the Debtor's business and financial affairs would be restructured under a chapter 11 plan, but instead intends to sell its assets as a going business concern. To that end, the Debtor previously filed a motion to approve bidding procedures and the sale of assets, Case Dkt. 395, and applied for authority to employ business brokers to market the Debtor's business and its assets. Case Dkt. 394.

Although the original sale motion was denied without prejudice, and the broker application withdrawn, the Debtor is proceeding with its plans to market the property for sale. On June 22, 2021, the Court held a hearing on a renewed application to employ business brokers to market the Debtor's business and assets for sale, which application was approved without objection.

The Court recognizes the importance of a prompt adjudication of the Motion considering the Debtor's pending marketing and sale efforts. Whether and to what extent White Winston has the ability to credit bid its secured claim is material information to which other potential bidders are undoubtedly entitled, as it may impact their willingness to invest time and resources in conducting due diligence and participating in a competitive bidding process for the Debtor's assets.

### D. Evidence For and Against The Motion

In support of the Motion, the Debtor filed the Declaration of Jaime Dietenhofer (the "Dietenhofer Declaration"), Case Dkt. 399; the Declaration of Matthew A. Lesnick, Case Dkt. 400; and a Request for Judicial Notice. Case Dkt. 398. In support of its Opposition, White Winston filed the Declaration of Robert P. Mahoney (the "Mahoney Declaration"). Case Dkt. 436. The Debtor did not file any additional evidence in support of its Reply. No timely objections were made to the admission and consideration of the declarations, the exhibits attached thereto, or the request for judicial notice. *See* Local Rule 9013-1(i). Accordingly, the declarations were deemed admitted and the request for judicial notice granted. As reflected in the record of the evidentiary hearing held June 1 and June 2, 2021, certain other impeachment exhibits also were admitted into evidence.

At the evidentiary hearing, White Winston elected to cross-examine Jaime Dietenhofer, who is the managing member and chief executive officer of the Debtor. The Debtor elected not to cross-examine any witness. As a result of the cross-examination of Dietenhofer, the Court had the opportunity to observe Dietenhofer, assess his demeanor, and judge his credibility. Although the cross-examination of Dietenhofer adduced some additional information that was not reflected in his declaration, the Court finds that Dietenhofer was a candid and credible witness. The Court was not able to assess the credibility of Mahoney because he was not cross-examined. Accordingly, for purposes of the Motion, the Court accepts Mahoney's declaration testimony as true.

The Court will reserve its detailed discussion of the evidence for the legal analysis in the following section. As a general matter, however, the Court observes that the nature of the evidence presented by the Debtor, on the one hand, and the evidence presented by White Winston, on the other hand, was very different.

The Dietenhofer Declaration provides a first-hand history of the Debtor's business and financial affairs, its transactions with White Winston (including Dietenhofer's communications and dealings with Todd Enright, the representative of White Winston who handled the firm's relationship with the Debtor), the financial and operational control exercised by White Winston over the Debtor, detailed descriptions of amounts charged to the loan, the value (or lack of value) received by the Debtor in respect of these charges, and the impact of these events on the Debtor's operations and financial condition.

In contrast, the Mahoney Declaration principally describes and authenticates the loan and security agreements pertaining to the Bridge Loan. The Mahoney Declaration does not directly respond to the testimony in the Dietenhofer Declaration. Thus, although White Winston makes arguments in opposition to the Motion based on the content of the documents authenticated by Mahoney, Dietenhofer's narrative testimony is generally unrefuted.

## III.

## LEGAL ANALYSIS

### A.  Bankruptcy Code Section 363(k) and "Cause" to Deny a Credit Bid

Bankruptcy Code section 363(k) provides as follows:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k).

The express terms of the statute provide (i) that a secured creditor may "credit bid" at a sale of estate property, i.e., offset its allowed claim against the purchase price of property sold pursuant to Bankruptcy Code section 363(b), but (ii) that the court may deny a secured creditor the ability to do so for "cause." Thus, a secured creditor's right to credit bid is not absolute. *See In re Free Lance-Star Publ'g Co.*, 512 B.R. 798 (Bankr. E.D. Va. 2014) ("Credit bidding ... is not an absolute right."); *In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 59 (Bankr. D. Del. 2014) ("... the right to credit bid is not absolute."); *In re Theroux*, 169 B.R. 498, 499, n. 3 (Bankr. D.R.I. 1994) ("there is no absolute entitlement to credit bid").

The term "cause" is not defined in the Bankruptcy Code and is left to the courts to determine on a case-by-case basis. *In re Olde Prairie Block, LLC*, 464 B.R. 337, 348 (Bankr. N.D. Ill. 2011); *see also In re N.J. Affordable Homes Corp.*, 2006 WL 2128624 at *16 (finding that cause is "intended to be a flexible concept enabling a court to fashion an appropriate remedy on a case-by-case basis"); *In re River Rd. Hotel Partners, LLC*, 2010 WL 6634603 at *1 (Bankr. N.D. Ill. Oct. 5, 2010) (holding that "[s]ection 363 gives courts the discretion to decide what constitutes 'cause' and the flexibility to fashion an appropriate remedy by conditioning credit bidding on a case-by-case basis."), *aff'd River Rd. Hotel Partners, LLC v. Amalgamated Bank*, 651 F.3d 642 (7th Cir. 2011).

"'Intrinsically, acting 'for cause' looks to the court's equity powers that allow the court to balance the interests of the debtor, its creditors, and the other parties of interests in order to achieve the maximization of the estate and an equitable distribution to all creditors.'" *SEC v. Capital Cove Bancorp LLC*, No. SACV 15-980-JLS (JCx), 2015 U.S. Dist. LEXIS 174856, at *29 (C.D. Cal. Oct. 13, 2015) (quoting *In re RML Dev., Inc.*, 528 B.R. 150, 155 (Bankr. W.D. Tenn. 2014)). "Generally, 'a court may deny a lender the right to credit bid in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment.'" *In re Free Lance-Star Publ'g Co.*, 512 B.R. 798, 805 (Bankr. E.D. Va. 2014) (quoting *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 316 n.14 (3d Cir. 2010)).

The Debtor makes four overarching arguments for why "cause" exists to restrict White Winston's ability to credit bid under section 363. Case Dkt. 397 at 29.

First, the Debtor argues that White Winston is not entitled to credit bid because it does not hold an "allowed" claim. Case Dkt. 397 at 29. The text of section 363 provides that a creditor may credit bid only where it holds "a lien [in the property to be sold] that secures an *allowed* claim." 11 U.S.C. § 363(k) (emphasis added). Pursuant to Bankruptcy Code section 502(a), "a claim . . . proof of which is filed under section 501 of this title, is deemed allowed, *unless* a party in interest . . . objects." 11 U.S.C. § 502(a) (emphasis added). Here, the Debtor has filed the Counterclaim, which includes an objection to the White Winston Claim.

White Winston argues that it would be unfair to limit or deny it a credit bid simply because the Debtor has filed an objection. The objection is part of a complicated adversary proceeding that has not been adjudicated and cannot be adjudicated before there is a sale of the Debtor's assets. The Court agrees. The filing of an objection containing allegations—without more—is not enough to limit or deny a credit bid.

If the objection cannot be timely adjudicated, any party seeking to limit or deny a credit bid must support its request with evidence demonstrating "cause," and the secured creditor must have an opportunity to respond, present evidence in opposition to the request, and be heard. Here, that opportunity has been provided. The procedures applicable to the Motion under Local Rule 9013-1 (including the submission of declaration testimony in support of and opposition to the relief requested), and the opportunity for live cross-examination afforded the parties, have provided adequate due process under the circumstances.

Second, the Debtor argues that White Winston should not be permitted to credit bid because doing so would chill the bidding process. Case Dkt. 397 at 43-45. The Debtor cites several cases in which courts have based their decision to limit or deny a credit bid—at least in part—because they found that doing so would chill or eliminate competitive bidding. *See, e.g., In re Free Lance-Star Publ'g Co.* 512 B.R. at 807 (Bankr. E.D. Va. 2014) (expert witness testified "that under the unique circumstances of this case, limiting DSP's credit bid would help restore a competitive bidding environment and engender enthusiasm for the sale"), *aff'd DSP Acquisition, LLC v. Free Lance-Star Publ'g Co.,* 512 B.R. 808 (E.D. Va. 2014); *In re Fisker Automotive Holdings, Inc.*, 510 B.R. 55, 60 ("The evidence in this case is express and unrebutted that there will be <u>no</u> bidding—not just a chilling of bidding—if the Court does not limit the credit bid.")

White Winston argues that those cases are distinguishable because the Debtor has not offered any evidence that bidding would be chilled by White Winston's exercise of a credit bid in the full amount of its secured claim. The Court agrees. Without evidence assessing the risk that a credit bid will chill bidding for a particular asset, it is difficult for the Court to assess whether that risk rises to the level of "cause." The Court, moreover, is not persuaded that the risk of chilling bids is an independently adequate basis to limit or deny a credit bid. In each of the cited cases, the court identified *other* reasons why permitting the secured creditor to credit bid the entirety of its claim was not equitable.

Third, the Debtor argues that White Winston should not be permitted to credit bid because it has engaged in inequitable conduct. Case Dkt. 397 at 45-46. The Debtor contends that under the pretense that it would eventually provide the working capital that the Debtor desperately needed

7

**MEMORANDUM OF DECISION**

(which it did not provide to the extent anticipated), White Winston induced the Debtor to enter into the Bridge Loan, through which White Winston used its contractual rights and position of power to exercise financial and operational control over the Debtor, exacerbate the Debtor's financial difficulties, increase the Debtor's indebtedness to White Winston (by adding millions of dollars of fraudulent, unreasonable and/or unnecessary amounts to the Bridge Loan) and thereby enhance White Winston's leverage—with the ultimate objective of acquiring ownership of the Debtor's assets.

White Winston denies these allegations, arguing that the Dietenhofer testimony on these issues is inaccurate, vague and/or conclusory. White Winston relies heavily on the recitations and operative language of the loan documents, arguing that all of the loan transactions with the Debtor were undertaken at the request of the Debtor, and that all of the rights White Winston exercised were in accordance with those agreements. White Winston contends that if the cost of the loans was high, it was because the Debtor was already in financial distress. White Winston also emphasizes the acknowledgments and releases contained in each of three loan modifications and two forbearance agreements insulate White Winston and the White Winston Claim from the myriad claims of wrongdoing asserted by the Debtor.

Although the Court discusses below how the evidentiary record is adequate to establish a genuine dispute with respect to the White Winston Claim (i.e., the Debtor's fourth argument), the evidentiary record presently is not adequate to establish *definitively* that White Winston is responsible for the inequitable conduct of which it has been accused. Proving White Winston's inequitable conduct likely will require additional evidence at trial on the Counterclaim, that demonstrates further White Winston's true intent, unravels complex issues of causation (e.g., as they pertain to the Debtor's existing financial distress and the extent to which White Winston may have exacerbated that distress), and provides a forensic accounting of the entire relationship (e.g., to understand exactly what the Debtor received from White Winston, when and for how long). While the Dietenhofer Declaration, the POC, and other available documents establish an objective basis for the Debtor's contentions in these matters, they do not conclusively prove them.

The cases discussed by the Debtor in which a section 363(k) credit bid was denied for inequitable conduct appear to have involved a more comprehensive factual record and/or followed more extensive proceedings. For instance, in *In re Aloha Airlines,* 2009 WL 1371950 (Bankr. D. Haw. May 14, 2009), the court denied a credit bid for the assets of Aloha Airlines because, among other things, one of the participants in the bid had entered the Hawaiian inter-island air travel market for the purposes of putting Aloha Airlines out of business, supported its effort by misusing information subject to confidentiality agreements, and relying on sworn misstatements to cover up its dishonesty and intentional destruction of records. *Id.* at *8-*9. The court relied on factual findings made by the court in its decision on the merits of a *completed* adversary proceeding (in another bankruptcy case), as well as findings made in connection with a motion for sanctions in that proceeding. *Id.* at *2-*3.

In *In re Free Lance-Star Publ'g Co.*, the court found that the acquirer of a defaulted loan engaged in inequitable conduct aimed at ensuring it would be the winning bidder in a section 363 sale. *See In re Free Lance-Star Publ'g Co.*, 512 B.R. at 806. The lender attempted unilaterally to expand the scope of its liens after the debtor declined to do so, recorded UCC financing statements it was not authorized to record, failed to disclose those filings during cash collateral hearings in which the lender sought liens on those assets, pressured the debtors to shorten the marketing period

8

**MEMORANDUM OF DECISION**

for the sale of the business, and insisted on the insertion of language in the marketing materials prominently advertising its credit bid rights in order to dissuade competitive bidders. The court reached these conclusions after a three-day evidentiary hearing in which it not only considered the section 363(k) issue, but also cross motions for summary judgment on the central issue of the extent of the lenders' liens. *Id.* at 800.

By comparison, the misconduct alleged by the Debtor here is substantially more complicated to prove and not yet proven—even though the available evidence provides an objective basis for disputing the White Winston Claim.

### B. Genuine Dispute

The Debtor's fourth argument in support of denying White Winston a credit bid is that the White Winston claim is subject to a genuine dispute. Courts have found "cause" under section 363(k) "to bar a secured creditor from credit bidding when the creditor's lien is questioned or otherwise in dispute." *In re Olde Prairie Block Owner, LLC*, 464 B.R. at 348; *see also In re Fisker Auto. Holdings, Inc.*, 510 B.R. at 61 (credit bid not permitted where amount of allowed secured claim had not yet been determined); *In re Daufuskie Island Props.*, LLC, 441 B.R. 60, 64 (Bankr. D.S.C. 2010) (creditor was not entitled to credit bid where its mortgage was in dispute); *Nat'l Bank of Commerce v. McMullan (In re McMullan)*, 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996) (holding that "at any such sale, [the secured creditor] shall not be entitled to offset any of its claimed liens or security interests under 11 U.S.C. § 363(k) because the validity of its liens and security interests are unresolved.") *aff'd*, 162 F.3d 1164 (8th Cir. 1998).

This makes sense because it would be unfair to the estate and its myriad stakeholders for a purportedly secured creditor to credit bid for assets and obtain an offset against the purchase price based on a secured claim that is later disallowed.

When courts apply this principal, they typically have not yet adjudicated allowance of the secured claim and/or related adversary claims, and they do not require the party seeking to limit or deny a credit bid to demonstrate that it is likely to succeed on its challenges. Instead, courts require a showing that a "*sufficient* dispute exists regarding the lien forming the basis for a credit bid." *In re Merit Group, Inc.*, 464 B.R. 240, 252 (Bankr. D.S.C. 2011) (emphasis added); *see also In re L.L. Murphrey Co.,* No. 12--03837--8--JRL, 2013 Bankr. LEXIS 2318, at *17 (Bankr. E.D.N.C. June 6, 2013) (quoting *Merit Group*); *Ratcliff v. Rancher's Legacy Meat Co.*, No. 20-CV-834 (NEB), 2020 U.S. Dist. LEXIS 127276, at *13 (D. Minn. July 20, 2020) ("Bankruptcy courts may also prohibit credit bidding entirely where the validity of the creditor's lien is *genuinely* in dispute" and describing the dispute as *"bona fide"*) (emphasis added); *In re Octagon Roofing*, 123 B.R. 583, 592 (Bankr. N.D. Ill. 1991) (conditioning credit bid where lien was subject to a "bona fide dispute" within the meaning of Bankruptcy Code section 363(f)(4)).

In articulating the standard for a "sufficient" or "genuine" dispute, the Court finds instructive and adopts for this purpose the test articulated for whether a dispute is a "bona fide dispute" under Bankruptcy Code section 363(f)(4), which effectuates a similar goal: "That test requires the court to determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the claim. *In re Dewey Ranch Hockey, LLC*, 406 B.R. 30, 39 (Bankr. D. Ariz. 2009); *see also SEC v. Capital Cove Bancorp LLC*, No. SACV 15-980-JLS (JCx), 2015 U.S. Dist. LEXIS 174856, at *15 (C.D. Cal. Oct. 13, 2015) ("the moving party must provide some

9

**MEMORANDUM OF DECISION**

factual grounds to show an objective basis for the dispute"). (quoting *In re Kellogg-Taxe*, No. 2:12-bk-51208-RN, 2014 Bankr. LEXIS 1033, at *22 (Bankr. C.D. Cal. Mar. 17, 2014)).[2]

The Court finds that there is an objective basis in fact and law to conclude that the White Winston Claim is subject to dispute. Although the Court does not find all of the Debtor's arguments persuasive, the Court concludes there is a sufficient dispute regarding the White Winston claim to establish "cause" to deny White Winston a credit bid under Bankruptcy Code section 363(k).[3]

### 1. Failure to Register As A Foreign Corporation Engaged in Intrastate Business

The Debtor argues that White Winston does not have the capacity to prosecute the White Winston Claim because it is a Delaware limited liability company and has not registered to conduct intrastate business in California. Cal. Corp. Code § 17708.07(a) ("A foreign limited liability company transacting intrastate business in this state shall not maintain an action or proceeding in this state unless it has a certificate of registration to transact intrastate business in this state.") The Debtor contends that White Winston conducted intrastate business by exerting financial and operational control over the Debtor's retail and wholesale brewing business, which is conducted in California. Case Dkt. 397 at 32.

White Winston does not contend that it is registered to conduct intrastate business in California, but cites to exceptions in the same statute under which creating, securing and collecting debt are specifically deemed not to constitute "intrastate" business:

> (b) Without excluding other activities that may not be considered to be transacting intrastate business in this state within the meaning of this article, activities of a foreign limited liability company that do not constitute transacting intrastate business in this state include all of the following:
>
> . . .
>
> (7) Creating or acquiring indebtedness, evidences of indebtedness, mortgages, liens, or security interests in real or personal property.

---

[2] "Bona fide dispute" is not defined in section 363(f)(4) or anywhere else in the Bankruptcy Code. The term 'bona fide dispute' is also found in section 303, and the Ninth Circuit, in interpreting the phrase for purposes of that section, defines it as the existence of 'an objective basis for either a factual or a legal dispute as to the validity of the debt.' *In re Vortex Fishing Sys., Inc.*, 277 F.3d 1057, 1064 (9th Cir. 2002)." *In re GGW Brands, LLC*, 2013 WL 6906375 at *24 (Bankr. C.D. Cal. November 15, 2013).

[3] The Court's findings and conclusions are based on the record now before it. The Court must necessarily make these findings and conclusions to adjudicate whether the White Winston Claim is the subject of a genuine dispute, for purposes of adjudicating White Winston's rights under Bankruptcy Code section 363(k). These findings and conclusions are without prejudice to judgment on the merits of the pending adversary, as to which the parties will have the opportunity to conduct discovery and present additional evidence.

> (8) Securing or collecting debts or enforcing mortgages or other security interests in property securing the debts and holding, protecting, or maintaining property so acquired.

Cal. Corp. Code § 17708.03(b).

The Court is not persuaded on the record before it that there is a genuine dispute over White Winston's capacity to enforce its claims under the Bridge Loan.

First, the extent of White Winston's active involvement with the Debtor's affairs was in furtherance of its interests as a secured lender, its activity does not trigger section 17708.07(a). Second, to the extent it was in furtherance of a scheme to acquire the Debtor, it seems more in the nature of interstate commerce (irrespective of whether it was proper). Third, entry into the Bridge Loan did not arise out of White Winston's involvement in the business of the Debtor; rather, White Winston appears to have become involved in the Debtor's business *after* entering into the Bridge Loan. *See Mazzei v. Sika Stables, LLC*, No. CV 19-572 DSF (MRWx), 2020 U.S. Dist. LEXIS 164557, at *4 (C.D. Cal. Apr. 23, 2020) (party questioning an opposing party's capacity to sue under section 177808.07 bears the burden of proving, among other things, that "the action arises out of a transaction of intrastate business by a foreign corporation") (quoting *United Med. Mgmt. Ltd. v. Gatto*, 49 Cal. App. 4th 1732, 1740 (1996)).

## 2. Avoidance of Constructive Fraudulent Transfers & Obligations

The Debtor argues that its cause of action to avoid all obligations incurred under the Bridge Loan, and all liens transferred to White Winston to secure those obligations, raises a genuine dispute with respect to the White Winston Claim. The Court agrees.

Bankruptcy Code section 548(a) authorizes the trustee or debtor in possession to avoid transfers of property and obligations incurred by the Debtor where: (i) the transfer or obligation was incurred within two years of the petition date; (ii) the property transferred and/or debt incurred were in exchange for "less than a reasonably equivalent value," and (iii) the debtor was financially unsound at the time of or as a result of the transaction, meaning that the debtor (1) was "insolvent;" (b) had "unreasonably small capital" for any business in which the debtor was or was about to become engaged; or (c) "intended" to incur or "believed" that it would incur debts "beyond the debtor's ability to pay as such debts matured." 11 U.S.C. §§ 548(a)(1), 1107(a).

> The language of Section 548 of the Bankruptcy Code clearly states that "the debtor" must receive reasonably equivalent "value" in exchange for" the transfer or the obligation. [Citation omitted]. That language means that a benefit is cognizable only if three requirements are satisfied. First, the benefit must be received, even if indirectly, by the debtor, and the touchstone of a cognizable benefit is whether the "debtor's net worth has been preserved and the interests of the creditors will not have been injured by the transfer." *General Electric Credit Corp. v. Murphy*, 895 F.2d 725, 727 (11th Cir. 1990) (quoting *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991). Second, any purported benefits must also be limited to cognizable "value." Section 548 does not refer to "benefits" whether direct or indirect. It requires reasonably equivalent "value" and includes a precise definition of "value" that encompasses only "property" and "satisfaction or securing of a present or antecedent debt of the debtor." 11 U.S.C. §§ 548(a)(1)(B)(i), (d)(2)(A). . .

. Third, property must have been received by the debtors "in exchange for" the transfers or obligation. Any "property" that the debtors would have enjoyed regardless of the [transaction] cannot be regarded as property received "in exchange for" the transfer or obligation.

*Blixseth v. Kirschner (In re Yellowstone Mt. Club, LLC)*, 436 B.R. 598, 668 (Bankr. D. Mont. 2010).[4]

"Once avoided, the transaction is a nullity and is treated as if it never happened." *United States v. Sims (In re Feiler)*, 218 F.3d 948, 953 (9th Cir. 2000). Unlike the language used in other avoidance provisions of the Bankruptcy Code, such as section 548(c) and 550(a), the statute does not limit avoidance *to the extent* the debtor received less than reasonably equivalent value. Instead, the statute provides for avoidance of the entire transfer or obligation *if* the debtor received less than reasonably equivalent value and the other statutory requirements are met.

In that instance, the transferee or obligee may retain certain rights by establishing its entitlement to the defense afforded by section 548(c): "[T]he transferee or obligee of such transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation." 11 U.S.C. § 548(c). But the burden is on the transferee or obligee to establish this entitlement. *See In re Agric. Research & Tech. Grp., Inc.*, 916 F.2d 528, 535 (9th Cir. 1990); *Rund v. Kirkland (In re EPD Inv. Co., LLC)*, Nos. 2:10-bk-62208-ER, 2:12-ap-02424-ER, 2020 Bankr. LEXIS 3091, at *66 (Bankr. C.D. Cal. Oct. 29, 2020).

The evidence presented provides an objective basis for the Debtor's cause of action to avoid the Bridge Loan and related transactions. For this reason, there is also an objective basis on which to conclude that the White Winston Claim, which is based on those transactions, is the subject of a genuine dispute.

### a. Timing.

The transactions took place, at the earliest, beginning in early July of 2019 with the original [Terms Letters]. The Bridge Loan itself was executed as of July 26, 2019. Case Dkt. 436 at 71. The Petition Date was October 5, 2020—which is less than two years later. Case Dkt. 1.

### b. Financial Condition

The evidence supports the conclusion that the financial condition requirement is satisfied. The unrefuted testimony of Jaime Dietenhofer indicates that the Debtor sought to complete an expansion of its brewing facilities, but the project (which was then and still is not entirely

---

[4] The Court is aware that the Debtor also seeks avoidance of the same transactions as a constructive fraudulent transfer under Bankruptcy Code section 544(b) and applicable state law. Because the Court concludes that there is an objective basis for avoidance under section 548, the Court does not believe it is necessary to address the parallel cause of action under section 544(b) and state law.

12

**MEMORANDUM OF DECISION**

complete) cost substantially more and took longer than expected. The Debtor had incurred millions in debt to its builder and others that it was unable to pay. The Debtor also did not have the working capital to buy the raw materials necessary to utilize the additional brewing capacity that it did complete. These facts support the conclusion that the Debtor had unreasonably small capital for the business in which it was or was about to become engaged  Further, it is clear the Debtor did not believe it could service its debts and pay its obligations as they became due without a facility that provided access to $2 million in actual working capital to buy additional raw materials, something that the Bridge Loan does not appear to have provided. Finally, the Schedules of Assets and Liabilities filed by the Debtor in this case suggest that if the Debtor was not already insolvent at the time it entered into the Bridge Loan, it was rendered insolvent by the obligations incurred pursuant to that loan. *See* Case Dkt. 142 at 16 (Summary of Schedules) (showing $870,672.76 in assets and $18,428,210.02 in liabilities).

### c. Reasonably Equivalent Value

The unrefuted evidence identifies myriad ways in which the Debtor did not receive reasonably equivalent value in exchange for the obligations under the Bridge Loan and the liens granted to secure those obligations. The court will discuss each of the most salient issues, in turn.

### i. Roll-Up Transactions

On its Disbursement Statement #20, dated November 12, 2019, White Winston purports to have "disbursed" under the Bridge Loan $4,610,561.00 in principal and fees. Claims Dkt. 57 at 244. This coincides with a modification of the Bridge Loan of the same date, which purports to (i) increase the nominal principal amount of the facility from $750,000 to $6.25 million, and (ii) "roll" into the secured Bridge Loan approximately $3.7 million in unsecured debt owed to unsecured creditors other than White Winston. *See* Claims Dkt. 57 at 127-165; Case Dkt. 399 at 11:13-14:13. On that date, White Winston purports to have "disbursed" $3,798,061.06 to three unsecured creditors with respect to their claims, $625,000.00 to itself as a loan origination fee, and $187,500.00 to itself as a closing fee.

It does not appear that this transaction provided any value to the Debtor, let alone "reasonably equivalent value." First, it is undisputed that White Winston did not disburse any cash to anyone in satisfaction of these claims. Second, there is an objective basis to conclude that the agreements between White Winston and the other creditors with respect to the claims (i) are illusory, (ii) did not actually extinguish the Debtor's liability to those creditors, and (iii) to the extent they were actually executed, were not executed until many months after White Winston recorded these "disbursements" and began charging the Debtor interest on them.

Third, even if the underlying unsecured debts were extinguished in the transaction, in exchange for adding them to the Bridge Loan, the Debtor did not receive any value from it. Rather, the Debtor appears to have received a net economic *detriment*. By adding these debts to the principal balance of the Bridge Loan, they were converted from unsecured to secured debts, subjected to a higher interest rate, and were the basis of additional fees. Moreover, the unrefuted testimony of Jaime Dietenhofer is that the unsecured creditors, whose claims were the subject of this transaction, had not filed any lawsuit, taken any other action or threatened any action against the Debtor at the time of the transaction.

13

**MEMORANDUM OF DECISION**

### ii. Consulting Fees

The Disbursement Statements attached to the POC show that White Winston charged to the Bridge Loan and purportedly "disbursed" to itself at least $1,197,306.68 in "Consulting and Monitoring" fees. The unrefuted testimony of Jaime Dietenhofer is that these services provided no benefit to the Debtor, did not result in any work product or constructive advice to the Debtor, and are not supported by invoices that contain detail of the work performed—notwithstanding the contractual requirement in the "Consulting Agreement" attached as Exhibit 11 to the Dietenhofer Declaration that amounts would be due for consulting services only after "presentation of a detailed billing invoice." *See* Case Dkt. 399 at 14:16-15:14 & 51. Moreover, the Consulting Agreement provides that consulting services would be provided to the Debtor, prior to an Event of Default, "at the request of Client, either verbally or in writing (including email)." Dietenhofer's unrefuted testimony is that the Debtor never requested such services and, at least with respect to one business matter, had no need for them. Hearing Transcript, June 2, 2021 at 60:12-61:24. This evidence provides an objective basis to conclude that the Debtor did not receive reasonably equivalent value in exchange for the consulting fees it was charged under the Bridge Loan.[5]

Similarly, the Disbursement Statements show $97,842.50 in "disbursements" for "Third Party Services—Credit Admin & Acctg. By Hillcrest Capital." Dietenhofer's unrefuted testimony is that (i) Hillcrest Capital is an affiliate or alter ego of White Winston and/or its principals, (ii) Hillcrest provided no value to the Debtor, (iii) the Debtor never received work product or advice from Hillcrest, and (iv) the Debtor is not aware of what services Hillcrest purportedly provided. This evidence provides an objective basis to conclude that the Debtor did not receive reasonably equivalent value in exchange for the fees charged to the Bridge Loan in respect of Hillcrest Capital.

### iii. "Comfort Letter" Charges

On its Disbursement Statement #36, dated March 6, 2020, White Winston purports to have "disbursed" for the benefit of the Debtor $124,500 for "Amount potentially due Steve Almaraz per 2/20/20 Letter." Claims Dkt. 57 at 262. According to Dietenhofer's unrefuted testimony: (i) this charge refers to a "comfort letter" that White Winston entered into with Almaraz promising to pay him $124,500 if he was terminated by the Debtor; (ii) Almaraz was not terminated at the time of the disbursement statement; and (iii) Almaraz was terminated after the Petition Date, when he was furloughed and then decided to leave voluntarily. Moreover, on June 22, 2021, the Court held a hearing on approval of a compromise of Almaraz's claims against the Debtor, pursuant to which the Debtor has agreed to pay Almaraz just over $51,000. The Court approved the compromise and entry of an order is pending. It is clear from this record that White Winston did not disburse $124,500 for the benefit of the Debtor at the time of the Disbursement Statement or anytime thereafter, and there is an objective basis to dispute whether the Debtor received reasonably

---

[5] Although by no means necessary to this conclusion, the Court notes that the evidence suggesting an ulterior motive on the part of White Winston and Enright provides additional support. There is an objective basis to conclude that White Winston and Enright were using their roles as a lender and "consultant" to exacerbate the Debtor's distress and position White Winston to acquire the Debtor's assets. This casts further doubt on the extent to which any "consulting" services actually conferred value on the Debtor.

equivalent value in exchange for the amount purportedly "disbursed" with respect to the Almaraz comfort letter and the interest accrued on that amount.

Also, on its Disbursement Statement #36, White Winston purports to have "disbursed" for the benefit of the Debtor $60,000 for "Amount potentially due Jen Pommier per 2/20/20 Letter." Case Dkt. 57 at 262. According to Dietenhofer's unrefuted testimony: (i) this charge refers to a "comfort letter" that White Winston entered into with Pommier promising to pay her this amount if she was terminated by the Debtor; (ii) Pommier was never terminated by the Debtor, but instead left voluntarily to take another job, and (iii) based on conversations with Pommier, Dietenhofer does not believe Pommier was ever paid such amount by White Winston. Accordingly, there is an objective basis to dispute whether the Debtor received reasonably equivalent value in exchange for the amount purportedly "disbursed" regarding the Pommier comfort letter and the interest accrued on that amount.

### iv. Miscellaneous Accruals for "Unbilled" Amounts

Disbursement Statement #36, dated March 6, 2020, shows a charge in the amount of $606,720.27, described as "Other Accruals/Reserves per Standstill Agreement." This total corresponds to the following amounts detailed in the claim backup materials produced by White Winston:

```
$ 150,000.00   Accrued expenses: Unbilled C&M Fees
$  63,365.13   Accrued expenses: Montecito Bank payments
$  75,000.00   Accrued expenses: Unbilled legal fees
$ 318,355.14   Accrued expenses: Unbilled Professional/Liquidation Fees
```

Case Dkt. 400 at 5.

It does not appear that most of these funds were actually disbursed (although there is some uncertainty about the Montecito Bank payments) or that the Debtor otherwise received reasonably equivalent value in exchange for incurring these charges—most of which appear to be for "unbilled" amounts—and for the interest accrued thereon. Moreover, even if these amounts ultimately were expended, it is not clear when they were expended and exactly for what purpose. Thus, the Court finds an objective basis to dispute whether the Debtor received reasonably equivalent value in exchange for incurring most of these obligations.

### v. Travel and Legal Reimbursements

White Winston billed the Debtor for $141,998.14 for travel expense reimbursements. Dietenhofer's unrefuted testimony provides an objective basis to dispute whether some or all of these obligations conferred any benefit on the Debtor. Case Dkt. 399 at 15:16-16:12 & Ex. 12. For instance, Dietenhofer testifies that after February 2020, no representative of White Winston traveled to California to visit the Debtor, yet White Winston billed the Debtor for travel charges after that day of over $43,027.24.

Further, there is evidence suggesting that White Winston billed for first class travel and lodging, including for hotel rooms in Massachusetts, where the Debtor has no operations or personnel. Even if one assumes for the sake of argument that the Bridge Loan was beneficial to the Debtor, and agreeing to the reimbursement of reasonable travel expenses necessitated by the Bridge

15

**MEMORANDUM OF DECISION**

Loan transactions was a reasonable and necessary cost of those transactions, it does not follow that unreasonable, unrelated and/or fraudulent charges charged to the loan constitute such a cost.

A similar problem exists with respect to legal fees. White Winston charged the Debtor more than $300,000 in legal fees, plus interest and fees on those charges. What were those charges for? Was the work actually performed? Was the work a reasonable and necessary expense incurred in connection with a transaction that benefitted the Debtor? These are legitimate questions. Yet the unrefuted testimony is that White Winston has never provided the Debtor with backup invoices or billing statements for these charges. Accordingly, the Court finds that there is an objective basis to challenge whether the Debtor received reasonably equivalent value in exchange for these obligations.

### vi.  Interest

The POC asserts $1,061,177.31 in "Advances for Accrued Interest (Capitalized)." Some portion of this amount constitutes an obligation for which the Debtor did not receive reasonably equivalent value. As reflected in the Disbursement Statements, every charge under the Bridge Loan was treated as an "advance," regardless of whether it was an actual advance of principal to or on behalf of the Debtor, capitalized interest, reimbursement of some cost incurred by a third party, or a fee charged by White Winston. Based on the Court's analysis above, Debtor did not receive reasonably equivalent value for many of these obligations. This is likewise true of the interest charged on those obligations, as well as any interest charged on such interest.

### vii.  Acknowledgements and Releases.

In its papers and at the hearing on the Motion, White Winston emphasized that on multiple occasions the Debtor signed acknowledgements of the amounts due under the Bridge Loan "without defense or offset" and broad releases in favor of White Winston. White Winston argues these constitute waivers that preclude relief on both the Debtor's claim objections and its affirmative claims against White Winston.

Whatever their impact on contractual claims and defenses, these agreements could not have waived any avoidance action for recovery of a constructively fraudulent transfer. This is because avoidance causes of action belong to the estate and may only be asserted or waived by a representative of the estate, i.e., a trustee or debtor in possession. The Debtor could not have waived any such action because prepetition the estate did not exist, and the Debtor was not the debtor in possession. *See In re Physiotherapy Holdings, Inc.*, 2016 WL 3611831, at *14 (Bankr. D. Del. June 20, 2016).

### d.  Good Faith Value Defense

The overarching question presented by the Debtor's avoidance action for constructive fraudulent transfer under section 548 is whether the value of what the Debtor received was reasonably equivalent to the obligations that White Winston asserts against the Debtor in the POC. The foregoing analysis shows that there is an objective basis to conclude otherwise to avoid the Bridge Loan transactions in their entirety, and thereby avoid the obligations asserted in the POC.

White Winston undoubtedly will argue at trial that it is entitled to a claim and/or lien to the extent it provided value in good faith. But the record before the Court at this juncture is inadequate

for the Court to determine whether and to what extent White Winston may be entitled to such a defense.

Understanding exactly how much value was received by the Debtor from White Winston is complicated by several factors. First, the Bridge Loan was structured as a revolving loan, in which all the Debtor's collections to a certain lockbox account were treated as payments of the loan and then certain amounts readvanced. Thus, the principal amount fluctuated regularly. Second, as noted, every debit under the Disbursement Statements was treated as an "advance," regardless of whether it was merely a release of collateral, an actual advance of new value, a fee, a reimbursement, or accrued interest. Third, interest was accrued and compounded over time on all these amounts. Given these circumstances, the Court is unable to unravel these transactions and calculate with any certainty the amount of value *actually* conferred on the Debtor by White Winston. In the context of the Motion—as it will be at trial—the burden to show the extent of any value given is squarely on White Winston. It has not done so.

Furthermore, White Winston has not established that any value it conferred on the Debtor was given in good faith. Although White Winston has argued that Dietenhofer's testimony was too "conclusory" to substantiate any of the claims asserted against White Winston, the Court finds that it did provide objective evidentiary support for the Debtor's contentions that White Winston used the Bridge Loan transactions to exert financial and operational control over the Debtor, exacerbate the Debtor's financial difficulties, increase the Debtor's indebtedness to White Winston and thereby enhance White Winston's leverage—all with the ultimate objective of acquiring ownership of the Debtor's assets. Nothing in the Mahoney Declaration or the cross-examination of Dietenhofer has persuaded the Court otherwise.

### 3. Other Theories

Because the Court finds ample evidence of a genuine dispute based on the Debtor's section 548 avoidance action, the Court finds it unnecessary to address the Debtors' other asserted theories. The Court expresses no opinion about the merits of those disputes.

### IV. CONCLUSION

For the foregoing reasons, the Court finds "cause" pursuant to Bankruptcy Code section 363(k) to deny White Winston the opportunity to credit bid the White Winston Claim, in any amount, in connection with any sale of the assets of the Debtor's estate. Accordingly, the Court will enter a separate order granting the Motion.

Date: July 2, 2021

Martin R Barash
United States Bankruptcy Judge